UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THOMAS E. PEREZ,                                  )
SECRETARY OF LABOR,                         )          FILE NO. 15-205-CG-M
UNITED STATES DEPARTMENT OF LABOR,   )
                                                              )
                     Plaintiff,                       )
                                                              )
          v.                                             )
                                                              )
LEAR CORPORATION EEDS AND INTERIORS, )
and RENOSOL SEATING, LLC                     )
                     Defendants.                    )

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S APPLICATION
FOR A TEMPORARY RESTRAINING ORDER AND
ORDER FOR DEFENDANTS TO SHOW CAUSE WHY
A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Thomas E. Perez, Secretary of Labor for the United States Department of Labor ("the

Secretary"), submits this memorandum of law in support of his Application for a Temporary

Restraining Order enjoining Defendants Lear Corporation EEDS and Interior ("Lear") and

Renosol Seating, LLC ("Renosol") (collectively "the Company" or "Defendants") from engaging

in and threatening retaliation against the Company's current and former employees. As discussed

below and in the accompanying affidavits, the Occupational Safety and Health Administration,

United States Department of Labor ("OSHA"), is currently investigating Defendants to

determine whether they have violated § 11(c) of the Occupational Safety and Health Act of 1970,

29 U.S.C. § 660(c) ("OSH Act" or "the Act").  Defendants are fully aware of this investigation

and have unlawfully interfered with this federal investigation in several ways.  Defendants have

intimidated, threatened, suspended, and terminated employees of the Company who have

participated in the Department of Labor investigation and otherwise engaged in protected activity.

Even more, Defendants filed a Verified Complaint and a Motion for Temporary Restraining Order and Preliminary Injunction against one of their former employees, Ms. Kimberly King, causing a Temporary Restraining Order to be issued against her in the Circuit Court of Montgomery Court, Alabama.[1]  The language of the Temporary Restraining Order is very broad and prohibits Kimberly King from

> "Directly or indirectly, intentionally engaging in conduct that interferes with Lear's business and contractual relations; Making any statements defaming Plaintiff, whether made to **Plaintiff's customer or any other person or entity**; and Destroying or concealing any emails and electronic records or any other documents relevant to this matter pending the end of the litigation.

(Emphasis added).  A reasonable interpretation of the Temporary Restraining Order is that Ms. King is now prohibited from making statements (potentially considered defamatory by Defendants) to OSHA about her safety and health concerns; this is extremely problematic and demands immediate resolution.   Further, the matter is currently set for hearing on Lear's request for a preliminary injunction on April 15, 2015, making the Secretary's request for a Temporary Restraining Order all the more time- sensitive and urgent.

In the Verified Complaint filed against Ms. King, Defendants allege that she engaged in Intentional Interference with Business Relations and Defamation.  Lear Corporation is a publicly traded Fortune 500 company with 235 locations, in 34 countries, with 132,000 employees.[2]  Colon Aff. ¶ 7.  By contrast, Ms. King was a long-term loyal employee of more than nine years, working for an hourly wage of $12.25 an hour.  Colon Aff. ¶s 7-8.  The disparity in power,

---

[1] Copies of the Defendants' filings are attached to Exhibit A, the Affidavit of Gloria Colon ("Colon Aff.") as exhibits; a copy of the restraining order is attached as Exhibit C to the Colon Aff; copies of the documents filed in support thereof are attached as Exhibits D and E to the Colon Aff.

[2] The information cited about Defendant Lear was obtained on its website, at http://lear.com/en/about/history.aspx.

control, resources, and the ability to inflict harm is clear in the relationship between Ms. King and Defendants.  Defendants' lawsuit and legal actions against Ms. King are only additional tools of harassment the Company is utilizing to unlawfully retaliate against Ms. King, and other current and former employees.  Accordingly, the Secretary respectfully requests that Defendants be enjoined from threatening, retaliating against, and/or otherwise harming current and former employees of the Company in any manner.  The Secretary also requests that Defendants be required to cease initiating retaliatory litigation against employees.  The Secretary further requests that Defendants be required to allow a representative of the Secretary to inform the employees of their rights under the OSH Act.

This request is urgent.  The Secretary's current investigation and future enforcement action are threatened with irreparable harm if Defendants are allowed to continue to retaliate against the Company's employees through its acts of intimidation for engaging in protected activities.  Such threats, if successful, will prevent witness participation not only in this investigation and enforcement action, but also in other cases by deterring other workers from exercising their right to communicate with the government without fear of retaliation.  Defendants must be prevented from continuing such unlawful conduct lest their threats be carried out again and more employees lose their livelihood or suffer other harm, including being made the subject of baseless retaliatory legal action.

The public interest favors the enforcement of labor and employment laws to protect employees from violations of the fundamental protections of the OSH Act.  Congress adopted the OSH Act "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and preserve our human resources."  29 U.S.C. § 651(b); *Cape and Vineyard Div. of New Bedford Gas v. OSHRC*, 512 F.2d 1148, 1150 (1st Cir. 1975) ("The [OSH]

Act's goal is to eliminate dangerous conditions in the workplace."). Additionally, the OSH Act protects employees from discrimination when an employee has filed any complaint or instituted or caused to be instituted any proceeding related to workplace health and safety. 29 U.S.C. § 660(c)(1). These important public interests are served by ensuring that government investigations and judicial proceedings, including all communications by employees to the Secretary, are free from witness intimidation.

Here, the balance of interests tips sharply in favor of the Secretary. Allowing Defendants to continue flouting the OSH Act's protections by threatening, frivolously suing, and suspending or terminating employees who are perceived to be cooperating with the Secretary will deter the Defendants' employees from communicating with the Secretary and thereby irreparably harm the Secretary's investigation and future enforcement efforts. If Defendants are not enjoined and their threats, suspensions, vexatious litigation, and terminations continue to be carried out, additional employees will suffer the irreparable harm at the hands of Defendants. By contrast, if the Court grants the requested relief to the Secretary, the Defendants would bear only the minimal burden of ceasing their interference with the Secretary's investigation.

Thus, the Secretary respectfully requests the Court enter an order enjoining Defendants from threatening, retaliating against, and/or otherwise harming current and former employees of the Company in any manner. To further protect the rights of employees, the Secretary additionally requests that Defendants be required to permit OSHA to inform employees of their rights under the OSH Act.

## I.   BACKGROUND

### A.  OSHA's Health Investigation of Renosol's Workplace

OSHA conducts investigations to determine compliance with health and safety standards promulgated under the OSH Act.  OSHA also investigates alleged violations of anti-retaliation provisions under 22 statutes, including the Section 11c of the OSH Act, 29 U.S.C. §660(c).  *See* attached affidavit of Joseph Roesler, hereinafter "Roesler aff.", at ¶ 1.   An OSHA investigation was conducted at the Selma, Alabama, plant of Renosol; the investigation began on May 27, 2014, after OSHA received employee complaints to exposure to Toluene Diisocyanate ("TDI"). Roesler aff., at ¶ 3.  TDI is a colorless to pale yellow liquid.  It is odorless until it reaches a concentration level of 0.17 to 3.2 parts per million ("ppm"), which is a concentration well above OSHA's Permissible Exposure Limit ("PEL").  Exposure to TDI can result in symptoms ranging from severe irritant effects on mucous membranes, the respiratory tract, and the eyes to an acute attack of asthma-like syndrome.  High concentrations may lead to chemical bronchitis with severe bronchospasm.  In all cases, it may lead to sensitization and workers may continue to exhibit effects for several years after removal from TDI exposures. Roesler aff. at ¶ 4.

As part of its investigation of the hazards complained of, OSHA conducted various tests to determine the presence of and exposure to TDI, including both respiratory and dermal exposure. Roesler aff. at ¶ 5.  Renosol did not permit the testing voluntarily; OSHA had to obtain a warrant to do testing. Roesler aff. at ¶ 6.   OSHA personnel participating in the investigation reported that, once OSHA executed the warrant to conduct testing, many employees appeared fearful or reluctant to cooperate in the testing.  Consequently, some of the sampling was conducted by placing the testing equipment on OSHA personnel.  Roesler aff. at

¶ 7.  Renosol filmed every part of the testing.  Roesler aff. at ¶ 8.  Part of OSHA's investigation involved conducting air monitoring to determine respiratory exposure. OSHA tested for two types of TDI; TDI 2,4 and TDI 2,6.  Roesler aff. at ¶ 9.

Under OSHA's current standards, the PEL for 2,4 TDI is 0.14mg/m3.  For 2,6 TDI, OSHA does not have a PEL and, therefore, relies on the American Conference of Government Industrial Hygienists' Threshold Limit Values ("TLV").  The TLV for 2,6 TDI is 0.005ppm.  The sampling for 2,4 TDI revealed exposures up to 0.0049mg/M3, and sampling for 2,6 TDI exposure levels up to 0.0011ppm.  However, respiratory exposure to the levels found here can cause health problems such as asthma.  Moreover, OSHA found that Renosol's employees suffered dermal exposure, which can also cause health problems such as allergic and irritant contact dermatitis as well as occupational asthma.  Roesler aff. at ¶s 10-13.

At the conclusion of OSHA's health investigation, on November 13, 2014, OSHA's Area Director in Mobile, Joseph Roesler, and the lead Compliance Officer participated in a closing conference with several representatives of Renosol: Connie Messer, Human Resources Manager; Kathy Jones, Environmental Health and Safety ("EHS") Specialist; Mike Walkowski, Director Foam; Gary Ansorge, Corporate/Regional Health and Safety Manager; Barbara Borough, Vice President of EHS; Christopher Jones, Plant Manager; and Zackary Welch, an Industrial Hygienist consultant. During the closing conference, OSHA told Renosol's representatives that OSHA's air readings were problematic and could cause a false sense of security.  OSHA informed Renosol's representatives that members from the OSHA's Office of Occupational Medicine, who reviewed employee medical records and came to Selma to speak with employees about their exposures, concluded that some

employees had occupational asthma related to their exposures at the facility.  Renosol representatives were also informed that, although they did not exceed OSHA's published PELs, the law required them to provide employees with a safe and healthy work environment and that employees were suffering from not only the chronic TDI levels, but also potentially from acute exposures resulting from leaks or spills of the TDI.  Indeed, Renosol's own monitors during upset condition, such as leaks or spills, showed a potential for acute exposures during the past 2 years.  Additionally, Renosol representatives were informed of the dangers of the dermal exposure, which can also result in occupationally related asthma. To address these hazards, OSHA recommended that Renosol install adequate ventilation; and move the TDI monitor to a place between the employees and the source of their exposure.  Roesler aff. at ¶s 14-16.

As a result of its investigation, OSHA issued citations to Renosol for failure to provide personnel protective equipment, failure to train regarding the hazards of TDI, and failure to correctly maintain injury and illness logs. Roesler aff. at ¶ 17 and Exhibit A hereto. OSHA and Renosol entered into an Informal Settlement Agreement on December 11, 2014. Pursuant to this agreement, Renosol paid penalties of $7,000; it also informed OSHA that Renosol has provided personal protective equipment, trained the employees, and updated their  injury and illness logs (OSHA-300 logs) as required by the agreement. Roesler aff. at ¶ 18.  However, Renosol has not stated that it implemented OSHA's recommendations regarding ventilation or moving the TDI monitor, which leads to the reasonable inference that Renosol has not implemented either recommendation. OSHA recently learned that one or more of the abatement actions may not have been implemented correctly, if at all.

Accordingly, it may become necessary to conduct a follow-up inspection to determine compliance with the agreement.  Roesler aff. at ¶s 19-20.

B. **Employees' Protected Activities and Whistleblower Investigation**

Gloria Colon is employed by OSHA as a Whistleblower Investigator ("WB Investigator") and, in this capacity, she conducts investigations to determine whether employers are complying with anti-retaliation provisions of 22 statutes, including Section 11(c) of the Act; she is located in the Tampa, Florida, OSHA office and reports to the Atlanta Regional Office, Whistleblower Protection Program. Colon aff. at ¶ 1.  In the course of performing her official duties, WB Investigator Colon was directed to conduct an investigation of Renosol to determine its compliance with Section 11(c) of the OSH Act.  The investigation, which is on-going, is a result of complaints submitted by three former or current employees of Respondent's, including Complainant Kimberly King.  The company was informed of these complaints, and OSHA's need to investigate them, on September 11, 2014.  Another investigator began the investigation process and the case was subsequently reassigned to WB Investigator Colon.  Colon aff. at ¶ 3.

According to its website,  Renosol Corporation formerly operated a joint venture with Lear Corporation involving its polyurethane formulations and seating businesses.  The joint venture operated plants in Farwell, Michigan; Hebron, Ohio; and Selma, Alabama. The joint venture ended in 2007 and, since then, the plants continue to operate under Lear Corporation's ownership as Renosol Seating, LLC.  Renosol Seating, LLC operates as a subsidiary of Lear Corporation.   Colon aff. at ¶ 4.  The complainants in this case are considered employees of Renosol Seating, LLC.  Colon aff. at ¶ 5.  Renosol Seating, LLC, and/or Lear Corporation manufacture and supply motor vehicle seating products throughout United States and abroad

and one of their customers is Hyundai Motor Manufacturing Alabama, LLC.  Colon aff. at ¶ 6.

      Ms. Colon's investigation to date has revealed that Kimberly King worked for Renosol as an hourly employee for about nine years until her termination on March 16, 2015.  Colon aff. at ¶ 8.  At the time of her termination, Ms. King earned $12.25 per hour.  Colon aff. at ¶ 9. Since at least July 2014, Ms. King and the other complainants have engaged in multiple protected activities under the OSH Act, including making complaints to OSHA and to management about health problems related to their working conditions. They have also spoken with the media about their work conditions at the plant and their concern for their health, and have participated in a YouTube video that included such discussions.  The first interview took place with NBC News and was released on July 14, 2014.  Colon aff. at ¶ 10 and Exhibit A thereto.  As evidenced in the articles and the YouTube video, Ms. King spoke about workers' exposure to TDI at the plant and her (and others') belief that this exposure causes respiratory problems.  In the video, Ms. King described suffering from a constant cough that she cannot control and her need to use three inhalers and a nasal spray, treatment that is costing her about $200.00 per month.  She explained that she tested positive for TDI on a test given by Dr. Carrie Redlich from Yale University.  Ms. King also stated that Defendants' management told the workers that OSHA's coming to the plant was not good for the company.  Additionally, Ms. King talked about being moved to the warehouse after bringing the health complaints. She stated that management moved her and the other two complainants to the warehouse to keep them from telling their co-workers about the health and safety issues.  Although management told them they were being moved because of their health, she questioned

management's motives because if they were moved because of their health then, she stated, "What about the other workers.  The other workers are exposed too."  Colon aff. at ¶ 11.

In March, 2015, Ms. King went to the Hyundai plant with others to deliver a letter asking Hyundai's management to help secure good, safe, and fair working conditions for the employees at the Renosol plant.  The letter (a copy of which is attached as Exhibit B to Ms. Colon's affidavit) was not written by Complainant King, but she and many others signed it. It was not actually delivered to Hyundai at that time, but was subsequently published on-line.  Ms. King states that she does not know who published it.  ."  Colon aff. at ¶ 12 and Exhibit B thereto.  The complainants explained to WB Investigator Colon that, after they started to participate in these protected activities, Renosol's management began  to  treat them  differently from the  other  employees at the  plant and engaged in a series of retaliatory actions against them. For example, immediately after the interviews with the complainants were released by the media, the complainants were pulled into a management office by, Human Resources Manager Connie Messer, Plant Manager Mike Walkowski, and Safety Manager Kathy Jones and questioned about the article.   These articles were released at different times by different media outlets and, according to the complainants, every time an article was released, they were pulled by company management into the office and questioned about their motives for participating in the article and asked who paid for it.  The complainants told  WB Investigator Colon  that  they believed they are being harassed by management because they participated in interviews by the media about their safety and health complaints. Colon aff. at ¶ 13.

On September 11, 2014, the complainants were transferred to a warehouse. The complainants were the only ones who were moved and were not given a choice about it.

They were told by management they were being moved because of their health.  However, the complainants told WB Investigator Colon that they felt isolated and that the other workers knew they were being transferred because of their media interviews.  Additionally, because of this transfer, the complainants were not able to take advantage of overtime as they did when they worked at the plant.  Colon aff. at ¶ 14.  Then, on January 21, 2015, Ms. King and another complainant each received a three-day suspension without pay for participating in the video about the working conditions and health concerns at the plant. Management offered to reduce the penalty to a one-day suspension if these complainants agreed to respond to the following questions:

> (a)  In making statements to the public that the air was unsafe when I knew all testing of the air showed it to be safe, what did I do wrong?
>
> (b) What are the consequences to the company when disparaging, false statements are made to the public? and
>
> (c)  How will I avoid violations in the future?

Colon aff. at ¶ 15.  Both of the suspended complainants state that they refused the offer to reduce the suspension because they felt they did nothing wrong by voicing their health concerns; they each lost approximately $221.00 because of the three-day suspension.  Colon aff. at ¶ 16.

Then, on March 9, 2015, Ms. King received a seven-day suspension without pay for attempting to deliver the letter to Hyundai (described above) on March 5, 2015. Colon aff. at ¶ 17.  When issuing her suspension, Human Resources Manager Connie Messer gave Ms. King a letter asking whether she accepted responsibility for acting with malice towards the company and making false statements.  Ms. Messer asked King to seriously consider

signing the letter as a condition for her continued employment. Colon aff. at ¶ 18.  Again, Ms. King refused to sign the letter because she felt she did nothing wrong by voicing her health concerns and complaining about the working conditions.  Colon aff. at ¶ 19.  On March 16, 2015, Ms. King was terminated when she returned to work from her seven-day suspension.  Colon aff. at ¶ 20.

The complainants expressed to WB Investigator Colon that they are intimidated by management's continuous retaliatory actions that started when they participated in the interview with NBC News in July 2014.  Colon aff. at ¶ 21.  Moreover, on or about March 25, 2015, WB Investigator Colon learned that Lear Corporation EEDS and Interiors obtained a temporary restraining order against Ms. King.  Issued by the Circuit Court of Montgomery County, Alabama, this restraining order forbids her from speaking to anyone about the health and safety conditions.  The language of the restraining order is so broad that it appears to even forbid her from speaking to government agencies.  Colon aff. at ¶ 22.  Given the way Ms. King and the other complainants have been treated,  it is reasonable to expect that other employees are afraid of being retaliated against in the same manner as complainants if they come forward with their concerns about their health and the working conditions in the plant.  Colon aff. at ¶ 23. Whistleblower investigations typically include, but are not limited to, reviewing records such as time sheets and company policies, and interviewing current and former employees in order to determine whether individuals were retaliated against because of their protected activities under the statute, in violation of the law.  Here, however, employees appear to be afraid to speak with WB Investigator Colon due to their fears of retaliation.  Further, WB Investigator Colon has reason to believe that management has told other employees, after the complainants were suspended, that adverse actions would be taken against them as well if they engaged in

similar protected activities. Colon aff. at ¶s 24-26.  Finally, OSHA has not been able to fully

conduct its whistleblower investigation due to the actions taken by the Company that have

interfered with the government's ability to thoroughly conduct its investigation.  Colon aff. at

¶ 27.

Defendants' intimidation, termination, suspension, and harassment of employees

thought to be cooperating with OSHA, or otherwise exercising their rights under the Act,

clearly constitute unlawful retaliation designed to chill cooperation with the government and

undermine the Secretary's ability to enforce the Act.

## II.     LEGAL AUTHORITY

### A.     Jurisdiction

Jurisdiction of this action is conferred upon the Court by Section 11(c)(2) of the OSH

Act, 29 U.S.C. § 660(c)(2), Fed.R.Civ.P. 65, and by 28 U.S.C. § 1345 (proceedings commenced

by the United States).

### B.     A Temporary Restraining Order Should Be Issued Restraining Defendants From Further Retaliation.

The temporary restraining order ("TRO") sought by the Secretary is an extraordinary

request forced by Defendants' serious and alarming actions of termination, suspension, and

threats of retaliation against employees who have participated in or who would like to participate

in the ongoing OSHA investigation.

To be entitled to a temporary restraining order, a plaintiff must meet a four-part test:  (1)

a substantial likelihood of success on the merits of his claim; (2) irreparable harm would occur

absent the injunction; (3) the harm suffered by the Plaintiff from a denial of the injunction

outweighs the harm suffered by the Defendant if the injunction were issued; and (4) no adverse

effect to the public interest.  *Tillman v. Miller*, 917 F. Supp. 799, 800 (N.D. Ga. 1995) *citing*

*Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561 (11th Cir. 1989); Fed.R.Civ.P. 65;

*see also Clincy v. Galardi South Enterprises, Inc.*, 2009 WL 2913208 (N.D. Ga. 2009) (granting

a temporary restraining order where an employer told employees they were being terminated for

filing a lawsuit under the FLSA, which was a "flagrant violation of the FLSA's anti-retaliation

provision"); *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (discussing

standard for preliminary injunction); *Johnson & Johnson Vision Care v. 1-800 Contacts, Inc.*,

299 F.3d 1242, 1246-47 (11th Cir. 2002) (discussing standard for preliminary injunction); *United

States v. Alabama*, 791 F.2d 1450, 1459 n. 10 (11th Cir. 1986), *cert. denied*, 479 U.S. 1085

(1987).

      As set forth below, the Secretary has plainly satisfied this test.

      ***1.    The Secretary is Likely to Succeed on the Merits of a Retaliation Claim.***

      "A substantial likelihood of success on the merits requires a showing of only likely or

probable, rather than certain, success." *United States v. Alabama*, 2011 WL 4863957, *5 (11th

Cir. Oct. 14, 2011) (citation omitted).  Here, it is likely or probable that the OSHA will prevail

on the merits of the retaliation claims, which are the basis for the current on-going OSHA

whistleblower investigation.

 Section 11(c) of OSHA, 29 U.S.C. § 660(c)(1) provides:

> No person shall discharge or in any manner discriminate against any employee
> because such employee has filed any complaint or instituted or caused to be
> instituted any proceeding under or related to this Act or has testified or is about to
> testify in any such proceeding or because of the exercise by such employee on
> behalf of himself or others of any right afforded by this Act.

      To establish a prima facie case, the plaintiff must show by a preponderance of the

evidence that (1) the employee engaged in protected activity; (2) the employer was aware of the

protected activity; (3) the employer took adverse action against the employee; and (4) a causal

connection exists between the protected activity and the adverse action.  *Chao v. Blue Bird*

*Corp.*, 2009 WL 485471 (M.D. Ga. 2009) (finding an employee was unlawfully discharged in retaliation for reporting a safety concern), *aff'd by Solis v. Blue Bird Corp.*, 404 Fed.Appx. 412 (11th Cir. 2010); see also *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1233 (11th Cir. 2006) (discussing factors under other anti-retaliation statute).  If a prima facie case is established, the burden shifts to the defendant-employer to articulate a legitimate, nondiscriminatory reason for the employment action; if articulated, the plaintiff must show that the defendant's reason was pretextual in order to prevail.  *Blue Bird at *3.* Here, the Secretary meets all four required elements to make his *prima facie* showing of retaliation and will further demonstrate that these unlawful acts of termination, suspension, intimidation and threats will continue without relief from this Court.

a.      *Protected Activity*

As set forth above, the language of the statute is very broad, protecting employee complaints on behalf of him/herself or others and exercise of <u>any </u>right afforded by this Act. Those rights include the statutory right to a safe and healthy workplace as well as a workplace free of retaliation.  Thus, employees engaged in protected activity when they reported their concerns regarding exposure to TDI to various people, including OSHA and Defendants' management.  See, *e.g.*, *Ridgley v. U.S. Dept. of Labor*, 298 Fed. Appx. 447 (6th Cir. 2008) (Complaints to employer constitute protected activity).  Moreover, the statute does not restrict the assertion of rights to complaints with any particular person or entity.  Thus, it is clear that Defendants' employees have engaged in protected activity, through reporting their concerns of TDI exposure and then by reporting to OSHA the retaliation faced after bringing concerns of the condition to management's attention.

b.      *Employer Awareness of Protected Activity*

Defendants were aware that Ms. King and other employees were engaging in the protected activity of notifying the Company, OSHA, and others of their health and safety concerns.  Employees continued to engage in protected activity when they reported to OSHA the retaliation they faced as a result of having reported safety violations.  Additionally, Defendants are officially on notice of OSHA's investigation of 11(c) whistleblower violations, as the Defendants have received letters from OSHA telling them of the investigation.  Colon aff. At ¶ 3.  Further, protected activity need not be actually known by the employer; employer suspicion or belief of an employee's protected activity is also sufficient to establish employer knowledge. See *Reich v. Hoy Shoe Co. Inc.,* 32 F.3d 361 (8th Cir. 1994).

> c. *Adverse Action*

Defendants' employees who are the subject of OSHA's current whistle-blower investigation, have clearly suffered materially adverse employment actions, including harassment, suspension, vexatious litigation and termination.  Two employees participating in OSHA's were suspended for engaging in protected activity, and one Complainant was actually terminated for engaging in protected activity.  Additionally, employees participating in OSHA's investigations have continually been questioned by management following their meeting with OSHA.   Defendants have even sued one employee and a restraining order has been issued against her.

The U.S. Supreme Court has made clear that retaliation "is not limited to [adverse employment actions] that affect the terms and conditions of employments." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 64 (2006).   Rather, an employment action is cognizable as adverse when it is reasonably likely to deter employees from engaging in protected activity.  See *Id. at* 64; *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000); *Poole*

*v. City of Plantation*, 2010 WL 4063728 (S.D. Fla. 2010) (holding as adverse actions against

employees, including suspension, frivolous criminal investigation, frequent transfers to other

shifts, denial of overtime, and physical threats); *Crayton v. Valued Services of Alabama, LLC*,

2010 WL 3522407 (M.D. Ala. 2010) (holding as adverse actions against a store manager,

including failure to respond, or to respond timely, for requests for assistance at her store;

demotion; repeated and unwarranted audits of her store; and threatened termination); *Ramos v.

Hoyle*, 2009 WL 2849093 (S.D. Fla. 2009) (finding adverse the filing of a counterclaim to an

employee's FLSA action).    Former employees are also protected from retaliatory acts after they

have voluntarily left the defendant's employ.  *See Phillips v. M.I. Quality Lawn Maintenance,

Inc.*, 2010 WL 4237619 (S.D. Fla. 2010).

      1.  **Defendants' Filing of Verified Complaint and Motion for Temporary
          Restraining Order and Preliminary Injunction Against Ms. King is a Retaliatory
          Adverse Action**

      The Defendants' circuit court lawsuit constitutes an action that is unlawfully retaliatory.

In *Burlington Northern*, the Supreme Court held that the "anti-retaliation provision [in Title VII]

does not confine the actions and harms it forbids to those that are related to employment or occur

at the workplace," and includes those employer actions taken against an employee that would

have been "materially adverse to a reasonable employee." 548 U.S. at 57. The Court held that an

employer's actions constitute an "adverse action" when they would dissuade a reasonable worker

from making or supporting a charge of discrimination. *Id.*

      The Supreme Court has recognized that legal proceedings can be a potent weapon

against employees who assert statutory rights and may constitute actionable retaliation. See *Bill

Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 740-41 (1983).  Several federal courts have held that

retaliatory lawsuits, and even retaliatory counterclaims, constitute adverse actions. See *EEOC v. Outback

Steakhouse of Fl., Inc*., 75 F.Supp.2d 756, 758 (N.D. Ohio 1999) (holding that an employee states a claim

for retaliation under Title VII when faced with an employer's counterclaim); *Darveau v. Detecon, Inc.*, 515 F.3d 334, 341-42 (4th Cir. 2008) (holding that adverse action includes an employer's state fraud suit filed in retaliation for an FLSA overtime claim); *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) (holding that "by initiating its groundless counterclaims, [the employer] engaged in an adverse employment action" under the FLSA).   Here, any reasonable employee would consider the lawsuit at issue, which seeks a broad range of damages, to be materially adverse and retaliatory.  Defending such a lawsuit will be time-consuming and stressful, and could be financially devastating to an employee. The lawsuit would dissuade a reasonable employee from making or supporting a charge of discrimination under Section 11(c) of the OSH Act.

The litigation commenced by Defendants against former employee Kimberly King is meritless and designed with the intent to create a chilling effect within Defendants' employee ranks.  Specifically, the lawsuit is intended to silence those who would otherwise be willing to participate in OSHA's investigation and otherwise seek to address health and safety concerns. Defendants' objective is not to prevail on its underlying claims, but rather to restrict employees' exercise of rights in petitioning or complaining to OSHA about violative workplace conditions. As large publicly traded corporate entities, Defendants are well aware of the financial advantage they have relative to one of their former employees, Kimberly King.  Defendants' transparent intention against Ms. King is to increase her litigation costs and intimidate her to a point that she abandons her claims and is unable to exercise her rights under the Act.  Additionally, Defendants seek to silence other employees who would otherwise participate in the government's investigation or  assert their rights under the Act, by sending the message that reporting your health and safety concerns could deem you subjected to expensive and time consuming litigation. Defendants' litigious actions against Ms. King are unlawfully retaliatory.

*d.*     *Causal Connection*

A causal connection may be demonstrated by direct as well as circumstantial evidence. *Perez v. Renaissance Arts and Educ., Inc., 2013 WL 5487097, at *2 (M.D. Fla.* 2013)(discussing provision under the OSH Act)(citing *Reich v. Hoy Shoe, Inc*, 32 F.3d 361, 365, n. 4 (8th Cir. 1994).  Generally, the plaintiff must show a causal connection between the protected activity and the adverse employment action.  To do so, a plaintiff must only produce "evidence that 'the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (citation and quotation marks omitted).  In this matter, the complainants have direct evidence that their reporting of health concerns to Defendants' management and OSHA resulted in adverse action.[3]  Indeed, Defendants' basis for seeking a TRO against Ms. King is her engagement in protected activities, namely, her discussion of conditions at the plant and the negative impact of those conditions on her. See Colon  aff. ¶s 10-22 and Exhibits c, D, and E thereto.  Under the guise of alleging "defamation" and tortious interference with contracts, **Defendants' entire goal in seeking a TRO is to silence Ms. King from continuing to speak out, in other words, to stop her from engaging in protected activities.**

Moreover, the Eleventh Circuit has noted that it "construe[s] the causal link element broadly." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  Indeed, the Supreme Court has held that close temporal proximity alone can indicate causation if the "proximity between an employer's knowledge of protected activity and an adverse employment

---

[3] Similarly, in its Verified Complaint, Defendant Lear admits that it twice suspended Kimberly King when she did not provide the employer "supporting facts" to substantiate her reports of illness and TDI in the workplace during an internet video that was posted on-line via Facebook.  See Verified Complaint, page 4.  See also Colon aff.

action . . . is 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Even relying on indirect evidence, Plaintiff is likely to prevail.

Thus, there can be little doubt here, that Defendants' threats of retaliation, suspensions, termination, a vexatious lawsuit and other intimidation of employees are in response to Defendants' belief that employees engaged in the protected activities of filing complaints regarding their health concerns and asserting their rights under the Act. This is precisely the type of intimidation that the OSH Act's anti-retaliation provision was designed to prevent.

e.     Pretext

The Company has claimed that Ms. King and others have engaged in defamation and tortious interference though the letter to Hyundai. The letter however, raises legitimate health concerns which Ms. King and others are trying to have fixed. These alleged "defamatory" statements are, in fact, protected activities under the OSH Act. Accordingly, as shown above, these statements are precisely those that constitute protected activity under the Act.

The Secretary can prove that Defendants' stated reasons for its actions are pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). Evidence of pretext "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (quotation omitted). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000); *see Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2004) (holding that the factual issue is not whether a plaintiff is a good employee or the accuracy of the employer's conclusion that the plaintiff was an unsatisfactory employee, but whether the conclusion is an honest one).

Here, Defendants have plainly violated the OSH Act's 11(c) investigatory provision by retaliating against employees through meritless litigation, intimidation, threats, suspensions and termination.  Such actions have especially hampered the Secretary's ability to determine the extent of any OSH Act 11(c) violations, because the Secretary must speak with the employees freely to determine  whether or not retaliation has taken place.  The Defendants' actions have hampered the Secretary's ability to fully investigate because of the chilling effect Defendants' actions have had on employees at the plant.  See Colon Aff. at ¶s 21, 23, 25, 26 and 27.  The Secretary depends on honest, forthright information from employees to enforce the OSH Act.

> 2. *The Secretary and Defendants' Current and Former Employees Will Continue to Suffer Irreparable Harm Absent a Temporary Restraining Order.*

The protections afforded by the OSH Act, including workplaces meeting certain health and safety standards, can only be effective if the anti-retaliation provision is strongly enforced. As the Supreme Court has explained, "effective enforcement . . . could only be expected if employees felt free to approach officials with their grievances . . . [I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees to quietly accept substandard conditions."  *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 335 (1960); *see also Centeno-Burnuy v. Perry*, 302 F. Supp. 2d 128, 137 (W.D.N.Y. 2003) ("Unchecked retaliation, no matter its form, subverts the purpose of the FLSA"); *See also Clincy v. Galardi South Enterprises, Inc.*, 2009 WL 2913208 (N.D. Ga. 2000) ("The anti-retaliation

provision of the FLSA is intended to allow employees to seek vindication of their statutory rights without the fear of reprisal.").   The chilling effect on workers prevents the Secretary from exercising his authority to investigate by limiting the Secretary's ability to interview workers and learn of potential OSHA violations.  Retaliatory termination also carries with it the risk that other similarly situated employees will be deterred from protecting their own rights.

Irreparable harm is particularly likely to result in this case.  Defendants' actions and threats to the Company's current and former employees has already succeeded in forcing employees to limit their communication with OSHA and has created a chilling effect preventing other employees from initiating discussion with OSHA.  See Colon Aff. at ¶s 21, 23, 25, 26 and 27.  Forcing individuals with claims under the OSH Act to choose between pursuing their claims or maintaining their employment results in irreparable harm.  *Clincy,* 2009 WL at *2 (finding irreparable harm where employees were put in the position of either being terminated or pursuing their FLSA claims); *see also Allen v. Suntrust Banks, Inc.*, 549 F. Supp. 2d 1379 (N.D. Ga. 2008) (finding irreparable harm where employees were put in a position of either obtaining a severance package or pursuing their FLSA claims).  Should these actions and threats continue to be allowed unchecked, the Secretary's ability to enforce the provisions of the OSH Act will be seriously compromised.  In conducting investigations into employers' health and safety practices and whether or not retaliation is occurring, the Secretary of Labor relies on the testimony of workers. Without assurances that employees who cooperate with the government are protected from retaliation, the Secretary cannot effectively enforce the law.  Defendants' conduct directly interferes with the Secretary's enforcement powers in its ongoing investigations.

It is well-established that an employer's retaliatory acts can irreparably harm employees, particularly where those acts deter potential complainants or witnesses from coming forward to

challenge the employer's illegal conduct.  *See Holt v. Cont'l Grp., Inc.*, 708 F.2d 87, 91 (2d Cir. 1983) ("A retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their own rights . . . or from providing testimony for the plaintiff in her effort to protect her own rights.  These risks may be found to constitute irreparable injury."); *Bonds v. Heyman*, 950 F. Supp. 1202, 1214-15 (D.D.C. 1997), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 546 U.S. 101, 105 (2002) ("[A] plaintiff who demonstrates that an adverse personnel action is likely to have a chilling effect on other employees who, after witnessing their fellow co-worker's discharge or dismissal, would now refuse to file claims in fear of reprisals, would also meet [the irreparable injury standard]"); *see also Carrillo v. Schneider Logistics, Inc.,* 2012 WL 556309 (C.D. Cal. 2012) ("courts routinely recognize that retaliatory discharges deter workers from vindicating their statutory rights and seeking access to courts, and that these injuries constitute irreparable harm").

The current and former employees are likely to suffer irreparable harm in this case if Defendants are not enjoined from terminating, threatening to terminate, suspending, frivolously suing, harming, or threatening to harm employees.  These statements have already had a chilling effect on the Defendants' employees. See Colon Aff. at ¶s 21, 23, 25, 26 and 27.   Allowing Defendants to continue these threats and retaliatory actions will further chill cooperation with the Secretary's investigation and prevent employees from asserting their rights under the OSH Act. Based on these threats, employees will continue to be fearful of losing their jobs or worse if Defendants continue their threatening and retaliatory conduct.

        3.      *Without an Order Enjoining Further Actions and Threats by Defendants, the Irreparable Harm Suffered by the Secretary and Defendants' Current and Former Employees Will Exceed Any Potential Harm Suffered by the Defendants if an Order Enjoining Defendants is Issued.*

The employees' "fear of economic retaliation" is inducing them "to quietly accept substandard conditions." *Kasten*, 131 S. Ct. at 1333 (quoting *Robert DeMario Jewelry*, 361 U.S. at 292). Without assurances from the Court that witnesses who cooperate with the government are protected from retaliation, the Secretary cannot effectively enforce the law in this case, thereby hampering other current and future investigations by the Secretary in this community. If this Court does not enter the relief sought, Defendants will continue to threaten and intimidate potential complainants and witnesses, preventing the Secretary from exercising his authority under Section 11(c) of the OSH Act to determine the full scope of Defendants' violations of the OSH Act, and harming the Secretary's future investigations.

        4.      *The Balance of Equities Tilts Sharply in the Secretary's Favor and an Injunction is in the Public Interest.*

In balancing the hardship that may result from the issuance of an injunction, the public interest is entitled to great consideration. The balance of equities tilts sharply in the Secretary's favor, and entering the temporary restraining order is in the public interest. *See Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolly*, 572 F.3d 644, 657-58 (9th Cir. 2009). Defendants have no legitimate interest in preventing the Secretary from exercising his investigative authority granted by Section 11(c) of the OSH Act. Further, Defendants have no legitimate interest in the termination or continued harassment of current or former employees in retaliation for those workers engaging in protected activities under the OSH Act. Moreover, the Secretary only requests that Defendants be required to comply with the law and that the employees be informed

of their protected rights under the OSH Act.  *Perez v. Fatima/Zahra, Inc.*, 2014 WL 2854812 (N.D. Cal. 2014).

Restraining Defendants from engaging in harassing and retaliatory contact toward their current and former employees pending the outcome of the OSHA investigation and any ensuing litigation will ensure that Defendants comply with the OSH Act's anti-retaliation provision and ensure that vulnerable employees are able to participate without fear of termination or other harm.   Similarly, the posting of a Notice of Rights and the subsequent reading of that Notice to employees will assist in reducing the hostile environment and the employees' current level of fear of retaliation, including being served with a lawsuit.  The reading of the public Notice of Rights corrects this misinformation by informing employees that they are protected by the OSH Act, they have a right to freely participate in the investigation or voice their concerns in other ways, and that any threats or retaliation based upon those protected activities is unlawful.  Also, training Defendants' managers at the Selma, Alabama facility on Section 11(c) of the OSH Act would also greatly benefit the employees and assist in creating a hostility-free workplace.

The hardship to the Defendants is negligible, as the Secretary merely seeks to ensure that these workers are allowed to exercise rights they already have under the law.  Enjoining Defendants is necessary to further public policy, and poses no hardship to the Defendants.  See, e.g., *Aguilar v. Baine Service Systems, Inc.*, 538 F. Supp. 581, 585 (S.D.N.Y. 1982) (ordering employer to reinstate employee, holding that "[o]n the one hand, if an injunction is not forthcoming, plaintiffs lose their livelihood and sole financial means" and that "if an injunction does issue, defendants will merely be required to retain the plaintiffs in their current employ"). The facts of this case warrant injunctive relief.

In sum, Defendants have created an environment hostile to employees' vindication of their rights.  Step by step, over a short time period, they have intimidated employees through numerous actions: expressing hostility toward OSHA, discouraging cooperation during OSHA's health inspection, aggressive interrogation, suspension, termination, and most recently a lawsuit and restraining order – a public and brash display of silencing an employee from speaking about valid health concerns that were also found by OSHA, a government agency tasked with conducting health inspections.  Defendants cannot be allowed to continue on this path with impunity.

## III.     CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court enter a Temporary Restraining Order giving full and fair notice to employees that this Court will not permit any retaliation suffered at the hands of the Defendants to continue.  The Secretary asks the Court to grant his motion and:

1)   Enjoin Defendants from terminating, suspending, harassing, suing, threatening, intimidating, or taking any other discriminatory/retaliatory action against any current and/or former employee based on Defendants' belief that such employee exercised any rights he/she has under the OSH Act, rights that include but not limited to: filing complaints with the Secretary; filing complaints with Defendants or with any other person or entity; participating in, testifying in, or cooperating in any way in an investigation  by the Secretary; or otherwise seeking to voice workplace health concerns or work towards having a safe and healthy workplace;

2)   Enjoin Defendants from telling any current or former employee to not speak to or cooperate with representatives of the Secretary or to provide false information to the Secretary;

3)   Enjoin Defendants from suing current or former employees or other individuals because of those individuals' complaints about health and safety or because they engaged in any other protected activity under the OSH Act.

4)   Require Defendants to immediately dismiss Case no. 03-CV-2015-900474.00, filed by Defendant Lear Corporation EEDS and Interiors against Kimberly King in the Circuit Court of Montgomery, Alabama;

5)   Require Defendants to permit a designee of the Secretary to read the following statement to all their employees during paid work hours:

> You have a right under the Occupational Safety and Health Act to a safe and healthy workplace.  You are protected by the Occupational Safety and Health Act and have the right to participate freely in the U.S. Department of Labor's investigation into the safety/health of your workplace. You have the right to speak freely with investigators or other officials from the Department of Labor.  You also have the right to discuss your workplace health or safety concerns with your employer or with other people.  Your employer is prohibited from retaliating against you in any way – including, but not limited to, terminating, suspending, harassing, suing, or intimidating –  because you spoke with the Department of Labor or in any way complained about reasonable workplace health or safety concerns or otherwise exercised your rights under the OSH Act.

The U.S. District Court for the Southern District of Alabama has ordered Renosol and Lear, and anyone acting on their behalf, to cease retaliating in any way, including coercing, harassing, interrogating, intimidating, or attempting to influence or in any way threatening employees for providing information to the Department of Labor or otherwise exercising their rights under the Occupational Safety and Health Act.  The Court has prohibited Renosol and Lear from contacting or communicating with employees concerning any communication between employees and the Department of Labor or with other persons or entities;

6)  Require Defendants to post at all Defendants' facilities a hard copy of the statement referred to in ¶6 above;

7)  Require Defendants to preliminarily reinstate Kimberly King to her previous employment position with the company pending the conclusion of OSHA's investigation and final resolution thereof;

8)  Prohibit Defendants from speaking to employees, either directly or through representatives acting on their behalf, regarding any communication any employee has or will have with the Secretary or any other person or entity about their workplace health concerns;

9)   Enjoin Defendants from obstructing the Secretary's investigation in any manner;

10)  Provide for costs and expenses to reimburse the Secretary in maintaining this Application; and

11)  Order all such other relief as may be appropriate, just, and proper.

Respectfully submitted,

ADDRESS:

Office of the Solicitor
U.S. Department of Labor
61 Forsyth Street, S.W.
Room 7T10
Atlanta, Georgia 30303

Telephone:      (404) 302-5435
Facsimile:      (404) 302-5438
Email:          yanthis-bailey.yasmin@dol.gov
                ATL.FEDCOURT@dol.gov

M. PATRICIA SMITH
Solicitor of Labor

STANLEY E. KEEN
Regional Solicitor

CHANNAH S. BROYDE
Counsel

By:/s/Yasmin Yanthis-Bailey
YASMIN YANTHIS-BAILEY
Attorney

Office of the Solicitor,
U.S. Department of Labor,
Attorneys for the Plaintiff

SOL Case No. 15-00094