UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

THOMAS E. PEREZ,                                     )
SECRETARY OF LABOR,                                  )      FILE NO. **15-205-CG-M**
UNITED STATES DEPARTMENT OF LABOR,                   )
                                                     )
                Plaintiff,                           )
                                                     )
        v.                                           )
                                                     )
LEAR CORPORATION EEDS AND INTERIORS )
and RENOSOL SEATING, LLC                             )
                                                     )
                Defendants.                          )

## AFFIDAVIT OF GLORIA E. COLÓN

COUNTY OF HILLSBOROGH

STATE OF FLORIDA

I, GLORIA E. COLÓN, am over 18 years of age, legally competent to give this affidavit and have personal knowledge of the facts set forth in this affidavit and being first duly sworn, do hereby state:

1. I am employed by the Occupational Safety and Health Administration, United States Department of Labor ("OSHA") as a Whistleblower Investigator ("WB Investigator"). In this capacity, I conduct investigations to determine whether employers are in compliance with anti-retaliation provisions of 22 statutes, including Section 11(c) of the Occupational Safety and Health Act, 29 U.S.C. §660(c) ("the OSH Act"). I am located in the Tampa, Florida, OSHA office and report to the Atlanta Regional Office, Whistleblower Protection Program.

2. I have been a WB Investigator since April 2010.

1

3.    In the course of performing my official duties, I was directed to conduct an investigation of Renosol Seating, LLC ("Renosol")[1], located at 6 Meadowcraft Parkway, Selma, Alabama 3670 to determine its compliance with Section 11(c) of the OSH Act. This investigation, which is on-going, is a result of complaints submitted by three former or current employees of Renosol, including Complainant Kimberly King. The company was informed of these complaints, and OSHA's need to investigate them, on September 11, 2014. Another investigator began the investigation process and the case was subsequently reassigned to me. Following is information I have learned thus far in the course of my investigation.

4.    According to its website, Renosol Corporation formerly operated a joint venture with Lear Corporation involving its polyurethane formulations and seating businesses. The joint venture operated plants in Farwell, Michigan; Hebron, Ohio; and Selma, Alabama. The joint venture ended in 2007 and, since then, the plants continue to operate under Lear Corporation's ownership as Renosol Seating, LLC. Renosol Seating, LLC operates as a subsidiary of Lear Corporation. http://www.renosol.com/about.shtml

5.    The complainants in this case are considered employees of Renosol Seating, LLC.

6.    Renosol Seating, LLC, and/or Lear Corporation manufacture and supply motor vehicle seating products throughout United States and abroad. One of their customers is Hyundai Motor Manufacturing Alabama, LLC.

7.    According to its website, Lear Corporation is a publicly trading Fortune 500 Company with 235 locations, in 34 countries, with 132,000 employees. http://www.lear.com/en/about/history.aspx

8.    Complainant Kimberly King worked for Renosol for about nine years until her termination on March 16, 2015.

---

[1] It is my understanding this company also goes by the name or is related to Lear Corporation EEDS and Interiors

2

9.     Throughout her employment for the company, Ms. King was an hourly employee. At the time of her termination, she earned $12.25 per hour.

10.     Since at least July 2014, Ms. King and the other complainants have engaged in multiple protected activities under the OSH Act, including making complaints to OSHA and to management about health problems related to their working conditions. They have also spoken with the media about their work conditions at the plant and their concern for their health, and have participated in a YouTube video that included such discussions. (See attached Exhibit A for examples of articles; see also https://www.youtube.com/watch?v=97ZjMcpLc_Q ). The first interview took place with NBC News and was released on July 14, 2014.

11.     As seen in the articles and the YouTube video, Ms. King spoke about workers' exposure Toluene Diisocyanate (TDI) at the plant; her (and others') belief that this exposure causes her respiratory problems. In the video, Ms. King described suffering from a constant cough that she cannot control and her need to use three inhalers and a nasal spray, treatment that is costing her about $200.00 per month. She explained that she tested positive for TDI on a test given by Doctor Carrie Redlich from Yale University. She King also stated that Defendants' management told the workers OSHA's coming to the plant was not good for the company. Additionally, Ms. King talked about being moved to the warehouse after bringing the health complaints. She stated that management moved her and the other two complainants to the warehouse to keep them from telling their co-workers about the health and safety issues. Although management told them they were being moved because of their health, she questioned management's motives because if they were moved because of their health then, she stated, "What about the other workers. The other workers are exposed too."

12.     In March, 2015, Ms. King went to the Hyundai plant with others to deliver a letter asking Hyundai's management to help secure good, safe, and fair working conditions for

the employees at the Renosol plant. The letter (a copy of which is attached as Exhibit B) was not written by Complainant King, but she and many others signed it. It was not actually delivered to Hyundai at that time, but was subsequently published on-line. Ms. King states that she does not know who published it.

13.     The complainants explained to me that, after they started to participate in these protected activities, Renosol's management began to treat them differently from the other employees at the plant and engaged in a series of retaliatory actions against them. For example, immediately after the interviews with the complainants were released by the media, the complainants were pulled to management office by, Human Resources Manager Connie Messer, Plant Manager Mike Walkowski, and Safety Manager Kathy Jones and questioned about the article.   These articles were released at different times by different media outlets and, according to the complainants, every time an article was released, they were pulled by company management into the office and questioned about their motives for participating in the article and asked who paid for it. The complainants told me that they believed they are being harassed by management because they participated in interviews by the media about their safety and health complaints.

14.     On September 11, 2014, the complainants were transferred to a warehouse. They were the only ones who were moved and were not given a choice about it. They were told they were being moved because of their health. However, they told me that they felt isolated and that the other workers knew they were being transferred because of their media interviews. Because of this transfer, the complainants were not able to take advantage of overtime as they did when they worked at the plant.

15.     On January 21, 2015, Ms. King and another complainant each received a three-day suspension without pay for participating in the video about the working conditions and

health concerns at the plant.  Management offered to reduce the penalty to a one-day suspension if these complainants agreed to respond to the following questions:

a)  In making statements to the public that the air was unsafe when I knew all testing of the air showed it to be safe, what did I do wrong?

b) What are the consequences to the company when disparaging, false statements are made to the public?

c)  How will I avoid violations in the future?

16.     Both of these complainants state that they refused the offer to reduce the suspension because they felt they did nothing wrong by voicing their health concerns.  They each lost approximately $221.00 because of the three-day suspension.

17.     On March 9, 2015, Ms. King received a seven-day suspension without pay for attempting to deliver the letter to Hyundai (described above) on March 5, 2015.

18.     When issuing her suspension, Human Resources Manager Connie Messer gave Ms. King a letter asking whether she accepted responsibility for acting with malice towards the company and making false statements.  Ms. Messer asked King to seriously consider signing the letter as a condition for her continued employment.

19.     Ms. King told me that she refused to sign the letter because she felt she did nothing wrong by voicing her health concerns and complaining about the working conditions.

20.     Ms. King was terminated on March 16, 2015 when she returned to work from her seven-day suspension.

21.     The complainants expressed to me that they are intimidated by management's continuous retaliatory actions that started when they participated in the interview with NBC News in July 2014.

22.   Moreover, on or about March 25, 2015, I learned that Lear Corporation EEDS and Interiors obtained a temporary restraining order against Ms. King.  Issued by the Circuit Court of Montgomery County, Alabama, this restraining order forbids her from speaking to anyone about the health and safety conditions. A copy of this restraining order is attached hereto as Exhibit C; copies of the documents filed in support thereof are attached hereto as Exhibits D and E.  The language of the restraining order is so broad that it appears to even forbid her from speaking to government agencies.

23.   Further, given the way Ms. King and the other complainants have been treated,  it is reasonable to expect that other employees are afraid of being retaliated against in the same manner as complainants if they come forward with their concerns about their health and the working conditions in the plant.

24.   Whistleblower investigations typically include, but are not limited to, reviewing records such as time sheets and company policies, and interviewing current and former employees in order to determine whether individuals were retaliated against because of their protected activities under the statute, in violation of the law.

25.   Here, however, employees appear to be afraid to speak with me due to their fears of retaliation.

26.   Indeed, I have reason to believe that management has told other employees, after the complainants were suspended, that adverse actions would be taken against them as well if they engaged in similar protected activities.

27.   Thus, the actions taken by the Company and its officials against Ms. King and other complainants have interfered with my ability to conduct a thorough investigation.

GLORIA E. COLÓN
Whistleblower Investigator
Occupational Safety and
Health Administration

Sworn and subscribed to before me
This _8_ day of April, 2015.

NOTARY PUBLIC
My Commission Expires on: May 23, 2019

**BALESKA BARILLAS**
Notary Public - State of Florida
Commission # FF 207215
My Comm. Expires May 23, 2019
Bonded through National Notary Assn

Baleska Barillas

# EXHIBIT A

What's Making These Selma, Alabama Auto Parts Workers So Sick? - NBC News



# What's Making These Selma, Alabama Auto Parts Workers So Sick?

BY SETH FREED WESSLER

SELMA, Ala.—Denise Barnett was thankful seven years ago when she started a job at the Renosol Seating plant, one of 90 hourly workers making foam cushions for Hyundai car seats and headrests.

"Here in Selma, a job is hard to find," said Barnett, 37. In Dallas County, where Selma is the county seat, the unemployment rate is about 12 percent, and 60 percent of children live below the poverty line.

Before landing this position, Barnett, who like most Renosol workers is African American, worked at a gas station for minimum wage. For Selma residents like her, a job at Renosol—$11 an hour plus healthcare—is like gold.

But in early 2013, Barnett developed a nagging cough that kept her up at night. One evening last July, Barnett came home after picking up her two young boys from her sister's house and had a serious coughing attack. "I made the kids run back into the car and rushed to the hospital," she said.

When Barnett arrived in urgent care, she said, she could barely breathe and spent two nights in the hospital.

"They say I have asthma," said Barnett, who said she'd never been a smoker and now uses two inhalers and a nasal spray. "I never had that before."

Barnett isn't alone among her Renosol colleagues: Eight other current employees and three past employees who work in jobs scattered throughout the foam production line told NBC News that they developed sinus infections, chronic coughs, bronchitis, shortness of breath, and asthma after working at the factory. At least four workers told of trips to hospitals or urgent care following asthma attacks.

Now some of these workers are trying to form a union with the help of the United Auto Workers. According to records provided to NBC by the UAW, health issues top the list of grievances that Renosol employees report to union organizers. "Workers continue to tell us they have serious concerns that making seats for Hyundai is making them sick," said Cindy Estrada, a UAW vice president.



Kim King works at the Renosol factory and says that she's developed "a cough that I can't get rid of." She spends $100 per month on inhalers and other medications for respiratory problems that she says come from working at the plant.

Kimberly King, 50, who has worked at Renosol since 2004 and is actively supporting a union, has been admitted to the hospital for multiple nights for respiratory issues. "It's pretty bad, she stays up coughing and coughing," said King's son Martavist, 14, one hot afternoon after his mother, a non-smoker, got winded from walking up the few steps to her single story home after a day

at work.

The Renosol workers have long had a theory about what is making them ill: A chemical called toluene diisocyanate, or TDI, which is used to make the foam in many car seats. According to decades of academic literature, isocyanates such as TDI, also used in paints, nail polish, and insulation, are among the leading causes of workplace-induced asthma. The company also uses an isocyanate called methylene diphenyl diisocyanate, or MDI.

When exposed to these chemicals, either through inhalation or touch, workers can become sensitized. "It's like an allergic reaction," explained James Lockey, M.D., an occupational health specialist at the University of Cincinnati College of Medicine. After sensitization, exposure to even trace amounts of TDI and MDI "can spur a decline in health, including serious asthma attacks," he said, which can be disabling, even life threatening.

Medical professionals generally agree that one-time exposure to a large quantity of isocyanates or repeated exposure to lower levels of the chemicals can lead to sensitization and sometimes, permanent asthma. But leading experts—including top occupational health doctors and even the head of the federal Occupational Safety and Health Administration—say that federal health and safety laws regulating these chemicals are insufficient.

"OSHA's workplace exposure limits for many chemicals," including isocyanates, "are out of date and not adequately protective," David Michaels, assistant secretary of labor for Occupational Safety and Health, told NBC News. "The result is that many workers in U.S. workplaces are not adequately protected from chemical exposures."

**Read an interview with OSHA chief David Michaels about workplace hazards and inequality.**

Under current OSHA standards, employers are not required to screen workers for illness, and can expose sensitized employees to low levels of isocyanates without violating any rules.

While some plants take steps to protect workers from TDI exposure and regularly screen them for health issues, employers are largely left to regulate themselves. But as parts suppliers such as Renosol become a larger part of the auto industry—currently they provide three of every four auto manufacturing jobs—workers are more vulnerable, say prominent occupational health doctors as well as government officials. Parts plants often operate under unyielding pressure from auto companies to produce at high volume and low cost, economists say. And because these plants are much less likely to be unionized than assembly plants run by major auto companies, experts say workers are left without a watchdog.

"Unions give people a level of protection," said Kenneth Rosenman, chief of Michigan State University's Division of Occupational and Environmental Medicine. Industry has said that it protects workers' safety on its own. But many experts, including Rosenman, argue that unions can provide workers with a voice as well as contracts that often hold employers to health and safety requirements above OSHA standards.

In a statement to NBC News, the Lear Corporation, the Michigan-based auto parts giant that owns the Renosol plant, said, "In response to recent employee concerns about chemical exposure (specifically TDI) at Lear's Selma, Alabama, plant, the company has taken these employee concerns very seriously." Lear said the company "completed exhaustive testing and evaluation," and that based on "internal investigation, two separate independent environmental evaluations, as well as a thorough OSHA evaluation," Lear "concluded that the environment in the Selma plant is safe for our employees."

"In the case of our Selma plant, we are in the midst of an emotional union organizing campaign," Lear added. "During such campaigns, there are often unsubstantiated allegations made."

Hyundai, which has no ownership stake in the Renosol plant, said its "expectation for Lear, as it is for each of our supplier companies, is that they meet or exceed all applicable legal requirements, including those focused on ensuring a safe and healthy work environment."



Letasha Irby straps her children into car seats outside her home near Orrville, Alabama on Monday, June 16. Irby works at the Renosol plant near Selma and is hoping that her coworkers will unionize.

NBC contacted Carrie Redlich, M.P.H., M.D., program director of Yale's Occupational and Environmental Medicine Program, for comment on the Renosol workers' claims. Redlich is among the nation's leading experts on isocyanates and her clinic at Yale regularly treats workers who have had contact with the chemicals.

Redlich and a colleague, Adam Wisnewski, Ph.D., senior research scientist at Yale, offered to test any interested Renosol worker for isocyanate antibodies. The tests, which Wisnewski said he has run thousands of times, measure antibodies in a person's blood to see if they've been exposed to TDI, and can help establish a connection between TDI exposure and related respiratory conditions.

NBC told several workers about the offer, and they contacted a number of their coworkers. Redlich's Yale clinic sent nine blood sample kits to Selma, and workers brought the kits to local doctors and labs, who then mailed the samples to Yale.

So far, the lab has tested six Renosol workers' blood, and reports that four showed evidence of exposure to TDI. One more showed a low level of exposure consistent with very low level contact or exposure years earlier.

"This is a high frequency of exposure, and it's cause for concern," said Adam Wisnewski, Ph.D., senior research scientist at Yale. He said that the workers may not be representative of the rest of the Renosol's 90-person hourly workforce, but that exposure in even four workers indicates a problem. "The company definitely needs to be looking at its industrial hygiene, and they probably need to look into personal protective equipment for workers, and medical surveillance of health issues."

In answer to NBC's questions about the tests, a Lear spokesperson said, "We're concerned about why they'd come forward and make an allegation to you. We're a major global operator; we don't run shoddy operations." The Lear spokesperson added that the company maintains a clear process for workers to make complaints. He said no Renosol worker has come forward with a TDI-related grievance, with the exception of one failed workers' compensation claim several years ago.

Though TDI tests cannot be the basis for a diagnosis of isocyanate asthma, Redlich and Wisnewski say that in symptomatic patients, they can be a vital piece of a diagnostic puzzle if combined with medical examination, analysis of symptoms and review of a worker's occupational history.

What's Making These Selma, Alabama Auto Parts Workers So Sick? - NBC News

Kimberly King, who gave Yale permission to speak to NBC about her case, appears to have been exposed to relatively high levels of TDI, and signs point to a case of TDI-induced asthma, Redlich and Wisnewski said.

"Of all the tests I've done," of workers exposed to isocyanates, said Wisnewski, "she is in the top 25 percent in terms of levels" of isocyanate antibodies in her blood. "In general, the higher the response, the higher the exposure was to isocyanates. We don't get these positive results with low levels of exposure."

"The tests are consistent with isocyanate asthma. [King] didn't have asthma before she started working there, and she's developed all the signs," said Redlich, who reviewed King's medical records and spoke with her and her local doctors.

"I knew it was the chemicals making me sick, but now nobody can say I'm making it up," King said one June day as she drove home past the payday lenders that line Selma's main street and over the Edmund Pettus Bridge, of Civil Rights-era infamy.

## *"I knew it was the chemicals making me sick, but now nobody can say I'm making it up."*

Health and safety concerns among Renosol workers are longstanding. In July 2006, the year before Lear took full control of the plant, (it previously was a joint partner), an OSHA investigation found that the TDI alarms were not "tested and maintained in accordance with the manufacturer's specifications, potentially causing employees to be exposed to TDI." The citation also noted, "employees assigned … to respond to chemical leaks were not provided with the necessary personal protective equipment..." The agency levied fines totaling $54,900, later reduced to $15,200.

Three months later, several gallons of TDI spilled in the plant, according to a Dallas County Emergency Management Agency report. Fire department records say 17 workers were injured. The company's OSHA logs for that year show 14 reports of respiratory conditions, including "possible respiratory exposure to TDI."

Harmon Love, 59, has worked at the plant since 2004, and was assigned to help clean up the 2006 spill. Afterward, he started to get sick, he said.

"Less than two years after the spill, I could not hardly catch my breath," Love said recently as he sat on his porch, his two grandchildren playing in the yard. "I was going up the stairs, I could not hardly make it."

Love, who said he has been hospitalized for his breathing problems, asked that the results of his TDI blood test remain confidential.

OSHA returned to Renosol in 2007, just before Lear took full ownership of the plant, and filed a citation for a repeat offense: the agency found that workers were not using equipment to protect against isocyanate exposure. OSHA levied a fine of $37,500, later reduced to $8,375 as part of a settlement.

When Lear, which in other plants produces foam cushions and other parts for Ford, GM, BMW and six other auto manufacturers including Hyundai, purchased the plant, workers say they hoped conditions would change. But in 2008, dozens of workers, including Barnett, King and Love, filed a lawsuit against Renosol and Lear, alleging that workers were "repeatedly and continuously exposed to hazardous chemicals."

Renosol filed a motion to dismiss the case, arguing in part that Alabama's workers' compensation laws protected the company from workplace illness-related lawsuits.

According to Lear, no Renosol worker has successfully won a worker's compensation claim based on isocyanates. But Rosenman, of Michigan State University, said workers almost never win such cases because few receive the type of medical surveillance or primary care that can help establish a connection between symptoms and a workplace hazard.

In 2012, a judge dismissed the workers' lawsuit without citing a reason.



The Renosol plant, which makes foam seats for Hyundai, near Selma, Alabama.

This spring, Renosol employees said they were working long hours to meet an order from Hyundai. During the rush, workers told NBC News and a local newspaper that there was a leak in a pipe that carries TDI. The TDI alarm sounded, and the plant was evacuated.

According to interviews with employees, management made a temporary fix, wrapping cloth and plastic on the leak, and sent the employees back into the factory. The company didn't fully repair the leak until days later, after the production rush was over, workers said. Lear did not answer questions about the alleged incident.

For some workers, that was the last straw. On May 8, 10 Renosol employees, including Barnett, King and Love, submitted a letter to the company announcing their intention to ask for a union vote and requesting "free medical screenings … to test our breathing and find out if we need additional medical care."

The workers also filed complaints with OSHA.

Four months earlier, OSHA had launched a program to investigate auto part plants in three southern states including Alabama, where in 2010 parts workers suffered a rate of workplace illness and injury 50 percent higher than the industry average. Coupled with a 2013 OSHA program to inspect companies using isocyanates, the Renosol factory was an obvious site for review.

But it was not until a group of workers filed a complaint with the support of the UAW that OSHA returned, entering the plant for the first time in seven years.

OSHA's inspection is ongoing. But in a statement, Lear told NBC News, "Prior to his leaving the plant, the [OSHA] compliance officer stated to the plant [environmental health and safety] person and an attorney representing Lear that he would recommend no citations for the items he reviewed." In a letter to workers, Lear wrote that OSHA and the company had held a closing conference about the findings.

In response, an OSHA spokesperson said agency investigators "don't release any findings until the investigation is over. They have not had a closing hearing or conference… We did not provide the company that kind of information."

Lear did provide a copy of the OSHA air test results, which show TDI levels below the agency's limit, set at five parts per billion. And Lear provided copies of the company's OSHA records for each year since it bought the plant, which show nearly no reports of respiratory illness.

Even if OSHA uncovers no isocyanate-related violations, experts say plant conditions may still be unsafe for workers who have been sensitized to TDI or MDI. Leading physicians and OSHA officials agree that workers should be protected from low-level exposure, and that once sensitized, they should be removed from contact with any amount of the chemicals.

For King, who shows signs of advanced isocyanate asthma, it may be too late. Exposure to even small amounts of TDI may simply be unsafe. Yet she worries about finding another job. "At my age, with my breathing like it is, I don't think so."

Some former workers who became sick while at Renosol and continued working through the illness say their conditions have become permanent. "I told my doctor where I worked and he told me I had to leave; he said it was the chemicals that were making me sick," said Sherry Goldsby, 56, who worked at Renosol until 2008. She still complains of constant sinusitis and a nagging cough that keeps her up at night, symptoms she says began when she worked at the plant.

## *The process to change worker safety and health standards, said OSHA chief Michaels, is "broken."*

Medical experts say that the way to protect workers from long term illness is to implement routine health screening. "If there's no medical surveillance, workers are at risk," said Rosenman of Michigan State University. "The earlier that signs of asthma are identified, the more likely it is a worker can be treated."

OSHA chief David Michaels said that workplace illness "almost never gets reported," because "medical practitioners rarely know how to identify an illness as work-related." And because current OSHA guidelines don't require companies to screen workers, few non-union parts plants do it regularly, experts say.

At Renosol, 11 of the 12 workers who spoke to NBC said they were provided one breathing test when they were hired, but have not been evaluated since. The worker who was tested again is a member of the team assigned to clean spills. Lear did not address NBC's questions about whether the company performs regular health monitoring.

Even the manufacturers of isocyanates recommend regular medical screening.

"Medical supervision of all employees who handle or come into contact with isocyanates is recommended," reads the literature from BASF, the global chemical company that, according to a document provided to NBC by a worker, produces the isocyanates used at Renosol."Preemployment and periodic medical examinations with respiratory function tests … are suggested."

Requiring such screenings would mean changing OSHA's standards, which have not been updated for more than four decades.

The process to update the standards, said OSHA chief Michaels, is "broken."

"New standards take many years, sometimes more than a decade, to complete," he told NBC.

At the Selma Renosol plant, workers were expecting a union vote in late June —several workers who are supporting a union say they want language in the contract requiring medical screening. But last month, the UAW filed a complaint with the National Labor Relations Board alleging that Lear had

engaged in unfair labor practices. The NLRB is investigating and has delayed the vote indefinitely.

For the UAW, a win at Renosol would be a boon to a union that has long struggled to make inroads in a region that is inhospitable to labor and home to the auto industry's most significant growth.

Workers say company representatives have intimated that Hyundai will terminate the contract and the plant will close if workers vote to form a union. Lear, which operates both unionized and non-unionized plants, said in a statement, "We deny any unfair labor practices at the Selma plant, and we want our employees to have the opportunity to choose if they will be represented by a union."

Barnett, who plans to send blood to Yale when she can make time, is worried the company's threats could come true. "I need this job," she said, "I really do."

"But I know that the longer I stay here and keep getting sick, it will have long term effects."

First published July 14 2014, 1:14 AM

☐        ☐        ☐        ☐

---

SETH FREED WESSLER

Seth Freed Wessler is a reporter for NBC News' "In Plain Sight" project on poverty and inequality in America, which is supported by a grant from the Ford Foundation. H... Expand Bio

### FROM AROUND THE WEB

The Middle Class Stimulus Package That Expires This Year (lendingnews.getsmart.com)

Why Is My Social Security Check Smaller Than That of Someone Who Earned a Similar Wage? (AARP)

Presidents' Wives Who Didn't Represent The Country Well (RantPolitical)

Michelle Obama's mixed race heritage proved by DNA. (Ancestry)

### MORE FROM NBC NEWS

Transgender Actress Laverne Cox to Speak at UConn (NBC Connecticut)

'Not Shock and Awe' : Hillary Clinton Plans Slow, Smaller Rollout (NBC News )

Double-Fatal Shooting Follows Deadly Crash in Milwaukee, Wisconsin (NBC News)

The Geography and Politics of Taxes (NBC News)

Rand Paul Slams Hillary Clinton's 'Grand

About Us    Careers    Contact    Privacy Policy - UPDATED    Terms of Service    Site Map    Advertise    ▷ Ad Choices    ©2014 NBCNews.com



# Selma Hyundai workers march to Montgomery over wages, work conditions

Selma Auto Workers March.png

Kim King, who has worked at Renosol Seating for nearly 10 years in Selma, Ala., turned away by security at Hyundai corporate offices in Montgomery. Hyundai is the exclusive customer of Renosol Seating in Selma. (Photo Credit: Selma Workers Organizing Committee)

**Erin Edgemon | eedgemon@al.com** By **Erin Edgemon | eedgemon@al.com**

**Email the author | Follow on Twitter**

on March 06, 2015 at 11:59 AM, updated March 06, 2015 at 4:09 PM

Two days before the 50th anniversary of the Selma-to-Montgomery march for voting rights, workers at Selma's Renosol Seating plant staged their own march for higher wages and safer work conditions.

Community supporter who joined worker delegation to Hyundai corporate offices in Montgomery, Ala., to deliver letter of concern about health and safety risks at Hyundai's Selma supplier. (Photo Credit: Selma Workers Organizing Committee)

Erin Edgemon | eedgemon@al.com

Several workers from the plant traveled to Hyundai's manufacturing facility in Montgomery on Thursday in an attempt to hand-deliver a letter to management asking Hyundai to demand its suppliers pay higher wages and protect the safety of their workers, according to information released by the Selma Workers Organizing Committee.

Renosol's Selma plant makes seats exclusively for Hyundai.

Local clergy leaders, representatives from the New York-based Kairos Center, an interfaith civil and human rights organization, and representatives from the Alabama Coalition for Immigrant Justice were also in attendance.

"I work hard all day making foam for Hyundai car seats, but Hyundai refuses to take responsibility for the fact that we are getting sick and struggling on low wages at its supplier plants like Renosol," said Kim King, who has worked at Renosol for more than nine years. "Hyundai has the power - and the responsibility - to make sure that the jobs it supports pay decent wages and do not put our health at risk. And until the company listens, our movement will only grow stronger."

Several workers at Lear Corp.-owned Renosol say they are suffering from chronic health conditions such

as sinus infections, chronic coughs, bronchitis, shortness of breath and asthma after working at the factory.

See related: **Working for Selma Hyundai supplier blamed for asthma, other ailments, employee Kim King says**

In December, the U.S. Occupational Safety and Health Administration fined Renosol for multiple serious violations of federal health and safety laws.

"As the delegation's march today illustrates, Selma is more than just a symbol of change. Faced with widespread poverty and limited opportunity, auto workers in Selma are carrying on the struggle started by civil rights leaders 50 years ago by joining together to demand good jobs and a shot at the middle class, and I am proud to support them today," said Camella Hollaway, a minister at Faith Full Gospel Baptist Church in Selma, Ala., who joined the delegation to Hyundai in Montgomery.

Hyundai didn't immediately reply to a request for comment.

Selma workers say worker pay at Renosol is capped at approximately $12 an hour and about half the jobs are temporary positions.

Lear Corp. spokesman Mel Stephens said wages at the Selma plant are at the median for wages in manufacturing operations in central Alabama.

He said benefits are generous and are about 45 percent of base wages.
In response to worker claims, Stephens said no Lear employee has pursued any workers compensation claim for any alleged occupational exposure.

Below is the text of the letter delivered to Hyundai:

March 5, 2014

Kim Jun Ha

President and CEO

Hyundai Motor Manufacturing Alabama, LLC

700 Hyundai Boulevard

Montgomery, AL 36105

Dear Mr. Kim:

Today starts an important weekend in Alabama--the fiftieth anniversary of the historic voting rights marches in Selma. As workers, community members, faith leaders, and others concerned about good jobs in the United States, we are calling on Hyundai to address a problem that faces people in Selma today--a Hyundai supplier where workers have been fighting for years to address serious safety concerns in the plant.

Workers at the Lear Corporation plant in Selma make seats for Hyundai. For years, those workers have been exposed to dangerous chemicals, called isocyanates, which are used to make the foam that is inserted Into the seats. These chemicals are known to cause lifelong breathing problems, including chronic asthma. One of the chemicals used in the plant, an isocyanate called TDI, also causes cancer. In the summer of 2014, NBC News did an in-depth investigative feature on the problems at the plant. Additionally, a recent OSHA investigation found numerous serious safety concerns at the plant, and concluded that some workers were exposed to chemicals that made them sick. For this difficult and dangerous work, workers earn a maximum of around $12.00 per hour--even after nine years of service to the company! We know that isn't enough to support a family

Despite numerous efforts by workers to address these health and safety issues with plant management, the problems continue--even after the OSHA investigation. It's not a mystery how to make a foam plant operate safely--close off the areas of the foam carousels where the chemicals are mixed and sprayed, provide adequate ventilation in the plant, give workers proper hand protection, make sure air quality alarms are functioning properly, and monitor workers' health on a regular basis to catch any problems before they become too serious.

Hyundai has the power and the responsibility, through its social responsibility policies, to require Lear to make the necessary investments to ensure good, safe, fair working conditions throughout its supply chain. Hyundai's 2014 "The Road to Sustainability" acknowledges that the company seeks to promote ethical business practices among its suppliers (p15), and states that Hyundai's Ethics Charter also applies to suppliers (p16). At the most practical level, better safety conditions at the Selma plant would reduce the number of production delays caused by evacuations at the plant--a frequent occurrence that sometimes leads to hours of lost work time.

Making the necessary investments to modernize the Selma plant will make it a stronger, safer, more productive facility for years to come. We strongly urge Hyundai to follow its existing corporate social responsibility policies and address the safety concerns at the plant in Selma before another worker gets sick.

*Updated at 4:09 p.m. with comments from Lear Corp.*

© 2015 AL.com. All rights reserved.

# EXHIBIT B

March 5, 2014

Kim Jun Ha
President and CEO
Hyundai Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard
Montgomery, AL 36105

Dear Mr. Kim:

Today starts an important weekend in Alabama—the fiftieth anniversary of the historic voting rights marches in Selma. As workers, community members, faith leaders, and others concerned about good jobs in the United States, we are calling on Hyundai to address a problem that faces people in Selma today—a Hyundai supplier where workers have been fighting for years to address serious safety concerns in the plant.

Workers at the Lear Corporation plant in Selma make seats for Hyundai. For years, those workers have been exposed to dangerous chemicals, called isocyanates, which are used to make the foam that is inserted into the seats. These chemicals are known to cause lifelong breathing problems, including chronic asthma. One of the chemicals used in the plant, an isocyanate called TDI, also causes cancer. In the summer of 2014, NBC News did an in-depth investigative feature on the problems at the plant. Additionally, a recent OSHA investigation found numerous serious safety concerns at the plant, and concluded that some workers were exposed to chemicals that made them sick. For this difficult and dangerous work, workers earn a maximum of around $12.00 per hour—even after nine years of service to the company! We know that isn't enough to support a family

Despite numerous efforts by workers to address these health and safety issues with plant management, the problems continue—even after the OSHA investigation. It's not a mystery how to make a foam plant operate safely—close off the areas of the foam carousels where the chemicals are mixed and sprayed, provide adequate ventilation in the plant, give workers proper hand protection, make sure air quality alarms are functioning properly, and monitor workers' health on a regular basis to catch any problems before they become too serious.

Hyundai has the power and the responsibility, through its social responsibility policies, to require Lear to make the necessary investments to ensure good, safe, fair working conditions throughout its supply chain. Hyundai's 2014 "The Road to Sustainability" acknowledges that the company seeks to promote ethical business practices among its suppliers (p15), and states that Hyundai's Ethics Charter also applies to suppliers (p16). At the most practical level, better safety conditions at the Selma plant would reduce the number of production delays caused by evacuations at the plant—a frequent occurrence that sometimes leads to hours of lost work time.

Making the necessary investments to modernize the Selma plant will make it a stronger, safer, more productive facility for years to come. We strongly urge Hyundai to follow its existing corporate social responsibility policies and address the safety concerns at the plant in Selma before another worker gets sick.

We would like to discuss this with you further, please contact Kim King at (334) 419-6390. *Kimberly King Kensol worker (Lear Selma)*

Sincerely,

*Joe Keffer, S.O.S., ALABAMA MORAL MONDAY, AFL-CIO*

*Jimmy Thomes Miles Center For Community Change*

(Willa Hillary) (former Doar employee)

_[signature]_ UAW

_[signature]_ UAW

James Crowden
President West Al Labor Council, AFL-CIO.

Charles Glaston,
Delegate to west AL Labor Council

_[signature]_ Kairos Center / Poor People's Campaign

_[signature]_ - Poor People's Campaign

_[signature]_, Oak Hill Center for Education & Culture

_[signature]_ Kairos Center For Religious, Rights + Social Justice

_[signature]_ Kairos Center / Poor People's Campaign

_[signature]_ United Workers / Poor People's Campaign

_[signature]_ United workers / Poor People's campaign

Ricky Kornegy   SECRETARY TREASURER ALABAMA AFL-CIO

Erica N. Williams   Kairos Center - / Poor People's Campaign

# EXHIBIT C

DOCUMENT 15



ELECTRONICALLY FILED
3/19/2015 10:39 AM
03-CV-2015-900474.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

LEAR CORPORATION EEDS AND  )
INTERIORS,.  )
)
        Plaintiff,  )
)
v.  )   CIVIL ACTION NO. *CU 2015-900474*
)
KIMBERLY KING,  )
)
        Defendant.  )
)

### ORDER GRANTING TEMPORARY RESTRAINING ORDER

Plaintiff Lear Corporation EEDS and Interiors. ("Lear") initiated this action by Verified Complaint filed *March 19*, 2015 with simultaneous Motion for Temporary Restraining Order and Preliminary Injunction, the Affidavits of Gary Ansorge and Mike Walkowski, and other evidence. The Court concludes that the Motion for Temporary Restraining Order is due to be granted.

    1.    I find that Plaintiff has established a reasonable chance of success of prevailing on the merits of its claim for intentional interference with a business or contractual relations and defamation. I find Lear has a longstanding business relationship with HMMA, its only customer. Defendant Kimberly King ("King") knew or should have known of the relationship, and King repeatedly interfered with this relationship by making falsehoods to HMMA and the public about the Lear plant. I also find that King published non-privileged false statements that the Selma plant air is unsafe, knew such statements were false, and they were directed at Lear's business reputation.

2.    I find that Plaintiff will suffer irreparable harm if the Temporary Restraining Order is not granted.  King's conduct has and will continue to jeopardize Lear's business relationships, its reputation and goodwill and the future of Lear's plant.

3.    I find that there is no adequate remedy at law if the Temporary Restraining Order is not granted.  Delay from enjoining King's conduct will cause further irreparable harm to Lear's plant and Lear's reputation in the community and with its customer.

4.    I find that the hardship imposed on King, the party opposing the Temporary Restraining Order, does not unreasonably outweigh the benefit accruing to Lear.  The order preserves the status quo and prevents King from making defamatory comments about her former employer or interfering with its only customer until such time that this Court can consider the merits.

5.    I find that appropriate bond is set forth below.

6.    Therefore, all requirements of Rule 65 of the Alabama Rules of Civil Procedure have been satisfied by the Plaintiff.

## TEMPORARY RESTRAINING ORDER

Based on the foregoing facts and conclusions of law, it is ORDERED, ADJUDGED and DECREED as follows:

Defendant Kimberly King, and any person acting in concert with her, is hereby restrained from:

(1)    Directly or indirectly, intentionally engaging in conduct that interferes with Lear's business and contractual relations;

(2)    Making any statements defaming Plaintiff, whether made to Plaintiff's customer or any other person or entity.

DOCUMENT 15

(3)     Destroying or concealing any emails and electronic records
and other documents relevant to this matter pending the end
of the litigation.

It is further ORDERED that Plaintiff as soon as practicable obtain a bond suitable for this

purpose in the amount of $ _1,000.00_ .

This Order shall expire on the _30th_ day of _March_ , 2015. or as otherwise

ordered.

This matter is set for hearing on Plaintiff's request for a preliminary injunction on the

_27_ day of _March_ , 2015 in Courtroom No. _____ , at the Montgomery County, Alabama

Courthouse in Montgomery, Alabama, at _9:00 am_ o'clock.

DONE this _19_ day of _March_ , 2015.

_____
CIRCUIT JUDGE

**EXHIBIT D**

| State of Alabama<br>Unified Judicial System<br><br>Form C-34   Rev 6/88 | SUMMONS<br>- CIVIL - | Case Number:<br><br>03-CV-2015-900474.00 |
|---|---|---|

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY
LEAR CORPORATION EEDS AND INTERIORS V. KIMBERLY KING

KIMBERLY KING, 393 COUNTY ROAD 540, SELMA, AL 36703

NOTICE TO _____

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY JOHN J. COLEMAN III

WHOSE ADDRESS IS 420 N. 20TH STREET, 3100 WACHOVIA TOWER, BIRMINGHAM, AL 35203

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

TO ANY SHERIFF OR ANY PERSONNEL AUTHORIZED by the Alabama Rules of the Civil Procedure:

☑ You are hereby commanded to serve this summons and a copy of the complaint in this action upon the defendant

☐ Service by certified mail of this summons is initiated upon the written request of _____

pursuant to the Alabama Rules of the Civil Procedure

Date   3/18/2015 6:09:15 PM      /s/ TIFFANY B. MCCORD

Clerk/Register

251 S. LAWRENCE STREET

MONTGOMERY, AL 36104

☐ Certified Mail is hereby requested

Plaintiff's/Attorney's Signature

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on _____

☐ I certify that I personally delivered a copy of the Summons and Complaint to _____

_____ in _____ County, Alabama on _____
(Date)

_____
Date

_____
Server's Signature

_____
Address of Server

_____
Type of Server

_____
Server's Printed Name

_____
Phone Number of Server

DOCUMENT I

| State of Alabama<br>Unified Judicial System<br><br>Form ARCIv-93   Rev.5/99 | **COVER SHEET**<br>**CIRCUIT COURT - CIVIL CASE**<br>(Not For Domestic Relations Cases) | Case Number:<br>**03-CV-201**<br>Date of Filing:<br>03/18/2015 | ELECTRONICALLY FILED<br>3/18/2015 6:09 PM<br>03-CV-2015-900474.00<br>CIRCUIT COURT OF<br>MONTGOMERY COUNTY, ALABAMA<br>TIFFANY B. MCCORD, CLERK |
|---|---|---|---|

## GENERAL INFORMATION

IN THE CIRCUIT OF MONTGOMERY COUNTY, **ALABAMA**
LEAR CORPORATION EEDS AND INTERIORS v. **KIMBERLY KING**

First Plaintiff: ☑ Business   ☐ Individual        First Defendant: ☐ Business   ☑ Individual
☐ Government   ☐ Other                        ☐ Government   ☐ Other

### NATURE OF SUIT:

**TORTS: PERSONAL INJURY**

☐ WDEA - Wrongful Death
☐ TONG - Negligence: General
☐ TOMV - Negligence: Motor Vehicle
☐ TOWA - Wantonnes
☐ TOPL - Product Liability/AEMLD
☐ TOMM - Malpractice-Medical
☐ TOLM - Malpractice-Legal
☐ TOOM - Malpractice-Other
☐ TBFM - Fraud/Bad Faith/Misrepresentation
☐ TOXX - Other: _____

**TORTS: PERSONAL INJURY**

☐ TOPE - Personal Property
☐ TORE - Real Property

**OTHER CIVIL FILINGS**

☐ ABAN - Abandoned Automobile
☐ ACCT - Account & Nonmortgage
☐ APAA - Administrative Agency Appeal
☐ ADPA - Administrative Procedure Act
☐ ANPS - Adults in Need of Protective Services

**OTHER CIVIL FILINGS  (cont'd)**

☐ MSXX - Birth/Death Certificate Modification/Bond Forfeiture
        Appeal/Enforcement of Agency Subpoena/Petition to
        Preserve
☐ CVRT - Civil Rights
☐ COND - Condemnation/Eminent Domain/Right-of-Way
☐ CTMP-Contempt of Court
☐ CONT-Contract/Ejectment/Writ of Seizure
☐ TOCN - Conversion
☐ EQND- Equity Non-Damages Actions/Declaratory
        Judgment/Injunction Election Contest/Quiet Title/Sale For
        Division
☐ CVUD-Eviction Appeal/Unlawfyul Detainer
☐ FORJ-Foreign Judgment
☐ FORF-Fruits of Crime Forfeiture
☐ MSHC-Habeas Corpus/Extraordinary Writ/Mandamus/Prohibition
☐ PFAB-Protection From Abuse
☐ FELA-Railroad/Seaman (FELA)
☐ RPRO-Real Property
☐ WTEG-Will/Trust/Estate/Guardianship/Conservatorship
☐ COMP-Workers' Compensation
☑ CVXX-Miscellaneous Circuit Civil Case

---

ORIGIN:   F☑ INITIAL FILING          A☐ APPEAL FROM          O☐ OTHER
                                        DISTRICT COURT

          R☐ REMANDED               T☐ TRANSFERRED FROM   _____
                                        OTHER CIRCUIT COURT

---

HAS JURY TRIAL BEEN DEMANDED?   ☐ Yes   ☑ No

---

RELIEF REQUESTED:   ☐ MONETARY AWARD REQUESTED   ☑ NO MONETARY AWARD REQUESTED

---

ATTORNEY CODE:   COL044        3/18/2015 6:09:08 PM        /s/ JOHN J. COLEMAN III

---

MEDIATION REQUESTED:   ☐ Yes   ☐ No   ☑ Undecided

ELECTRONICALLY FILED
3/18/2015 6:09 PM
03-CV-2015-900474.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

DOCUMENT 2

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | |
|---|---|
| LEAR CORPORATION EEDS AND INTERIORS, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION NO. _____ ) |
| KIMBERLY KING, | ) ) |
| Defendant. | ) ) |

### VERIFIED COMPLAINT

#### Parties

1.  Plaintiff Lear Corporation EEDS and Interiors, ("Lear") is a Delaware corporation doing business in Montgomery County, Alabama and Dallas County, Alabama.

2.  Defendant Kimberly King ("King") is a resident of Dallas County, Alabama, formerly employed by Lear, but committed some acts complained of in Montgomery, Alabama.

#### General Allegations

3.  Lear manufactures automotive seats and components at plants in Selma, Alabama and Montgomery, Alabama; the Selma plant supplies only Hyundai Motor Manufacturing Alabama, LLC ("HMMA") in Montgomery.

4.  King was employed in the Selma plant from 2004 until March 16, 2015.

    a.  Lear has operated the Selma plant since 2008 when it acquired the plant from its prior owner Renosol.

    b.  Lear places great emphasis on the safety of its 82 production employees at the Selma plant.

    c.  The manufacturing process for making car seats calls for small amounts of a chemical (also used in mattresses) known as toluene diisocyanate ("TDI").

23107901 v1

1

d.      Lear carefully keeps track of employee exposure to TDI by using plant monitors that operate throughout the production process, and performs employee training and periodic atmospheric testing as well; no Lear employee has ever received workers' compensation as a result of any condition relating to TDI exposure at the plant.

5.      Some or all of the relevant acts giving rise to this action are being directed toward HMMA and occurred in Montgomery County, Alabama, where HMMA's facility is located.

a.      King has a long history of an asthmatic condition with etiology outside the workplace and preceding her employment with Lear.

b.      On May 10, 2014, Kim King reportedly told the *Selma Times* that Lear in Selma exposed employees to chemicals that caused her asthma-like symptoms.

c.      On May 16, 2014, an independent third-party consulting group tested the air in the Lear Selma plant and found it safe, with levels of TDI, another chemical called MDI, particulates, and mold all well below the OSHA maximum safe level, or, if they lacked an OSHA maximum, well below American Council of Government Hygienists ("ACGH") safe levels; employees (including King) received the results on May 21, 2014 at a group meeting, and individually on June 3, 2014.

d.      On May 20, 2014, OSHA made an unannounced visit to Lear Selma plant as the result of an employee complaint relating to OSHA recordkeeping and alleged TDI exposure.

e.      On May 27 and 28, 2014, an OSHA industrial hygienist conducted sampling for TDI, reviewed the Selma plant's hazard communication written program respecting chemicals and related training records, observed hazardous materials alarm response, considered a ventilation report, observed TDI stationary monitors, and interviewed numerous employees.

DOCUMENT 2

(1)     Lear retained an independent third party industrial hygienist from the EI Group, Inc. to do side by side sampling of TDI while OSHA was sampling on May 28.

(2)     The results of the second round of sampling both from the third party and from OSHA showed appropriate time weighted test levels well below the ACGIH maximum safe level for exposure over time.

(3)     On June 4, 2014, these test results referenced next above were discussed individually with each employee who wore a sampling pump and results were posted on the safety board for all employees.

f.      On June 23, 2014, OSHA gave Lear its May 28, 2014, sampling test results that were consistent with those of the EI Group, Inc. and showed that levels well below the OSHA maximum safe limit; Lear notified all employees (including King).

g.      Notwithstanding the foregoing, King on July 14, 2014, was the subject of an nbc.com news article in which she claimed the plant atmosphere was unsafe and making her sick, a claim she repeated a day later in *al.com*.

h.      On July 17, 2014, OSHA again conducted Selma plant TDI sampling.

(1)     Samples conducted were compared to the ACGIH limits for an 8 hour time weighted average.

(2)     The independent third party EI Group also conducted side by side sampling.

i.      Both sets of results were well below OSHA and ACGIII maximum safe level for exposure over time, and Lear shared these with employees when it received them.

(1)     Lear received EI group results on July 21, 2014.

(2)     Lear received OSHA results December 2014.

(3)    OSHA has never cited Lear's in Selma plant for airborne or any other kind of TDI exposure to any employee at any time.

j.    Notwithstanding the foregoing, King in late July of 2014 began wearing a medical mask at work, but it was quickly apparent safety was not the issue.

(1)    In an effort to satisfy her, Lear gave King an easier assignment in the warehouse (away from the plant) for the same pay and benefits.

(2)    Upon receiving this new assignment, immediately filed a legal challenge and demanded to be returned to the area she claimed (and continues to claim) is unsafe.

k.    On July 23, 2014 though she never filed paperwork seeking workers compensation, King was offered the opportunity to be medically evaluated to determine if eligible for workers' compensation but she refused; King repeatedly has been offered the opportunity to produce any facts to Lear that would support her statements but has not done so.

l.    OSHA again returned for Selma plant testing on November 13, 2014; Lear again did parallel testing, and both sets of tests again revealed the atmosphere was safe and well within OSHA and ACGIII maximum safe levels, and employees (including King) were informed.

m.    Notwithstanding the foregoing, King posted a 7:22 video on Facebook stating that TDI in the workplace caused her illness.

n.    King was provided the opportunity to offer supporting facts but refused January 21, 2015, and was suspended.

o.    While on suspension, King repeated this behavior thereafter and was suspended again.

p.    On March 4, 2015, King posted the following on Facebook:

DOCUMENT 2



q.     Most recently, on March 5, 2015, King tried to force her way onto HMMA

premises in Montgomery County to leave a misdated letter there that repeats these false claims.

(1)     She and others were stopped at the HMMA guard shack for about

30 minutes:



(2)     The letter stated in relevant part:

"Workers at the Lear Corporation plant in Selma make
seats for Hyundai.  For years, those workers have been
exposed to dangerous chemicals, called isocyanates, which
are used to make the foam that is inserted into the seats.

These chemicals are known to cause life-long breathing problems, including chronic asthma."

\* \* \*

"...a recent OSHA investigation found numerous serious safety concerns at the plant, and concluded that <u>some workers were exposed to chemicals that made them sick</u>."

\* \* \*

"<u>Hyundai has the power</u> and the responsibility, through its social responsibility policies, to require Lear to make the necessary investments to ensure good, safe, fair working conditions throughout its supply chain."

Emphasis added.

  r. King repeated her attack on Lear's customer in identical March 6, 2015

posts to *al.com* and *The Root*:

"I work hard all day making foam for Hyundai car seats, but Hyundai refuses to take responsibility for the fact that we are getting sick and struggling on low wages at its supplier plants like Renosol [Lear's Selma Plant]," said Kim King, who has worked at Renosol [Lear's Selma Plant] for more than nine years."

  s. On March 12, 2015, the following was posted on Facebook:

**Kairos Center**
March 12 at 9.29am · Edited

Click to send an email to Hyundai demanding that they respect their workers' fight for our human rights and dignity.

Kim King is an auto worker in Selma who's been standing up for herself and her co-workers to demand safer working conditions: the chemicals that she's exposed to at the plant cause chronic respiratory conditions and even cancer. The Hyundai supplier she works for just suspended her and is threatening to fire her if she doesn't take back the true statements she's said about the company.



*Making seats for* **HYUNDAI** *made Kim King sick, but she*

**Stop Silencing Workers Who Speak Out**
Kim King helped build your Hyundai and now she is being silenced!
ACTIONNETWORK.ORG

DOCUMENT 2

6.      In all, between May 20, 2014 and November 13, 2014, OSHA conducted six visits to the Lear Selma facility, took numerous air samples and interviewed numerous plant employees; none reflected exposure above recognized limits causing illness and none close to legal limits, and OSHA never cited Lear for any unsafe TDI exposure, and OSHA never made any determination that anything in the workplace made anyone sick.

7.      During the above period and ever since, King has continued to make false statements and assertions to the media and third parties against Lear that she was being forced to work in an unsafe work atmosphere despite repeated assurances that Lear had received confirmations in testing and monitoring by OSHA and by independent laboratories that the air in the plant is safe and in conformity with all safety standards.

8.      King has known the statements being made by her were false when she made them.

9.      King has made and is continuing pursue a pattern of distributing false statements for purposes of having Lear's ability to do business interfered with, harming Lear's relationship with its customer, adversely affecting Lear customers elsewhere, and harming Lear's reputation.

10.     King's pattern of conduct has harmed and is harming Lear in ways that no legal remedy can address adequately.

### Count I - Intentional Interference with Business Relations

11.     Plaintiff re-avers and realleges the allegations contained in paragraphs 1-10 as if fully set forth herein.

12.     The actions of Defendant constitute intentional interference with the business relationship between Plaintiff and the sole customer for its Selma plant.

13.     At all material times, Defendant had actual knowledge of the existence of the relationship with which she interfered and continues to interfere.

DOCUMENT 2

DOCUMENT 2

14.    As King knew or should have known that making false statements designed to harm customer relationships was a discharge offense under Lear's employee handbook, and as King knew the statements and assertions were false when she made them, she did so with malice and no justification.

15.    Plaintiff has been and will continue to be irreparably injured as a result of Defendant's tortious interference.

16.    The harm done by Defendant threatens the Selma Plant's viability by deliberately targeting Plaintiff's relationship with its only customer;  Defendant has irreparably injured the interests of Plaintiff, and such irreparable injury will continue unless Defendant is enjoined by this Court from further violation of Plaintiff's rights, for which Plaintiff has no adequate remedy at law.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests a temporary restraining order be entered against Defendant, a preliminary and permanent injunction, and any damages for the cost of efforts to replace contractors that have declined to do business as a consequence of King's disinformation and otherwise, as appropriate, and any other such relief as the Court deems appropriate.

## Count II - Defamation

17.    Plaintiff re-avers and realleges allegations contained in paragraphs 1-16 as if fully set forth herein.

18.    The above referenced statements made and published by Defendant were false and defamatory statements concerning Plaintiff.

19.    Defendant made and published to third parties these false and defamatory statements against Plaintiff without reasonable care as to the truth or falsity of the statements.

23107901 v1                                         8

20.  Although Defendant knew or should have known that the statements were false and defamatory months ago, Defendant continues to publish the false and defamatory statements with malice and without regard to Plaintiff and published these statements to hundreds and perhaps thousands of third parties.

    a.      Defendant continues to publish her false and defamatory statements after receiving test results reflecting they are false and defamatory.

    b.      Defendant continues to publish her statements after being apprised that they are damaging to Lear's reputation and relationship with customers.

    c.      Defendant continues to publish her statements after being provided more than one opportunity to provide any facts supporting her statements and being unable to do so.

    d.      Defendant continues to publish knowingly false, knowingly injurious statements in literally hundreds of media outlets.

21.  The actions taken by Defendant and continue to be taken constitute unprivileged publications to countless third parties—including, among others, customers of Plaintiff and of its customer, HMMA-- of the above described false and defamatory statements about Plaintiff.

22.  The acts of Defendant are being done intentionally or recklessly and with malice in an attempt to injure Plaintiff's reputation.

23.  The Defendant's statements are being made with the intent to injure Plaintiff in its business and reputation.

24.  Defendant's actions continue to be the proximate cause of damages to Plaintiff.

25.  The harm done threatens Lear's Selma Plant's viability by targeting its relationship with its only customer.

DOCUMENT 2

26.   No legal remedy can address resulting continuing harm adequately, and the balancing of the equities favor enjoining Defendant's activity.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests a temporary restraining order be entered against Defendant, a preliminary and permanent injunction, and any damages for the cost of efforts to replace contractors that have declined to do business as a consequence of Defendant's disinformation and defamation, repair reputation and otherwise, as appropriate, and any other such relief as the Court deems appropriate.

Respectfully submitted,

*s/ Joseph C. Espy, III*
Joseph C. Espy, III (ESP002)
Attorney for Plaintiff
Lear Corporation EEDS and Interiors

**OF COUNSEL:**
MELTON ESPY & WILLIAMS, P.C.
255 Dexter Avenue
Montgomery, Alabama 36104
Telephone: 334-263-6621
Facsimile: 334-263-7252

*s/ John J. Coleman, III*
John J. Coleman, III (COL044)
Marcel L. Debruge (DEB006)
Frank McRight (MCR002)
Matthew T. Scully (SCU005)
Attorneys for Plaintiff
Lear Corporation EEDS and Interiors

BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone: 205-251-3000
Facsimile: 205-458-5100

23107901 v1                    10

### VERIFIED COMPLAINT

    I, Connie Messer, Human Resources Manager of Lear Corporation EEDS and Interiors,

verify that I am informed and believe, and on the basis of such information and belief, state that

the facts set forth in the foregoing Verified Complaint are true and complete, to the best of my

personal knowledge.

Lear Corporation EEDS and Interiors

By: Connie Messer

Its Human Resources Manager

STATE OF _____Ohio_____ )

COUNTY OF _____Licking_____ )

    I, ___Shalan Bergeson___, a Notary Public in and for said County in
said State, hereby certify that Connie Messer, whose name is signed to the foregoing VERIFIED
COMPLAINT, and who is known to me, acknowledged before me on this day that, being
informed of the contents of such instrument, he executed the same voluntarily on the day the
same bears date.

    Given under my hand and seal, this ___18th___ day of March, 2015.



**SHALAN BERGESON**
Notary Public, State of Ohio
My Commission Expires
February 25th, 2019

NOTARY PUBLIC

My Commission Expires: ___02/25/2019___

DOCUMENT 2

# EXHIBIT E

DOCUMENT 11



ELECTRONICALLY FILED
3/19/2015 8:47 AM
03-CV-2015-900474.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

|  |  |
|---|---|
| **LEAR CORPORATION EEDS AND INTERIORS,** | ) <br> ) <br> ) |
| **Plaintiff,** | ) <br> ) |
| v. | ) **CIVIL ACTION NO. CV-2015-900474** <br> ) |
| **KIMBERLY KING,** | ) <br> ) |
| **Defendant.** | ) <br> ) |

### MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

To stop a former employee from continuing through an orchestrated pattern of dozens of directed knowingly and demonstrably false statements and actions designed to interfere with its relationship with its only customer and to destroy its own business reputation, Plaintiff Lear Corporation EEDS and Interiors ("Lear") moves this Court for a temporary restraining order and a preliminary injunction pursuant to Rule 65 of the Alabama Rules of Civil Procedure to maintain the status quo and prospectively restrain and order Defendant Kimberly King ("King") from:

      (1)    Directly or indirectly, intentionally engaging in conduct that interferes with Lear's business and contractual relations;

      (2)    Making any statements defaming Plaintiff, whether made to Plaintiff's customer or any other person or entity.

      (3)    Destroying or concealing any emails and electronic records and other documents relevant to this matter pending the end of the litigation.

In support of this Motion, Lear incorporates the attachments and the Verified Complaint, and states as follows:

DOCUMENT 11

## Fact Summary

Hyundai Motor Manufacturing of Alabama ("HMMA") supplier Lear employs eighty-two people in its Selma, Alabama plant making car seats exclusively for a single customer in Montgomery.   Exhibit 1, Affidavit of Mike Walkowski ("Walkowski Affidavit") ¶¶3, 6-7; Verified Complaint ¶¶3-4.   Toluene diiscyanate ("TDI") is used in small amounts to make the seats (as well as most mattresses). Verified Complaint ¶4.  Lear's safeguards during the process include monitors that run throughout production and periodic atmospheric testing have been so successful that no employee at the Selma Plant has ever sought or received workers' compensation benefits due to any condition resulting from TDI exposure. Exhibit 1 (Walkowski Affidavit) ¶¶4-5; Verified Complaint ¶4.

King worked at Lear from 2004 until March 16, 2015. Verified Complaint, ¶4.  She never sought workers' compensation benefits for TDI exposure, but began in May of 2014 as part of a union organizing campaign a pattern of conduct designed to spread falsehoods to the media and the plant's sole customer that TDI made the plant's atmosphere unsafe.[1]  Exhibit 1 (Walkowski Affidavit) ¶¶9-12; Verified Complaint ¶¶5, 6-10.  Seven sets of test results provided from two independent testing labs and from OSHA itself between May 14, 2014 and November of 2014 confirmed the plant posed no such threat whatsoever, but each new result merely caused King to

---

[1] King, who has a long history of asthmatic conditions predating her employment with Lear, contends that TDI levels in the plant are unsafe, and that the TDI levels in the facility were causing her asthma like symptoms. Verified Complaint ¶5. Specifically, she told the *Selma Times* in May 2014 that Lear exposed employees to chemicals that caused her illness and on July 14, 2014, claimed, in an al.com article, that the plant atmosphere was unsafe and made her sick. Id. On or around July 23, 2014 King refused to be evaluated for a workers' compensation claim by a doctor, despite her assertion that TDI levels at the plant caused a work injury. Id.  King continued to make public statements that the air was unsafe and was making workers' sick. For example, despite the test results finding the air to be safe which were made known to King, posting a video in January 2015 on Facebook that TDI in the workplace caused her illness. Id.

DOCUMENT 11

redouble her effort to discredit the plant with its customer and defame Lear's good name. Exhibit 2 Affidavit of Gary Ansorge ("Ansorge Affidavit") ¶4, Attachment A, Verified Complaint ¶6.

King had no legitimate interest in safety. Lear in September of 2014 moved her (same pay and benefits) from the plant (where she claimed the air was unsafe) to another location away from TDI, and she immediately filed a legal action demanding to be moved back. Verified Complaint ¶5. Lear offered her multiple chances to provide facts contrary to the tests to justify her statements, but she offered none. See Exhibit 1 (Walkowski Affidavit) ¶9; Verified Complaint ¶5. Lear gave her multiple chances to stop her unlawful behavior but she only increased her efforts and broadened their scope. Id.

King seeks only to injure Lear and its business relationships. On March 5, 2015, security photos showed she attempted to break through customer  HMMA's plant employees only security entrance and when prevented from doing so left a letter for HMMA's president again repeating her falsehoods and made a speech, which is available on the internet, falsely claiming that OSHA concluded that workers were exposed to chemicals that made them sick, that the air problems identified by OSHA continue, and that Lear workers are currently exposed to dangerous working conditions. Exhibit 1 (Walkowski Affidavit) ¶¶10-11; Verified Complaint ¶5. She followed up a day later repeating the same statements for multiple media outlets. Exhibit 1 (Walkowski Affidavit) ¶11; Verified Complaint ¶5. Even though she was discharged for violating Lear policy, her campaign continues. Verified Complaint ¶¶7-10. Her actions will continue to cause irreparable injury to Lear every moment she is allowed to continue to make defamatory statements about the Company and unlawfully interfere with Lear's contractual and business relations. Exhibit 1 (Walkowski Affidavit) ¶¶13-17; Verified Complaint ¶¶6-10.

DOCUMENT 11

## Injunctive Relief

1.      Plaintiff seeks a temporary restraining order and a preliminary injunction to prohibit King from further defaming Plaintiff to its customers and to the public and from further engaging in conduct that unlawfully interferes with Lear's business and contractual relations.

2.      The elements required for the issuance of a temporary restraining order (TRO) are the same as the elements required for the issuance of a preliminary injunction. A plaintiff seeking a TRO has the burden of demonstrating: (1) a reasonable chance of success on the ultimate merits; (2) that without the TRO, the plaintiff would suffer immediate and irreparable injury; (3) that the plaintiff has no adequate remedy at law; and (4) that the hardship imposed on the defendant by the TRO would not unreasonably outweigh the benefit accruing to the plaintiff. Ormco Corp. v. Johns, 869 So2d 1109, 1113 (Ala. 2003); see Lott v. East Shore Christian Ctr., 908 So2d 922, 927 (Ala. 2005).

3.      A temporary restraining order and a preliminary injunction is appropriate to prohibit and restrain King from further committing tortious interference with Lear's business relationships, and Lear has shown the likelihood that it will prevail on the merits of its Verified Complaint filed simultaneously herewith.

        a.      Lear will likely prevail on the merits.

            i.      In Alabama, a party commits the tort of **intentional interference** with business or contractual relations where (1) there exists a contract or business relation; (2) the defendant had knowledge of the contract or business relation; (3) the defendant intentionally interferes with the contract or business relation; (4) defendant cannot show justification for interference; and (5) the plaintiff is damaged as a result of the defendant's interference. White Sands Group, L.L.C. v. PRS II, LLC, 32 So. 3d 5, 14 (Ala. 2009).

            ii.      Lear can meet these **intentional interference** elements.

DOCUMENT 11

1.      Lear has a longstanding business relationship with HMMA as its supplier of seats; HMMA's Montgomery plant is the Selma plant's only customer.[2] Exhibit 1 (Walkowski Affidavit) ¶¶3,6-7; Verified Complaint ¶¶3-4.

2.      Though King should know of the HMMA relationship from her long tenure at the Selma plant, its mention in her repeated media posts and her assault on the HMMA property make clear her awareness beyond doubt.[3] Exhibit 1 (Walkowski Affidavit) ¶¶10-13; Verified Complaint ¶5.

3.      King repeatedly intentionally interfered with this relationship.

a.      She engaged in a campaign of falsehood against the Lear plant and made clear by its content it was directed at the disruption of Lear's relationship with the plant's only customer so that the customer would cease doing business with the plant.[4] See, Walkowski Affidavit ¶9; Verified Complaint ¶¶5-9.

b.      Her campaign most recently has culminated in her visit to the customer's premises and her direct communication with the customer's CEO and media directed at the customer toward her unlawful end. Exhibit 1 (Walkowski Affidavit) ¶¶10-13; Verified Complaint ¶5.

4.      King's continuing actions are not justified; the repeated test results (of which King was made aware) establish she had no benign reason for her campaign, and its virulence as indicated by her repeating falsehoods literally hundreds of times in a manner

---

[2] White Sands, 32 So2d at 19 (relationship alone sufficient to meet element).

[3] Spring Hill Lighting & Supply Co. v. Square D Co., 662 So2d 1141, 1150 (Ala. 1995)(inferring defendant's knowledge of business relationship because it knew plaintiff supplied equipment to the third party).

[4] White Sands, 32 So3d at 14 (false statements to interfere with business relations is "wrongful conduct" sufficient to create a claim for tortious interference).

to do harm forecloses any claim of privilege.[5]   Exhibit 1 (Walkowski Affidavit) ¶9; Exhibit 2 (Ansorge Affidavit) ¶4; Verified Complaint ¶¶5-6.

        5.      Her campaign is continuing to injure Lear's relationship with the plant's only customer as we speak, and her continued efforts threaten the plant's continued existence.[6]   Exhibit 1 (Walkowski Affidavit) ¶¶8, 13-17; Verified Complaint ¶¶9-10.

        iii.      In Alabama, a plaintiff establishes a **defamation** claim by showing "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement."  Gary v. Crouch, 867 So2d 310, 315 (Ala. 2003)(reversing summary judgment against defamation claim).

        iv.      Lear will likely prevail on the merits of its **defamation** claim.

        1.      King continues a pattern of false representations that the Selma plant air is unsafe. Exhibit 1 (Walkowski Affidavit) ¶¶9-15; Verified Complaint ¶¶5-7.

        2.      King is publishing her false statements to media and the plant customer literally hundreds of times despite awareness that they are false.[7]  Id.

        3.      From being informed of repeated test results, and from being able to offer no contrary facts, King clearly knew such statements are false when she is

---

[5] Ex parte Blue Cross & Blue Shield, 773 So2d 475, 478 (Ala. 2000)(the defense of qualified privilege "suffices against only claims for innocent or mistaken defamation and not against claims for defamation committed with actual malice.").

[6] District of Columbia v. Eastern Trans-Waste of Maryland, 758 A.2d, 1, 15 (D.C. 2000) ("While economic loss does not, in and of itself, constitute irreparable harm, such harm will be found if economic loss threatens the very existence of the movant's business.").

[7] S.B. v. St. James Sch., 959 So2d 72, 91-92 (Ala. 2006)(citation omitted)("'Publication,' in that sense, is a word of art, which includes any communication by the defendant to a third person.").

making them and certainly has no basis for claiming benign ignorance.[8] Exhibit 1 (Walkowski Affidavit) ¶9; Exhibit 2 (Ansorge Affidavit) ¶4; Verified Complaint ¶¶5-6.

    4.    Such statements are directed at Lear's business reputation, and are causing irreparable harm.[9] Exhibit 1 (Walkowski Affidavit) ¶¶13-17; Verified Complaint ¶¶6-10.

    b.    Ms. King's unlawful actions will continue to cause irreparable injury to Lear every moment she is allowed to continue to tortiously interfere with Lear's business and contractual relations;[10] Ms. King's actions have and will jeopardize the future of Lear's plant, the employment of the 82 individuals who work there, and the benefits and goodwill Lear provides to the Selma community.[11] Exhibit 1 (Walkowski Affidavit) ¶¶8, 13-17; Verified Complaint ¶¶5-10.

    c.    No legal remedy will suffice; no damages alone can ever open a plant in danger of closing or restore a reputation in the community once tarnished by a smear campaign of this national magnitude. See, Verified Complaint ¶10.

    i.    Immediate and irreparable harm will result to Lear if Lear is forced to await a hearing on the merits and/or defendant can be heard in opposition. See Ala. R. Civ. P. 65(b)(1); American Express Fin. Advisors v. Knox, 1998 U.S. Dist. LEXIS 14018, 5-6 (S.D.

---

[8] Wiggins v. Mallard, 905 So2d 776 (Ala. 2004)(malice may be shown by proof of "the recklessness of the publication and prior information regarding its falsity."); Johnson Publishing Co. v. Davis, 271 Ala. 474, 487 (Ala. 1960)(the recklessness of publication and prior information regarding its falsity establishes malice).

[9] Kelly v. Arrington, 624 So2d 546, 549 (Ala. 1993)("Words are defamatory per se if they directly tend to prejudice anyone in his office, profession, trade, or business, or in any lawful employment by which he may gain his livelihood.").

[10] American Express Fin. Advisors v. Knox, 1998 U.S. Dist. LEXIS 14018, *5-6 (S.D. Ala. July 23, 1998)("injury to the reputation of the plaintiffs will occur if an injunction is not issued [and] this harm is by its very nature intangible and incapable of monetary compensation.").

[11] District of Columbia v. Eastern Trans-Waste of Maryland, 758 A.2d 1, 15 (D.C. 2000) ("While 'economic loss does not, in and of itself, constitute irreparable harm, such harm will be found if economic loss threatens the very existence of the movant's business.'").

Ala. July 23, 1998)("injury to the reputation of the plaintiffs will occur if an injunction is not issued [and] this harm is by its very nature intangible and incapable of monetary compensation."); Special Purpose Accounts Receivable Cooperative Corporation v. Prime One Capital Company, LLC, 125 F.Supp.2d 1093, 1105 (S.D. Fla. 2000) (" . . . irreparable injury is presumed in cases involving tortious interference with business relationship.").

        ii.    Lear is suffering irreparable damage to its business every moment King is permitted to make false and defamatory statements about the Company and interfere with the relationship Lear has with its customers. Exhibit 1 (Walkowski Affidavit) ¶¶8, 13-17; Verified Complaint ¶¶9-10.

        d.    Lear has suffered and is suffering harm with every passing day; granting this TRO will merely stop the harm long enough to have a hearing, while King will suffer no adverse effect by not being able to defame her former employer or interfere with the Selma Plant's only customer until a hearing can be held.

        i.    A temporary restraining order is necessary to preserve the status quo until such time that this Court can consider the merits. See, e.g., Water Works and Sewer Board of the City of B'ham v. Anderson, 530 So2d 193, 197 (Ala. 1988)(properly granting temporary restraining order to preserve the status quo).

        ii.    A temporary restraining order is necessary to prevent King from interfering with Lear's business and contractual relations and making defamatory statements about the company. Exhibit 1 (Walkowski Affidavit) ¶ 17; Verified Complaint ¶9.

        iii.    Preventing King from engaging in defamation and tortious interference will not cause her any harm; the threat of injury to Lear's business and reputation outweighs any possible harm to King, which might occur as a result of the entry of a temporary restraining order preventing her from engaging in the aforementioned misconduct. See also

Mbakpuo v. Ekeanyanwu, 738 A.2d 776, 783 (D.C. 1999) (affirming trial court's injunction because "[t]he injunction merely prohibits [appellant] from doing something that he has absolutely no right to do in the first place").

        iv.    Lear stands ready, pursuant to Ala. R. Civ. P. 65(c), to post a bond as reasonable security to protect defendants from any wrongful issuance of an injunction.

   2.    Pursuant to Ala. R. Civ. P. 65(b)(2), Lear hereby certifies to this Court that it has made substantial efforts to provide notice to Defendant King, as evidenced by:

        a.    Lear's attorneys have notified the law firm that has informed Lear that it represents King of Lear's intentions to seek a temporary restraining order concerning the subject of the complaint; and

        b.    Based on the facts set forth herein (including the Verified Complaint), Lear is concerned that any further notice efforts could result in King, who no longer works for the Company, engaging in further acts of defamation and tortious interference.

   WHEREFORE PREMISES CONSIDERED, Lear respectfully requests this Court to:

   (a)    grant a temporary restraining order prohibiting Ms. King from engaging in the activities set forth above;

   (b)    grant preliminary injunctive relief.

                Respectfully submitted,

                *s/ Joseph C. Espy, III*
                Joseph C. Espy, III (ESP002)
                Attorney for Plaintiff
                LEAR Corporation EEDS and Interiors

**OF COUNSEL:**
MELTON ESPY & WILLIAMS, P.C.
255 Dexter Avenue
Montgomery, Alabama 36104
Telephone: 334-263-6621
Facsimile: 334-263-7252

DOCUMENT 11

s/ John J. Coleman, III
John J. Coleman, III (COL044)
Marcel L. Debruge (DEB006)
Frank McRight (MCR002)
Matthew T. Scully (SCU005)

Attorneys for Plaintiff
LEAR Corporation EEDS and Interiors

BURR & FORMAN LLP
3400 Wells Fargo Tower
420 North 20th Street
Birmingham, Alabama 35203
Telephone:  205-251-3000
Facsimile:  205-458-5100

## PLEASE SERVE WITH COMPLAINT

### NOTICE OF HEARING

Please be advised that the above and foregoing has been filed with the Clerk of the Circuit Court of Montgomery County, Alabama and that the same is set for hearing before _____ on _____ at _____.

## PLEASE SERVE WITH COMPLAINT

DOCUMENT 11

# EXHIBIT 1

### AFFIDAVIT OF MIKE WALKOWSKI

**State of Ohio**       )

**County of Licking**   )

The undersigned, Mike Walkowski, deposes and states as follows:

1.     My name is Mike Walkowski, I am over 21 years of age, I have personal knowledge of the facts, which I declare true under penalty of perjury and which I set forth in this affidavit, and I give this affidavit voluntarily and without coercion.

2.     I am and have been employed at Plaintiff Lear Corporation EEDS and Interiors ("Lear") since 1994.

    a.     I worked exclusively at Lear's Selma, Alabama plant ("Selma Plant") for 6 months in 2014; I currently work in Farwell, Michigan, and have since 2008.

    b.     I am the Operational Director of all foam plants and have Lear's Selma Plant under my direct supervision.

3.     Located in Selma, Alabama, Lear is a Tier-2 auto parts supplier that employs more than 80 employees to manufacture car seats; Tier-2 means our parts go directly to our plant's sole customer, and are not incorporated into the parts of other contractors who deal directly with the ultimate manufacturer of the automobile.

4.     In my role as Operational Director, I am aware of Lear's comprehensive TDI monitoring processes, as well as employee training and periodic atmospheric testing.

5.     No Lear employee has ever received workers' compensation benefits as a result of any condition relating to TDI exposure at the plant.

6.     Hyundai Motor Manufacturing Alabama ("HMMA") manufactures automobiles in Montgomery, Alabama.

DOCUMENT 11

7.    Lear has a contractual relationship with HMMA to provide seats for the vehicles HMMA manufacturers, it is the Selma Plant's only customer and accounts for all of the Selma Plant's sales.

8.    If Lear lost HMMA as a customer, it would jeopardize the future of the Selma Plant and the employment of the 82 individuals who work there.

9.    From my job, I was aware of Kim King's pattern of conduct beginning May 10, 2014 and attempting to harm Lear and HMMA, the Selma Plant's sole customer, through a pattern of dissemination of information she knew to be false about plant safety, that she had been notified of negative test results that seven times confirmed the plant posed no safety risk as she claimed, that she had offered no contrary information when given the chance to do so, and that she has continued to do so despite disciplinary action up through her discharge this past Monday.

10.    On March 5, 2015, I learned that Ms. King had attempted to enter HMMA premises through the HMMA employee entrance to leave a letter there that makes false claims about Lear; it stated in relevant part:

> "Workers at the Lear Corporation plant in Selma make seats for Hyundai. For years, those workers have been exposed to dangerous chemicals, called isocyanates, which are used to make the foam that is inserted into the seats. These chemicals are known to cause life-long breathing problems, including chronic asthma."

> \* \* \*

> "...a recent OSHA investigation found numerous serious safety concerns at the plant, and concluded that some workers were exposed to chemicals that made them sick."

> \* \* \*

> "Hyundai has the power and the responsibility, through its social responsibility policies, to require Lear to make the necessary investments to ensure good, safe, fair working conditions throughout its supply chain."

DOCUMENT 11

11.    She repeated her attack on Lear's customer in identical March 6, 2015 posts to al.com and The Root:

> "I work hard all day making foam for Hyundai car seats, but Hyundai refuses to take responsibility for the fact that we are getting sick and struggling on low wages at its supplier plants like Renosol," said Kim King, who has worked at Renosol for more than nine years."

12.    The letter falsely claimed that OSHA concluded that workers were exposed to chemicals that made them sick, that the air problems identified by OSHA continue, and that Lear workers are currently exposed to dangerous working conditions.

13.    Ms. King's letter to HMMA's President and CEO interfered with Lear's business relationship with HMMA; Lear must price and bid their service to HMMA in order to win their contract periodically, and this disruption impacts future bid evaluation.

    a.    Ms. King's statements that we knowingly harm employees could cause our customer to decide to award our contract to another provider which would cause 82 hourly employees to be unemployed and financial injury to Lear.

    b.    Due to Lear's global nature, this **could** affect us not only in Montgomery, but worldwide.

14.    Further, Lear has a strong reputation in the profession for quality and safety.

15.    Ms. King has made a number of false statements to the media and public that OSHA concluded that workers were exposed to chemicals that made them sick, that the air problems identified by OSHA continue, and that Lear workers are currently exposed to dangerous working conditions from TDI exposure and that the conditions are making them sick.

16.    As a result of these statements, Lear's reputation in the business community has been damaged.

a.    Local business owners, as well as the Mayor of Selma, have questioned Lear management on the validity of these allegations and asked for data proving our position that we would never expose employees to a hazardous work environment.

b.    Subcontractors to the plant, due to the false allegations, have refused to service the plant and Lear has suffered injury.

(1)    After Ms. King began her disinformation campaign, it has become increasingly difficult to attract temporary workers from Kelly Services, causing delay in filling positions.

(2)    At least one contractor has refused to provide service locally due specifically to King's disinformation, requiring having to fly in a replacement from Michigan at a cost of $13,000.

17.    The damages to Lear's business relationships and reputation as result of Ms. King's statements and conduct are ongoing and continuous; the damages have become worse over time as she continues to publicize her false statements in the media, to the public, and to our customers.

The foregoing I voluntarily declare under penalty of perjury is true and complete.

3-18-15
_____
Date

_____
Mike Walkowski


STATE OF ___Ohio___ )

COUNTY OF ___Licking___ )

    I, ___Ashton Hall___, a Notary Public in and for said County in said State, hereby certify that Mike Walkowski, whose name is signed to the foregoing AFFIDAVIT, and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he executed the same voluntarily on the day the same bears date.

    Given under my hand and seal, this __18__ day of March, 2015.

_____
NOTARY PUBLIC

My Commission Expires: Dec 11, 2019

**ASHTON HALL**
Notary Public, State of Ohio
My Commission Expires
December 11, 2019

DOCUMENT 11

# EXHIBIT 2

DOCUMENT 11

## AFFIDAVIT OF GARY ANSORGE

STATE OF _____Michigan_____ )

COUNTY OF ____Oakland_____ )

My name is Gary Ansorge, I am over 21 years of age, and I have personal knowledge of all matters set forth below:

1. I have been employed by Lear Corporation's Corporate EH&S Department as a Corporate Regional Health, Safety and Workers' Compensation Manager.

2. In that capacity, I am called on from time to time to become involved to coordinate employee sampling by an independent third party, coordinating measures to assist the company in protecting employee safety, and in responding to inquiries from the Occupational Safety and Health Administration ("OSHA").

3. I played that role in connection with OSHA's investigation of Lear's Seating Plant (previously Renosol) in Selma, Alabama last year.

4. I was familiar with atmospheric testing relating to Toluene-2, 4 and 2,6 - Diisocyanate ("TDI").

a. I am familiar with sampling done both by the company retained independent third parties and by OSHA during the relevant period, and summarize it in Attachment A.

b. On May 16, 2014, Renosol retained SevenGen, an independent third-party consulting group, to conduct sampling for TDI, MDI, particulates, and mold release in the plant for the purpose of ascertaining if any of the foregoing posed a hazard to employees; the sampling indicated that the levels in the plant were safe and well below their respective OSHA permissible exposure limits ("PEL") and, for those substances without such limits, below limits established by the American Conference of Government Industrial Hygienists ("ACGIH"), the latter of which are called TLV.

c. OSHA appeared unannounced thereafter on May 20, 2014, and for two days beginning May 27, conducted employee sampling for TDI. The results of these samples also fell well below their respective OSHA PEL, as did parallel sampling done by the EI Group at the same time.

d. OSHA again appeared July 17, 2014, and again conducted TDI sampling to determine how samples compared to the ACGIH's 8-hour time weighted average limits. Parallel sampling was again done by the EI Group. Both the OSHA and EI Group results were below the ACGIH's TLV.

e. OSHA again appeared on November 13, 2014 and again conducted TDI sampling to determine how samples compared to both the OSHA PEL and the ACGIH TLV.

21513591 v1

Parallel sampling was again done by the EI Group.  Both the OSHA and EI Group results were below the OSHA PEL and ACGIH's TLV.

Thus, after seven separate instances of sampling, the limits for the complained of substance in each instance has been determined to be well within acceptable limits.

The foregoing is true and complete to the best of my knowledge.


_March 18, 2015_
Date

_Gary F. Ansorge_
Gary Ansorge


STATE OF ___MICHIGAN___  )

COUNTY OF ___WAYNE___  )

I, ___KAREN M. CRITTENDEN___ , a Notary Public in and for said County in said State, hereby certify that Gary Ansorge, whose name is signed to the foregoing AFFIDAVIT, and who is known to me, acknowledged before me on this day that, being informed of the contents of such instrument, he executed the same voluntarily on the day the same bears date.

Given under my hand and seal, this ___18 th___ day of August, 2014. MARCH 2015


_Karen Crittenden_
NOTARY PUBLIC

[SEAL]

My Commission Expires: ___4/15/19___


KAREN M  CRITTENDEN
NOTARY PUBLIC, STATE OF MI
COUNTY OF WAYNE
MY COMMISSION EXPIRES Apr 15, 2019
ACTING IN COUNTY OF  OAKLAND

21513591 v1                          2

DOCUMENT 11

**ATTACHMENT A**

DOCUMENT II

## Summary of Industrial Hygiene Sampling at Lear Corporation Selma, AL in 2014 for 2,4 and 2,6 Tolulene Diisocyanates (TDI)

<u>May 16, 2014</u> Sampling by SevenGen (independent third party):

- Sampled for 2,4 TDI and compared results to Occupational Safety and Health Administration (OSHA) Permissible Exposure Limit (PEL) – **All results below**
- Sampled for 2,6 TDI and compared results to American Conference of Governmental Industrial Hygienists (ACGIH) Threshold Limit Values (TLV) – **All results below**

<u>May 28, 2014</u> Sampling by OSHA:

- Sampled for 2,4 TDI and **all results are below** OSHA PEL

<u>May 28, 2014</u> Sampling by EI Group (independent third party):

- Sampled for both 2,4 and 2,6 TDI and **all results are below** OSHA PEL for 2,4 TDI

Note: A PEL for 2,6 TDI is not established by OSHA

<u>July 17, 2014</u> Sampling by OSHA:

- Sampled for 2,6 TDI and compared results to ACGIH TLV – **All results below**

<u>July 17, 2014</u> Sampling by EI Group (independent third party):

- Sampled for 2,6 TDI and compared results to ACGIH TLV – **All results below**

<u>November 13, 2014</u> Sampling by OSHA:

- Sampled for 2,4 TDI and compared results to OSHA PEL – **All results below**
- Sampled for 2,6 TDI and compared results to ACGIH (TLV) – **All results below**

<u>November 13, 2014</u> Sampling by EI Group (independent third party):

- Sampled for both 2,4 and 2,6 TDI and **all results are below** OSHA PEL for 2,4 TDI

Note: A PEL for 2,6 TDI is not established by OSHA

Please see supporting documentation attached.

DOCUMENT 11

**7G**

TABLE - 3
AIRBORNE CONCENTRATIONS – Isocyanates
Renosol – Selma, AL
May 16, 2014

| Sample ID | Date | Start Time | Stop Time | Total Min. | Personal Breathing Zone Sample Employee Name; Location / Activity | Name of Chemical | Conc. (ppb) | Limit (ppb)[9] | % of Limit |
|---|---|---|---|---|---|---|---|---|---|
| MDI-1 | 5/16/14 | 0712 | 1432 | 440 | ▓▓▓▓▓; Headrest Line Demold | MDI | < 0.093 | 5.0 | < 2 |
| MDI-2 | 5/16/14 | 0705 | 1430 | 445 | ▓▓▓▓▓; Headrest Line Rotates | MDI | < 0.080 | 5.0 | < 2 |
| TDI-1 | 5/16/14 | 0700 | 1430 | 450 | ▓▓▓▓▓; Seat Line Demold | 2,4-TDI | 0.36 | - | - |
|  |  |  |  |  |  | 2,6-TDI | 1.0 | - | - |
|  |  |  |  |  |  | Total TDI | 1.36 | 5.0 | 27 |
| TDI-2 | 5/16/14 | 0702 | 1430 | 448 | ▓▓▓▓▓; Seat Line Insert | 2,4-TDI | 0.50 | - | - |
|  |  |  |  |  |  | 2,6-TDI | 1.0 | - | - |
|  |  |  |  |  |  | Total TDI | 1.50 | 5.0 | 30 |
| TDI-3 | 5/16/14 | 0725 | 1435 | 430 | ▓▓▓▓▓; Seat Line Lead Hand | 2,4-TDI | 0.36 | - | - |
|  |  |  |  |  |  | 2,6-TDI | 0.85 | - | - |
|  |  |  |  |  |  | Total TDI | 1.21 | 5.0 | 24 |

| Notes: | Occupational Exposure Limits Name of Chemical | OSHA PEL 8-hr TWA[10] | OSHA PEL-C | ACGIH TLV® 8-hr TWA[11] | ACGIH STEL |
|---|---|---|---|---|---|
| ppb = parts per billion | Methylene Bisphenyl Isocyanate (MDI) | - | 20 ppb | 5.0 ppb | NB |
|  | Toluene-2,4-diisocyanate (2,4-TDI) | - | 20 ppb | 5.0 ppb | 20 ppb |
|  | Toluene-2,6-diisocyanate (2,6-TDI) | - | - | 5.0 ppb | 20 ppb |

Isocyanate samples were collected using 37-millimeter diameter Glass Fiber Filters (GFF) impregnated with 1, [2-pyrdyl] piperazine and mounted in three-stage cassettes, with an open face. Each cassette was connected via a length of Tygon tubing to a pump operating at a nominal flow rate of 1 liter per minute (L/min). Analysis was performed via high-pressure liquid chromatography with fluorescence per OSHA method #42 / 47.
< = Result is below the limit of detection.

[9] The limit referenced is the lower of the OSHA PEL or ACGIH TLV.
[10] OSHA Air Contaminants, 29 Code of Federal Regulations, Part 1910.1000, 2014. http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=standards&p_id=9991.
[11] ACGIH. *Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indices*, 2013.

- MAY 16, 2014 SAMPLING BY SEVENGEN
  - 2,4 TDI RESULTS COMPARED TO OSHA PERMISSIBLE EXPOSURE LIMIT (PEL) - ALL RESULTS BELOW

  - 2,6 TDI RESULTS COMPARED TO ACGIH THRESHOLD LIMIT VALUES (TLV) - ALL RESULTS BELOW

5-16-14          SEVENGEN PAGE 1

DOCUMENT 11

**7G**

TABLE – 3 (continued)
AIRBORNE CONCENTRATIONS – Isocyanates
Renosol –Selma, AL
May 16, 2014

| Sample ID | Date | Start Time | Stop Time | Total Min. | Personal Breathing Zone Sample Employee Name; Location / Activity | Name of Chemical | Conc. (ppb) | Limit (ppb)[12] | % of Limit |
|---|---|---|---|---|---|---|---|---|---|
| MDI-3 | 5/16/14 | 1400 | 1420 | 20 | AREA: 1st Headrest Line Insert | MDI | < 0.98 | 20 | 5 |
| TDI-4 | 5/16/14 | 1330 | 1345 | 15 | AREA: 1st Demold on Seat Line | 2,4-TDI | < 1.9 | 20 | < 10 |
| | | | | | | 2,6-TDI | < 1.9 | - | - |
| ISO-1 | 5/16/14 | 0756 | 1400 | 364 | AREA: Bulk Tank Area | MDI | < 0.084 | - | < 2 |
| | | | | | | 2,4-TDI | 0.22 | - | - |
| | | | | | | 2,6-TDI | 0.42 | - | - |
| | | | | | | Total TDI | 0.64 | 5.0 | 13 |

| Notes: | | Occupational Exposure Limits Name of Chemical | OSHA PEL 8-hr TWA[13] | OSHA PEL-C | ACGIH TLV® 8-hr TWA[14] | ACGIH STEL |
|---|---|---|---|---|---|---|
| ppb = parts per billion | | Methylene Bisphenyl Isocyanate (MDI) | - | 20 ppb | 5.0 ppb | NE |
| | | Toluene-2,4-diisocyanate (2,4-TDI) | - | 20 ppb | 5.0 ppb | 20 ppb |
| | | Toluene-2,6-diisocyanate (2,6-TDI) | - | - | 5.0 ppb | 20 ppb |

Isocyanate samples were collected using 37-millimeter diameter Glass Fiber Filters (GFF) impregnated with 1, (2-pyridyl) piperazine and mounted in three stage cassettes, with an open face. Each cassette was connected via a length of Tygon tubing to a pump operating at a nominal flow rate of 1 liter per minute (L/min). Analysis was performed via high-pressure liquid chromatography with fluorescence per OSHA method #42 / 47.

< = Result is below the limit of detection.

[12] The limits referenced are the OSHA PEL for full-shift sample and the OSHA PEL-C for short-term samples.
[13] OSHA Air Contaminants, 29 Code of Federal Regulations, Part 1910.1000. 2013. http://www.osha.gov/pls/oshaweb/owadisp.show_document?p_table=standards&p_id=9991.
[14] ACGIH, *Threshold Limit Values for Chemical Substances and Physical Agents & Biological Exposure Indices*, 2013.

5-16-14          SEVENGEN PAGE 2

DOCUMENT 11

**U.S. Department of Labor**

Occupational Safety and Health Administration
1141 Montlimar Dr. Suite 1006
Mobile, AL 36609
(251) 441-6131 Fax (251)441-6398



Reply to the Attention of:   Area Director

June 23, 2014.

Kathy Jones,
Renosal Seating LLC,
6 Meadowcraft Pkwy,
Selma, AL 36701.

RE:    Renosal Seating, LLC, Inspection No: 978386

Dear Kathy Jones,

The results of the sampling results performed at your establishment on May 28, 2014 were
as follows:

| Employee Name | Chemical Agent Toluene-2, 4 – Diisocyanate(TDI) | Results in mg/m3 | OSHA *PEL in mg/m3 | Exceeds Yes/No |
|---|---|---|---|---|
|  | TDI | 0.00000 | 0.140 | No |
|  | TDI | 0.00490 | 0.140 | No |
|  | TDI | 0.00000 | 0.140 | No |
|  | TDI | 0.00000 | 0.140 | No |

*PEL- Permissible Exposure Limit

If you have any questions regarding the results, please contact Assistant Area Director Jeff
Stawowy at (251) 441-6131. Thank you for your cooperation during our inspection of your
facility and for your interest in the safety and health of your employees.

Sincerely,

Joseph Roesler
Area Director
/db

— MAY 28,2014 SAMPLING BY OSHA
— SAMPLED FOR 2,4 TDI AND ALL
RESULTS ARE BELOW OSHA
PERMISSIBLE EXPOSURE LIMITS (PEL)

5-28-14        OSHA PAGE 1

DOCUMENT 11

### Results and Discussion

#### 2, 4 and 2, 6 Toluene Diisocyanate

Exposure to 2, 4 Toluene Diisocyanate  was assessed for  four employees working on
the seating and head rest line . These samples were analyzed and compared to the
OSHA Ceiling Levels . All employees assess were found to be below the current
OSHA Ceiling Level for 2,  4 and 2, 6  TDI (0.02 ppm). A summary of the   sampling
results can be found in Table 1 below.

Table 1: 2, 4 and 2 ,6 Toluene Diisocyanate Sampling Results

| Employee/Work Area | Sample Number | Sample Time (min) | Flow Rate (Liters Per Min) | Sample Volume (Liters) | Employee Exposure 2, 4 TDI (ppm) | Employee Exposure 2, 6 TDI (ppm) | OSHA Ceiling (0.02 ppm) Exceeded? (YES/NO) |
|---|---|---|---|---|---|---|---|
| ▇▇▇ Seating Line | 14-0923630 | 19 | 1.004 | 19.08 | <0.0007 | <0.0007 | NO |
| ▇▇▇ Seating Line | 14-0943634 | 15 | 1.004 | 15.06 | <0.0009 | <0.0009 | NO |
| ▇▇▇ Seating Line | 14-0923626 | 18 | 0.999 | 17.99 | <0.0008 | 0.001 | NO |
| ▇▇▇ Seating Line | 14-0923639 | 15 | 0.999 | 14.99 | <0.0009 | 0.002 | NO |
| ▇▇▇ Seating Line | 14-0923631 | 19 | 1.002 | 19.04 | <0.0007 | 0.0009 | NO |
| ▇▇▇ Seating Line | 14-0923623 | 17 | 1.004 | 17.07 | 0.001 | <0.0008 | NO |

- MAY 28, 2014 SAMPLING BY EI GROUP
- SHORT TERM EXPOSURE LIMIT (STEL) SAMPLES
  FOR BOTH 2,4 AND 2,6 TDI RESULTS DID
  NOT EXCEED OSHA PERMISSIBLE EXPOSURE
  LIMIT (PEL) FOR 2,4 TDI
  NOTE: PEL FOR 2,6 TDI IS NOT ESTABLISHED

5-28-14          EI GROUP PAGE 1

DOCUMENT 11

**U.S. Department of Labor**

Occupational Safety and Health Administration
1141 Montlimar Dr. Suite 1006
Mobile, AL 36609
(251) 441-6131 Fax (251) 441-6398

Reply to the Attention of: Area Director



Kathy Jones,
Renosal Seating LLC,
6 Meadowcraft Pkwy,
Selma, AL 36701.

RE:   Renosal Seating, LLC, Inspection No: 978386

Dear Kathy Jones,

The results of the sampling performed at your establishment on July 17, 2014 were as
follows:

| Employee Name | Chemical Agent *TDI | Results in *ppm | OSHA *PEL in *mg/m3 | ACGIH TLV® in ppm |
|---|---|---|---|---|
| | TDI | 0.0002 | 0.000 | 0.005 |
| | TDI | 0.0011 | 0.000 | 0.005 |
| | TDI | 0.0004 | 0.000 | 0.005 |
| | TDI | 0.0006 | 0.000 | 0.005 |

*TDI – Toluene-2, 6 – Diisocyanate
*PEL- Permissible Exposure Limit
*TLV® – Threshold Limit Values
*ppm – parts per million
*mg/m3 – milligrams per cubic meter

If you have any questions regarding the results, please contact Assistant Area Director Jeff
Stawowy at (251) 441-6131. Thank you for your cooperation during our inspection of your
facility and for your interest in the safety and health of your employees.

Sincerely,

Joseph Roesler
Area/Director
/db

– JULY 17, 2014 SAMPLING BY OSHA
– 2,6 TDI RESULTS COMPARED TO
   ACGIH THRESHOLD LIMIT VALUE (TLV) –
   ALL RESULTS BELOW

7-17-14        OSHA PAGE 1

DOCUMENT 11

### Results and Discussion

2, 6 Toluene Diisocyanate

Exposure to 2, 6 Toluene Diisocyanate was assessed for four employees working on the seating and headrest line. These samples were analyzed and compared to the ACGIH TLV. Potential exposures for all employees included in the scope of the survey were found to be below the current ACGIH TLV for 2, 6 Toluene Diisocyanate (0.005 ppm / 5.0 ppb). A summary of the sampling results can be found in Table 1 below.

Table 1: 2 ,6 Toluene Diisocyanate Sampling Results

| Employee/ Work Area | Sample Number | Sample Volume (Liters) | Concentration (ppm) | Concentration (ppb) | ACGIH TLV (0.005 ppm/ 5.0 ppb) Exceeded? (YES/NO) |
|---|---|---|---|---|---|
| /Seat Line | 14-0962620 14-0962614 | 412.9 | 0.0002 | 0.2 | NO |
| Seat Line | 14-0962616 14-0962618 | 407.0 | 0.0013 | 1.3 | NO |
| Seat Line | 14-0962613 14-0962617 | 406.02 | 0.0006 | 0.6 | NO |
| Headrest Line | 14-0962621 14-0962611 | 400.59 | 0.0007 | 0.7 | NO |

—JULY 17, 2014 SAMPLING BY EI GROUP
—2,6 TDI RESULTS COMPARED TO ACGIH
THRESHOLD LIMIT VALUE (TLV) —
ALL RESULTS BELOW

DOCUMENT 11

**U.S. Department of Labor**

**DEC 1 1 2014** · · · 4

Kathy Jones,
Renosal Seating LLC,
6 Meadowcraft Pkwy,
Selma, AL 36701.

Occupational Safety and Health Administration
1141 Montlimar Dr. Suite 1006
Mobile, AL 36609
(251) 441-6131 Fax (251)441-6398

Reply to the Attention of:  Area Director



RE: Renosal Seating, LLC, Inspection No: 978386

Dear Kathy Jones,

The results of the sampling performed at your establishment on November 13, 2014 were as follows:

| Employee Name | Chemical Agent TDI | Sample Number | Results mg/m3 | Results ppm | ACGIH TLV® in ppm |
|---|---|---|---|---|---|
|  | TDI | A3 | 0.0044 | 0.0006 | 0.005 |
|  | TDI | M13 | 0.0139 | 0.0020 | 0.005 |
|  | TDI | M14 | 0.0111 | 0.0016 | 0.005 |
|  | TDI | M15 | 0.0147 | 0.0021 | 0.005 |
|  | TDI | M16 | 0.0033 | 0.0005 | 0.005 |
|  | TDI | A5 | 0.0045 | 0.0006 | 0.005 |
|  | TDI | A6 | 0.0040 | 0.0006 | 0.005 |
|  | TDI | P1 | 0.0000 | 0.0000 | 0.005 |
|  | TDI | P3 | 0.0000 | 0.0000 | 0.005 |
|  | TDI | P2 | 0.0000 | 0.0000 | 0.005 |

*TDI – Toluene-2, 6 – Diisocyanate *TLV® – Threshold Limit Values
*ppm – parts per million *mg/m3 – milligrams per cubic meter

Note: The sampling performed on November 13, 2014 tested for Toluene 2, 4 – Diisocyanate and Toluene 2, 6 – Diisocyanate (TDI).  Toluene 2, 4 – Diisocyanate was not detected using OSHA's standard sampling methods. OSHA does not have a Permissible Exposure limit for Toluene 2, 6 – Diisocyanate. ACGIH TLV was used as a guideline.

If you have any questions regarding the results, please contact Assistant Area Director Jeff Stawowy at (251) 441-6131.  Thank you for your cooperation during our inspection of your facility and for your interest in the safety and health of your employees.

Sincerely,

Joseph Roesler
Area Director
/db

— NOVEMBER 13, 2014  SAMPLING BY OSHA
— 2,4 TDI RESULTS COMPARED TO OSHA
   PERMISSIBLE EXPOSURE LIMIT (PEL) —
      ALL RESULTS BELOW

— 2,6 TDI RESULTS COMPARED TO ACGIH
   THRESHOLD LIMIT VALUE (TLV) — ALL
      RESULTS BELOW

11-13-14          OSHA PAGE 1

DOCUMENT 11

### Table 1: 2, 4 and 2, 6 Toluene Diisocyanate Sampling Results

| Employee/Work Area | Sample Number | Sample Volume (Liters) | 2,4 TDI Conc. (ppm) | 2,6 TDI Conc. (ppm) | Exposure Limit (0.02 ppm) Exceeded? (YES/NO) |
|---|---|---|---|---|---|
| Renosol Rep Position 1 | 14-1054963 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 1 | 14-1054971 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 2 | 14-1054949 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 2 | 14-1054967 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 3 | 14-1054960 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 3 | 14-1054958 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 1 | 14-1054968 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 1 | 14-1054962 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 2 | 14-1054957 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 2 | 14-1054970 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 3 | 14-1054956 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 3 | 14-1054959 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 4 | 14-1054969 | 14.85 | <0.001 | <0.001 | NO |

| Employee/Work Area | Sample Number | Sample Volume (Liters) | 2,4 TDI Conc. (ppm) | 2,6 TDI Conc. (ppm) | Exposure Limit (0.02 ppm) Exceeded? (YES/NO) |
|---|---|---|---|---|---|
| Area Sample Position 4 | 14-1054953 | 14.85 | <0.001 | <0.001 | NO |
| Area Sample Position 1 | 14-1054951 | 14.85 | <0.001 | <0.001 | NO |
| Renosol Rep Position 5 | 14-1054961 | 14.77 | <0.001 | <0.001 | NO |
| Renosol Rep Position 5 | 14-1054955 | 14.77 | <0.001 | <0.001 | NO |
| ▮ Position 3 | 14-1054965 | 18.05 | <0.0009 | <0.0009 | NO |
| ▮ Position 1 | 14-1054948 | 15.15 | <0.0009 | <0.0009 | NO |
| ▮ Position 1 | 14-1054952 | 15.15 | <0.0009 | 0.002 | NO |
| ▮ Position 2 | 14-1054966 | 15.15 | 0.001 | 0.003 | NO |
| ▮ Position 3 | 14-1054954 | 15.15 | <0.0009 | 0.002 | NO |
| Field Blank | 14-1054950 | 0 | None Detect | None Detect | NO |

- NOVEMBER 13, 2014 SAMPLING BY EI GROUP
- SHORT TERM EXPOSURE LIMIT (STEL) SAMPLES FOR BOTH 2,4 AND 2,6 TDI RESULTS DID NOT EXCEED OSHA PERMISSIBLE EXPOSURE LIMIT FOR 2,4 TDI
NOTE: PEL FOR 2,6 TDI IS NOT ESTABLISHED

11-13-14        EI GROUP PAGE 1

DOCUMENT 12



ELECTRONICALLY FILED
3/19/2015 8:47 AM
03-CV-2015-900474.00
CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA
TIFFANY B. MCCORD, CLERK

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

LEAR CORPORATION EEDS AND )
INTERIORS )
             Plaintiff, )
 )
          V. )         **Case No.:** CV-2015-900474.00
 )
KING KIMBERLY )
           Defendant. )

### Order Granting Temporary Restraining Order

### <u>ORDER GRANTING TEMPORARY RESTRAINING **ORDER**</u>

Plaintiff Lear Corporation EEDS and Interiors. ("Lear") initiated this action by Verified Complaint filed _____, 2015 with simultaneous Motion for Temporary Restraining Order and Preliminary Injunction, the Affidavits of Gary Ansorge and Mike Walkowski, and other evidence. The Court concludes that the Motion for Temporary Restraining Order is due to be granted.

1.    I find that Plaintiff has established a reasonable chance of success of prevailing on the merits of its claim for intentional interference with a business or contractual relations and defamation. I find Lear has a longstanding business relationship with HMMA, its only customer, Defendant Kimberly King ("King") knew or should have known of the relationship, and King repeatedly interfered with this relationship by making falsehoods to HMMA and the public about the Lear plant. I also find that King published non-privileged false statements that the Selma plant air is unsafe, knew such statements were false, and they were directed at Lear's business reputation.

2.    I find that Plaintiff will suffer irreparable harm if the Temporary Restraining Order is not granted. King's conduct has and will continue to jeopardize Lear's business relationships, its reputation and goodwill and the future of Lear's plant.

3.    I find that there is no adequate remedy at law if the Temporary Restraining Order is not granted. Delay from enjoining King's conduct will cause further irreparable harm to Lear's plant and Lear's reputation in the community and with its customer.

DOCUMENT 12

4.       I find that the hardship imposed on King, the party opposing the Temporary Restraining Order, does not unreasonably outweigh the benefit accruing to Lear.  The order preserves the status quo and prevents King from making defamatory comments about her former employer or interfering with its only customer until such time that this Court can consider the merits.

5.       I find that appropriate bond is set forth below.

6.       Therefore, all requirements of Rule 65 of the Alabama Rules of Civil Procedure have been satisfied by the Plaintiff.

## TEMPORARY RESTRAINING ORDER

Based on the foregoing facts and conclusions of law, it is ORDERED, ADJUDGED and DECREED as follows:

Defendant Kimberly King, and any person acting in concert with her, is hereby restrained from:

> (1)       Directly or indirectly, intentionally engaging in conduct that interferes with Lear's business and contractual relations;

> (2)       Making any statements defaming Plaintiff, whether made to Plaintiff's customer or any other person or entity.

> (3)       Destroying or concealing any emails and electronic records and other documents relevant to this matter pending the end of the litigation.

It is further ORDERED that Plaintiff as soon as practicable obtain a bond suitable for this purpose in the amount of $_____.

This Order shall expire on the _____ day of _____, 2015, or as otherwise ordered.

This matter is set for hearing on Plaintiff's request for a preliminary injunction on the ____ day of _____, 2015 in Courtroom No. _____, at the Montgomery County, Alabama Courthouse in Montgomery, Alabama, at _____ o'clock.

DONE this[To be filled by the Judge].

/s/[To be filled by the Judge]

CIRCUIT JUDGE