## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

THOMAS E. PEREZ,                )
SECRETARY OF LABOR,             )
UNITED STATES DEPARTMENT        )
OF LABOR,                       )
                                )
    Plaintiff,                 )
                                )
vs.                             )    CASE NO. 15-205-CG-M
                                )
LEAR CORPORATION EEDS AND       )
INTERIORS and RENOSOL           )
SEATING, LLC,                   )
                                )
    Defendants.                )

## DEFENDANTS' OPPOSITION RESPONSE

Defendant Lear Corporation EEDS and Interiors and Renosol Seating, LLC (collectively "Lear") files this Opposition Response to "Plaintiff's Application for Temporary Restraining Order and to Show Cause Why a Preliminary Injunction Should Not Issue" (Doc. 1).[1] This matter is set for hearing on April 29, 2015 at 9:00 a.m. (Doc. 3 at p. 5). Lear welcomes the chance to offer evidence.

## Introduction

The Occupational Safety and Health Administration's ("OSHA") own scientific test results and Lear's measured response to employee attacks on its only customer foreclose OSHA's grounds for its instant campaign. Lear's plant is not

---

[1] This case in fact involves a single defendant. OSHA's Memorandum Doc. 1-1 is "OB"; Lear's response is "LB".

unsafe, and OSHA knows it from the three air tests (two voluntary) OSHA and the four (4) outside experts conducted between May 16 and November 13, 2014.

No Lear employee suffered retaliation.[2] When §11(c) claimant employees complained about air quality, Lear promptly conducted air testing, shared the test results with its workforce, and took no adverse actions. When those employees committed unlawful acts, Lear responded appropriately. It is just that simple:

1. When employees made their sole complaint to Lear concerning the air May 7, 2014, Lear not only did not retaliate; Lear hired the group headed by the renown author of a National Institute for Occupational Safety and Health ("NIOSH," OSHA's research arm) toluene diisocyanate ("TDI") study, who tested the air within ten days and found it perfectly safe.

2. When an anonymous employee contacted OSHA shortly thereafter, Lear punished no one but obtained a third party expert to test alongside OSHA, whose inspector was allowed voluntarily onto the premises, to interview employees and to test wherever OSHA wanted; both sets of tests showed no safety hazard—again.

3. When OSHA sought to repeat the tests July 17, Lear punished no one but again obtained a third party expert to test alongside OSHA, whose inspector again was allowed voluntarily onto the premises, to interview employees and to test wherever OSHA wanted; both sets of tests showed no safety hazard—again.

4. When after five (5) negative tests, several employees who refused to cooperate even with filing workers compensation claims on their own behalf began wearing surgical masks to work reflecting their fear of TDI sensitivity, Lear punished no one but transferred those employees to a location where there would be no potential exposure to the chemical they feared;

---

[2] OB 3-4 appropriately relies on <u>Cape and Vineyard Div. of New Bedford Gas  v. OSHRC</u>, 512 F.2d 1148 (1st Cir. 1975), which threw out OSHA's fatal electrocution citations based on non-existent evidence. <u>Id.</u> at 1153-1154.

5. When after notification of seven (7) negative tests, employees published a video reflecting information <u>opposite</u> of what those test results revealed and could provide Lear no information (no opposing tests, no blood tests, no medical records, nothing) supporting their contention, Lear punished no one for safety complaints (none were made) but suspended the two (2) employees for the video's defamatory communications;

6. On March 5, 2015, after so-called "long term, loyal employee"[3] employee Kim King had made posts on the internet claiming working on Lear's only customer's car seats made her sick, went to Lear's only customer's premises, attempted to enter and then to block its employees' entrance, was removed by police, read aloud at a press conference a statement addressed to the customer's president claiming Lear's plant's air had made her sick and demanding the customer do something to Lear, Lear discharged her for defamation and interfering with its relationship with its customer and brought suit to make her stop injuring this relationship.

Lear's plant is small, but it employs over 100 people in a part of the state desperate for jobs.[4] Lear's sole customer has nearby foam cushion alternative suppliers. Lear employees do not have nearby employment alternatives. OSHA's current process abuse threatens Lear's Selma Plant's business and these jobs.[5]

It is obvious what is happening. The United Auto Workers, who have been campaigning against Lear since April of 2014,[6] are using OSHA to punish employees who do not want to pay it tribute. This Court should be aware of the lengths that the UAW is willing to go in order to harass employers and further its

---

[3] <u>See</u> OB (Doc. 1-1) at p. 2.

[4] <u>See</u> LB, Exh. 1, Verified Complaint ¶4(b).

[5] Though Court's Order concerns only future actions, OSHA's TRO effectively prevents Lear from protecting against future attacks on its customer.

[6] For reasons known only to the UAW, they have repeatedly denied Lear's Selma employees the opportunity to vote in a representation election conducted by the National Labor Relations Board.

own agenda by using governmental agencies and wasting the valuable time and resources of the federal judiciary.

### Relevant Facts

OSHA's "Facts," OB 5-13, are fiction. The Court deserves the real story.

**Lear's Selma Operation**

Lear manufactures foam cushions in Selma. A chemically <u>closed system</u> automatically offloads toluene diisocyanate ("TDI"), along with other inert chemicals, from rail cars and combines them into molds to make foam cushions.[7] Lear's employees are not exposed to the substances.[8] Lear's Montgomery plant assembles Selma cushions into seats for HMMA to install at its Montgomery plant.[9]  HMMA is Lear Selma's only customer, and its orders account for all of the Selma plant's revenues.[10]

**Enter the UAW**

The UAW began attempting to organize Lear's Selma employees in the Spring of 2014. A representation election was scheduled for last June, but, seeing that they would lose, UAW filed meritless unfair labor practice charges to block employees' opportunity to vote.  The UAW then changed its game plan.  As they had at other locations in other campaigns, the UAW fabricated a "safety concern."

---

[7] Verfied Complaint ¶4.

[8] <u>Id.</u>

[9] <u>Id.</u>

[10] LB Att. A  Ex. 1. Verified Complaint ¶7; Ex. 2 Temporary Restraining Order ¶1.

### Lear's Prompt Response to Employee Concerns

Lear places great emphasis on safety -- it carefully monitors its atmospheric conditions and performs continuous training and evaluation to maintain safe working conditions for all employees.[11]  Lear has operated its Selma facility since 2008.[12]  Since that time, no Lear Selma employee has ever sought workers' compensation benefits as a result of any condition related to TDI exposure.[13]

### The Sole Safety Complaint and Test One

On or about May 7, 2014, Kim King and others complained to Lear's management and to the media that they were concerned about TDI exposure in the plant.[14] Certainly OSHA's regulations recognize that TDI airborne exposure, at certain identified levels, is unsafe. Tests show these have never been exceeded.  On May 16, 2014, Lear obtained the services of an independent expert led by a noted certified industrial hygienist widely published in studies funded by OSHA's research arm, the National Institute for Occupational Safety and Health ("NIOSH").[15] This company tested the air for particulates, for certain mold issues, and for TDI. Test results revealed trace levels in some cases, with all levels <u>well below</u> maximum safe levels set by the OSHA permissible exposure limit figure

---

[11] <u>Id.</u>, Verified Complaint ¶4.

[12] <u>Id.</u>, Verified Complaint ¶4(a).

[13] <u>Id.</u>, Verified Complaint ¶4(d).

[14] <u>Id.</u>, Verified Complaint ¶5.

[15] <u>Id.</u>, Verified Complaint ¶5(c).

("PEL").[16]  Lear shared these test results with all employees in a group meeting on May 21, 2014 and for a second time individually with Ms. King on June 3, 2014.[17]

### Enter OSHA—Tests Two and Three

Following receipt of an employee complaint, OSHA began an investigation on May 20, 2014.[18]  After Lear voluntarily allowed OSHA to inspect the premises and speak to employees, Lear allowed OSHA to perform tests May 27th and 28th, selecting which individual employees would be required to wear a recording meter.[19]  Results for 3 of the 4 employees whom OSHA selected demonstrated that they were not exposed at any level, and the 4th individual's exposure was well below half the safe limit.[20]  Parallel tests by an independent expert confirmed the same results.[21]  OSHA provided its test results to Lear on June 23rd; Lear promptly notified all employees, including Ms. King.[22]

Nevertheless, though making no further complaint to Lear, Ms. King continued her media campaign. In July of 2014, she posted an on-line petition regarding hazardous air quality at the Selma plant that ended by asking people to

---

[16] The expert also tested under the American Conference of Government and Industrial Hygienists' ("ACGIH") limits (called "TLV"), which OSHA uses for some types of TDI, and again found levels well below safe limits. See Verified Complaint ¶5(c).

[17] See Verified Complaint ¶5(c).

[18] LB Exh. 1, Verified Complaint ¶5(d).  OSHA's Memorandum incorrectly assigns this date as May 27.  See OB. 6.

[19] LB, Exh. 1, Verified Complaint ¶5(e).

[20] Id. ¶¶5(e) and 5(f).

[21] Id.

[22] Id. ¶5(f).

"let Renosol, Lear and **Hyundai** [the plant's only customer] know that we're not alone!"[23]  Despite the tests, Ms. King claimed that she was being exposed to unsafe levels of TDI <u>even after</u> she was provided with multiple negative test results. [24]

On July 14, 2014, after getting negative tests two and three June 23, Ms. King stated in local newspaper interview that she and Letasha Irby, a fellow Lear Selma employee, claimed chemical exposure at Lear caused them asthma-like symptoms.[25] The same day, Ms. King was the subject of an article published by the national news outlet NBC.com[26] in which King claimed she and other employees had blood samples testing positive for TDI (she never gave Lear these even after being asked for proof or documentation of her claim).[27]

**Tests Four and Five.**

On July 17, 2014, Lear again voluntarily allowed OSHA access to its facility for another round of testing,[28] and an independent expert also took parallel samples.[29] The testing revealed absolutely <u>no exposure whatsoever</u> of any

---

[23] Verfied Complaint ¶5(g).

[24] On June 23, King and Irby got the May 27-28 OSHA tests and the parallel expert tests (tests two and three).

[25] Verfied Complaint ¶5(g).

[26] Id.

[27] It should be noted that those individuals who evaluated the blood samples neither drew the samples nor supervised the chain of custody. The scientific community agrees that TDI tests cannot be the basis for a diagnosis of isocyanate asthma. See, e.g., *Scientific Information Statement* from Diisocyanates Panel, American Chemistry Council May 2010 (LB ex. 4) at 3 of 6. As previously noted, neither Ms. King nor anyone else had ever recovered workers' compensation for any condition relating to TDI exposure at Lear, and Ms. King had never even filed a workers' compensation claim. See LB, Exh. 1, Verified Complaint ¶4(d).

[28] LB, Exh. 1, Verified Complaint ¶5(h).

[29] Id. ¶5(h)(2).

substance for which there was an OSHA-permissible exposure limit, and only trace exposure, nowhere near ACGIH limits, for the other TDI kind.[30] Lear provided its employees with the independent expert test results on July 21, 2014.[31]  OSHA delayed giving Lear its own <u>identical</u> test results until December of 2014, nearly 6 months later, even though they had received the results much earlier.[32]

In light of Ms. King's and Ms. Irby's media statements, it became necessary under Alabama workers' compensation law to complete workers' compensation paperwork and notify Lear's workers' compensation carrier.[33] When Lear attempted to obtain necessary information from Ms. King and Ms. Irby in order to process a claim for workers' compensation benefits, they refused to provide it.[34]

**Transfer, Complaint, and §11(c) Investigation**

Though they refused to seek workers' compensation benefits, Ms. King and Ms. Irby began wearing surgical masks to work.[35] In response to these concerns, on September 11, 2014, Lear transferred[36] Ms. King and Ms. Irby at the same pay rate to an alternate plant location where there is <u>absolutely</u> <u>no</u> <u>risk</u> <u>of</u> <u>**any**</u> TDI

---

[30] Id. ¶¶5(h) and 5(i).

[31] Id. ¶5(i).

[32] Id. The 5-month delay has never been explained by OSHA.

[33] Verfied Complaint ¶¶5(k) and 5(i).  Though Ala. Code §25-5-78 appears to require written notice, case law is far different. See e.g., McAbee Constr. Co. v. Allday, 135 So.3d 968, 973-4 (Ala. Civ. App. 2013).

[34] Id. In Alabama, an employee who seeks workers' compensation benefits must disclose medical records relevant his/her claim. See Ala. Code §25-5-77(b).

[35] Verfied Complaint ¶5(j).

[36] The transfer did not affect the wage rates paid to Ms. King and Ms. Irby.

exposure.[37]   Ms. King and Ms. Irby immediately filed OSHA §11(c) complaints claiming that the transfer was retaliation against them based on protected activity.[38]

Contrary to OB 8-10, Ms. Colón was not the §11(c) Investigator until very recently. Lear voluntarily allowed Mr. Michael Taylor, the original §11(c) Investigator, to access its premises, interview employees and managers (including its HR Manager), and review/copy all records requested (he chose to do employee interviews off-site).   Based on the foregoing, Mr. Taylor recommended that the §11(c) complaint be dismissed. In a curious turn of events, OSHA removed Mr. Taylor from the case, and replaced him with Ms. Colón, whose affidavit reflects has interviewed only King and Irby, and has interviewed no management.[39]

**Five is Not Enough--OSHA Demands More Testing**

In October of 2014, OSHA asked again to return to the plant and conduct tests for which there was neither scientific methodology nor scientific means of determining the test results.[40] Lear declined, explaining that OSHA already had 5 atmospheric tests in its possession that were conducted using scientifically-accepted methodology with scientifically-accepted results. OSHA then sought a federal warrant authorizing an unlimited wall-to-wall investigation retracing the

---

[37] Verfied Complaint ¶5(j)(1).

[38] LB, Exh. 1, Verified Complaint ¶5(j)(2).

[39] See Id., Doc. 1-3, (Colón Affidavit) ¶13.

[40] Verfied Complaint ¶5(l).

steps it had already taken.[41] Lear exercised its constitutional Fourth Amendment right to file a motion to quash, which was granted.

In compromise, Lear offered to allow OSHA onto the premises to conduct one of the 2 non-scientific tests, but OSHA instead sought and obtained a warrant to conduct both tests. Upon coming onto the premises for the 8th time, OSHA conducted its 3rd (the 7th overall) atmospheric tests using appropriate scientific methodology, and an independent expert conducted a parallel test. To no one's surprise, these test results were negative. In December of 2014, Lear's management again told employees the test results were negative and the plant's air was safe.[42]

To this point, no Lear employee had been disciplined for making any complaint of any kind. To this point, all expressions of safety concerns were met with immediate efforts to determine if protective action was required.

### The Real Citations

OSHA never cited Lear for unsafe TDI--either under its regulation or under the "general duty clause."[43] OSHA never cited for unsafe air.[44] OSHA never cited for poor ventilation -- an odd allegation indeed given the test results.[45] No

---

[41] The pleadings related to the entire warrant legal proceeding can be found on Pacer:  In The Matter of Inspection of Worksite at 6 Meadowcraft Pkwy, Selma, Ala. 36701, USDCT SD AL, Case 2:14-mc-0031-KD-C.

[42] Verfied Complaint ¶5(l).

[43] LB, Exh. 3: Informal Settlement Agreement.

[44] Id.

[45] Id. cf. OB 7-8 (false contrary contention). Lear agreed only to consider the option, which it did, and, consistent with ACGIH standards referenced in the agreement, determined it was satisfactory.

agreement ever altered or expanded the foregoing:[46]

| **OSHA'S VERSION** | **THE TRUTH** |
|---|---|
| Renosol has not stated that it implemented OSHA's recommendations regarding ventilation or moving the TDI monitor, which leads to the reasonable inference that Renosol has not implemented either recommendation.[47] | The employer agrees to <u>consider</u> installing an effective local exhaust ventilation system on the seat line to ensure that an adequate airflow is pulling potential TDI vapors away from employees <u>as measured by a method accepted by ACGIH</u> or equivalent acceptable to the parties.[48] |

OSHA's every test reflects the air was safe.[49] OSHA offered no test suggesting a skin or dermal hazard.[50] OSHA's citations changed nothing. OSHA cited Lear for not requiring employees to wear gloves it had always voluntarily provided (OSHA abandoned its initial insistence on sleeves as well because there was no hazard against which sleeves protected just because employees' arms touched formed foam cushions). OSHA cited because existing hazcom training needed to be more detailed. OSHA cited the omission from the 300 illness and injury log of King's Irby's and one other employee's claimed TDI exposure injuries, but did not object to Lear following OSHA procedure and lining through the name and claim of each of the three because none substantiated work relatedness. Lear's plant has always been safe.  Lear has not retaliated against anyone.  Lear has only protected its employees' safety and their jobs.

---

[46] LB Ex.3 (Informal Settlement Agreement).

[47] OB-7.

[48] LB, Exh. 3: Informal Settlement Agreement ¶13.

[49] Verified Complaint ¶5(l).

[50] <u>See</u> LB Ex. 3: Informal Settlement Agreement.

### Ms. King Continues Her Attacks on Lear

January of 2015 brought with it more unprotected, unlawful, and defiant conduct. At that point, Lear's employees had received 7 scientific test results that demonstrated no one had been exposed to dangerous levels of TDI at the plant. On or about January 18, 2015, Ms. King and Ms. Irby (at the UAW's behest) posted an on-line video which claimed precisely the opposite.[51] Their statements were false, and they knew them to be false because previously provided 7 separate test results. These statements were harmful to Lear's business reputation and its relationship with its only customer.[52] Ms. King and Ms. Irby did not make safety complaints; instead they attempted to damage their employer's business interests.

On January 21, 2015, Ms. King and Ms. Irby received the chance to provide evidence contradicting the tests. They offered no tests, no blood sample results, no medical records, no nothing. Accordingly, both Ms. King and Ms. Irby received suspensions for making the defamatory statements in the video.[53] No one discussed or considered any protected safety complaint made to Lear, OSHA or anyone else.

Undaunted, Ms. King escalated her unlawful acts. On March 4, 2015, she had her likeness posted on the Internet next to specific attacks on Hyundai, stating that she became sick making seats for Hyundai cars and on March 10, that Hyundai

---

[51] Verfied Complaint ¶5(m).

[52] Verfied Complaint ¶¶8-9.

[53] Id.

did nothing while she became sick making seats for its cars.[54] This was not a safety complaint. These were postings designed to harm Lear by interfering with its relationship with its only customer.

Amidst these, on March 5, Ms. King traveled to Montgomery with a group of UAW organizers (of which none were Lear employees aside from Ms. King) and descended on HMMA's employee entrance.[55] They blocked the entrance, demanded to deliver a letter to HMMA's President, and did not leave until ejected by police.[56] They went to a nearby Burger King and conducted a press conference, where Ms. King publicly read a letter stating again that the Lear plant's atmosphere had made her sick and that Hyundai needed to do something about it.[57] This was not a safety complaint -- it was a brazen and unprotected attack on Lear's relationship with its only customer. For these reasons -- and only these reasons -- Lear decided to terminate Ms. King's employment.[58]

OB 12-13 contends that OSHA has "reason to believe" that other Lear employees have been harassed or intimidated, but names no names. OSHA's failure is not surprising. Over 80% of Lear's employees presented a petition stating that they want the UAW, for whom OSHA is surrogate, to go away.

---

[54] LB, Exh. 1, Verified Complaint ¶5(p).

[55] Id. ¶5(q).

[56] Id.

[57] Id.

[58] Verified Complaint ¶14.

## Argument

This Court lacks jurisdiction. OSHA cannot satisfy the necessary requirements for relief.

### I.   This Court Lacks Jurisdiction

Contrary to OB 13, this Court lacks jurisdiction to hear this action. OSHA lacks statutory authority to file an action seeking preliminary or temporary relief. OSHA lacks statutory authority to file an action prior to reaching a determination on the merits. This unauthorized attempt to expand its statutory authority deprives Lear of its due process rights.

### A.   The Statute Does not Confer Jurisdiction

OSHA lacks statutory authority to seek a TRO or preliminary injunction. Federal district court jurisdiction is solely a creature of congressional statute.[59] OSHA §11(c)[60] does not authorize district courts hear a TRO or preliminary injunction in this kind of proceeding. Other statutes containing whistleblower protection investigated by OSHA do contain such provisions.[61] The Occupational Safety and Health Act itself authorizes OSHA to seek temporary and preliminary injunctive relief when there is an imminent danger to an employee's life and

---

[59] See Bell v. New Jersey, 461 U.S. 773, 777-78 (1983)("Since federal courts are courts of limited jurisdiction, [the district court can] only hear the case if authorized by statute. . . .The strong presumption is that judicial review will be available only when agency action becomes final.").

[60] 29 U.S.C. §660(c)

[61] See, e.g., Surface Transportation Assistance Act of 1982 ("STAA"), 49 U.S.C. § 2305(c)(2)("Where the Secretary of Labor has concluded there is reasonable cause to believe that a violation has occurred, he shall accompany his findings with a preliminary order providing the relief requested."); Martin v. Yellow Freight Sys., Inc., 983 F.2d 1201, 1203 (2nd Cir. 1993); AIR21, 49 U.S.C. § 4212(b)(1); § 29 C.F.R. § 1980.113 (Sarbanes-Oxley).

health.[62] The omission in § 11(c), therefore, is not an oversight.

OSHA fails to cite a single decision granting a temporary restraining order in the 11(c) context, and research reveals none. "'Where Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant to power.'" Marshall v. Gibson's Products, Inc., 584 F.2d 668, 676 (5th Cir. 1978). Gibson's Products denied OSHA temporary injunctive relief to require an employer to let it investigate its facility[63] because such relief was not provided in the statute.[64]  Likewise, here, given the numerous test results and the suspect timing of this action, OSHA is apparently asking this Court to exercise authority it does not have in order to punish an innocent employer. Because this Court lacks jurisdiction over OSHA's application for TRO and preliminary injunction, this case must be promptly dismissed.

**B.    OSHA Cannot File § 11(c) Before Reaching a "Determination."**

OSHA cannot pursue a § 11(c) action until it fulfills the statutory prerequisite.  Absent specific statutory authority, under Supreme Court precedent,

---

[62] 29 U.S.C.§662(b).

[63] Jurisdiction has been "very explicitly delineated" to allow for injunctive relief after OSHA completes its investigation with a determination (none here) and the Court has made a determination after hearing. Id. at 674

[64] Id. at 675 ("Given the congressional awareness and concern illustrated by the provisions of OSHA and the other acts we have just discussed, we think the natural inference to be drawn from the omission of any grant of jurisdiction for the Secretary to obtain an injunction under section 8(a) is that no such grant was intended."). The Fifth Circuit listed § 11(c) among "the only provisions of OSHA that authorize the Secretary to bring suit in the district courts." Id. at 674.  The text of the cited provisions makes clear that § 662(b) is the only section of OSHA which provides the court jurisdiction to grant "such injunctive relief or temporary restraining order pending the outcome of an enforcement proceeding." Id.

judicial review is available only for final agency actions.[65]    Unlike other

employment statutes that provide specific authority to agencies to file actions

seeking preliminary relief,[66] § 11(c) fails to provide for such preliminary or

temporary relief pending final agency resolution. Unlike the Fair Labor Standards

Act, which contains no administrative prerequisite prior to the Secretary seeking

29 U.S.C. § 217[67] injunctive relief, § 11(c) authorizes the Secretary to bring suit in

district court only, if, after "such investigation to be made as he deems

appropriate," he "determines that the provisions of this subsection have been

violated." 29 U.S.C. § 660(c)(2).  Here, the investigation is ongoing and there has

been no such determination.  *See* OB13. The Secretary's attempt to obtain

injunctive relief providing reinstatement, lawsuit dismissal, and other substantive

provisions, prior to the conclusion of its investigation is not authorized by statute,

---

[65] *See* Bell, 461 U.S. at 780 ("The strong presumption is that judicial review will be available only when agency action becomes final.").

[66] *See* 42.U.S.C. § 200e-5(f)(2)("Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission . . . may bring an action for appropriate temporary or permanent relief pending final disposition of such charge."); 29 U.S.C.§ 160(j)("Injunctions: The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged or is engaging in an unfair labor practice, to petition any United States district court . . . for appropriate temporary relief or restraining order.").

[67] The Secretary cites only two cases involving the Secretary seeking injunctive relief in FLSA cases. Mitchell v. Robert De Mario Jewelry, Inc., 361 U.S. 288 (1960) did not involve temporary or preliminary injunctive relief. 361 U.S. at 294-95 (suit brought by Secretary pursuant to Secretary's specific injunctive power under 29 U.S.C.§ 217 requiring ). Mitchell required clear and convincing relief of retaliatory conduct for the injunction to issue. *See* 180 F. Supp. 800, 802 (D.C. Ga. 1957). Perez v. Fatima/Zahra, Inc., 2014 WL 2854812 (N.D. Cal. June 20, 2014) granted a preliminary injunction in the FLSA context that did not provide substantive relief such as reinstatement or lawsuit prohibition. 2014 WL 2854812 at *4. The other FLSA cases cited by the Secretary are irrelevant cases brought by individual employees, not the Secretary. *See* Allen v. Suntrust Banks, Inc., 549 F. Supp. 2d 1379, 1380 (N.D. Ga. 2008); Clincy v. Galardi South Enters., Inc., 2009 WL 2913208, *1 (N.D. Ga. Sept. 2, 2009); Centeno-Bernuy v. Perry, 302 F. Supp. 2d 128, 130 (W.D.N.Y. 2003).

and this Court lacks jurisdiction of the claims.

This interpretation is supported by Congress's recent use of whistleblower framework other than § 11(c) to provide courts jurisdiction to enforce preliminary agency determinations. In statutes enacted more recently than the OSH Act, Congress has authorized OSHA to seek judicial enforcement of its preliminary decisions pursuant, not to OSHA § 11(c), but to the AIR21 whistleblower provisions, which empower the Secretary to issue a preliminary order and enforce the preliminary order in district court if needed.[68] Some courts have found that such authority is not authorized even under the AIR21 framework.[69]

### C.    OSHA's Contrary Approach is Unconstitutional.

Any other interpretation of the statute would violate Lear's due process rights. Prior to the Secretary filing this action, Lear was not contacted or given the opportunity to provide evidence or obtain information regarding the substance of the retaliation allegations concerning the suspension, termination, or lawsuit. The Supreme Court has held that "minimum due process" for an employer prior to even temporary reinstatement by an agency requires "notice of the employee's

---

[68] See n. 67 supra; Solis v. Tennessee Commerce Bancorp, Inc., 713 F. Supp. 2d 701, 712-13 (M.D. Tenn. 2010) (agreeing with OSHA's position that AIR21 whistleblower provisions allow for judicial enforcement of Secretary's preliminary order); see also Interim Rule, Affordable Care Act, Feb. 27, 2013, 29 C.F.R. § 1984.113.

[69] See Welch v. Cardinal Bankshares Corp., 454 F. Supp. 2d 552, 556-57 (W.D. Va. 2006); Bechtel v. Competitive Technologies, 448 F.3d 469, 474-75 (2nd Cir.2006) (holding that district court lacked jurisdiction to enforce preliminary order on Sarbanes-Oxley whistleblower claim); Solis v. Union Pacific Railroad Co., 2013 WL 440707, *2-3 (D. Idaho Jan. 11, 2013) (dismissing Federal Railroad Safety Act claim under AIR 21 framework because court did not have jurisdiction to enforce preliminary order).

allegations, notice of the substance of the relevant supporting evidence, and an opportunity to submit a written response, and an opportunity to meet with the investigator and present statements from rebuttal witnesses." Here, the Secretary's TRO and preliminary injunction petition seeking to deprive Lear of property, including wages for reinstatement and its rights to vindicate wrongs in state court, without concluding its investigation or involving Lear whatsoever deprives Lear of its due process rights. Thus, this action lacks jurisdiction and must be dismissed.

## II.    OSHA Cannot Satisfy the Necessary Requirements for Relief

"In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established 'the burden of persuasion' 'as to the four requisites.'"[70] Strawser v. Strange, 44 F. Supp. 3d 1206, 1207 (S.D. Ala. 2015), quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998); All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)(a preliminary injunction is issued only when 'drastic relief' is necessary.) This matter is not even a close call. OSHA cannot prevail on the merits, OSHA cannot show irreparable harm, the

---

[70] "This court may grant a preliminary injunction only if the plaintiff demonstrates each of the following prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the required injunction may cause the non-moving parties; and (4) the injunction will not be adverse to the public interest." Strawser, 44 F. Supp. 3d at 1207 (quoting Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002)); see also McDonald's Corp., 147 F.3d at 1306.

equities favor denying the injunction, and OSHA's relief tramples public interest.[71]

### A.     OSHA Cannot Show Likely Success on the Merits

In OSHA's foundering efforts to suggest likely success on the retaliation claim, it inexplicably omits the controlling Supreme Court precedent.   Though repeatedly referencing the relevance of Title VII precedent,[72]  OSHA nowhere cites University of Texas Southwestern Med. Ctr. v. Nassar, 133 S.Ct. 2517 (2013), that, overruling prior precedent that OSHA cites, makes clear that retaliation requires proof that protected conduct was the "but for" causation of resulting adverse action.   133 S.Ct. at 2533.   When properly viewed, OSHA simply cannot show protected activity, causation or retaliation in this action.

### 1.     OSHA Cannot Show Protected Activity

Protected conduct under §11(c) includes employees making good faith safety complaints to OSHA and their employers.  Here, no such complaints

---

[71] The cases cited in OB 13-14 do not reflect otherwise.  See, in order cited, Tillman v. Miller, 917 F.Supp. 799, 800 (N.D. Ga. 1995)(granting TRO against law prohibiting workers compensation ads by lawyers because ads' harm was not self-evident and first amendment was compromised; neither Ms. King nor Ms. Irby has a first amendment right to interfere with business or defame Lear); Haitian Refugee Center, Inc. v. Nelson, 872 F.2d 1555, 1561 (11th Cir. 1989)(successful challenge to INS processing practices that incredibly did not include translator for temporary workers seeking asylum; OSHA shows nothing like that here); Clincy v. Galardi South Enterprises, Inc., 2009 WL 2913208 (N.D. Ga. 2009)(recognized "extraordinary and dramatic" nature of preliminary injunction to be used "sparingly" in this Circuit, Court found appropriate after hearing; OSHA made no such showing); Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)(reversed injunction under National Environmental Policy Act against Navy defense exercises based upon alleged impact on marine wildlife, Court held plaintiff must not show simply a "possibility" of irreparable harm, but that it is likely; OSHA made no such showing, and its actions reflect that none is possible); Johnson & Johnson Vision Care v. 1-800 Contacts, Inc., 299 F.3d 1242 (11th Cir. 2002)(vacating preliminary injunction against 1-800 Contacts for so-called false or misleading advertising); United States v. State of Alabama, 791 F.2d 1450 (11th Cir. 1986)(recognized preliminary relief appropriate to preserve the existence of Alabama State University's teacher program that District Court would go out of existence within 3 years if preliminary relief were not granted so that District Court could determine whether discriminatory acts had occurred).

[72] See OB 15-19, citing Burlington Northern & Sante Fe Railway Company v. White, 548 U.S. 53, 64 (2006), Cotton v. Cracker Barrel Old Country Store, 434 F.3d 1227 (11th Cir. 2006), and Pennington v. City of Huntsville, 261 F.3d 1262 (11th Cir. 2001).

occurred after May of 2014.  The employees' conduct which clearly led to suspension, termination, and the subsequent lawsuit is not protected, and OSHA does not even claim it to be.  OB-15.

OB-15 describes no specific protected activity in which any individual engaged.  Instead, it vaguely asserts that "unnamed 'various individuals'" reported exposure to TDI to "various people," including OSHA and defendant's management.  The only exposure reports to "defendant's management" came May 7, 2014; these were followed, not by discipline, but instead by a series of tests to determine if protective action was necessary.  The only report to OSHA came in an anonymous employee complaint prompting its investigation that began back on May 20, 2014. Again, there was no adverse action. The activity cited by OSHA bears no relationship to the adverse action OSHA now challenges in this action.

The employees' May 2014 complaint was met by Lear with thorough investigation, not retaliation. As a result, in the months leading up to suspension, §11(c) claimants received multiple notifications that the safety concerns about which they subsequently made false statements were unfounded.

By the end of 2014: (1) the OSHA investigation was resolved with no finding that the atmosphere was hazardous; (2) Lear employees had received no less than 7 atmospheric test results demonstrating that there was no atmospheric hazard; (3) no Lear employee claimed workers' compensation benefits for TDI

exposure; and (4) no Lear employee could reasonably conclude they faced any safety risk discussed in the on-line video that prompted the suspensions.

Considering that the investigations revealed no hazardous atmosphere, Ms. King's and Ms. Irby's January 2015 on-line video making false statements regarding the atmosphere in which Lear and Hyundai seats are made were not protected. Simon v. Simmons Food, 49 F.3d 386 (8th Cir. 1995),[73] held that an employee could be terminated for falsely telling the employer's customer that its product was unsafe. 49 F.3d at 390-91. Ms. King did the same thing here, stating that Lear's product sold to Hyundai was made in unsafe working conditions, after OSHA tests had found otherwise. This conduct was not protected, and OSHA's discussion of protected activity does not contend otherwise.[74]

In the 4 months preceding Ms. King's termination, she did not go to either Lear or OSHA. Instead, Ms. King directed illegal acts at Lear's only customer, Hyundai: (1) she ridiculed Hyundai with web postings claiming Hyundai was guilty of doing nothing while she got sick making its seats; (2) she went to Hyundai's premises for a showdown that had to be broken up by police; and (3) she conducted a press conference and read a letter indicting Hyundai for not taking action against Lear, whom she again said was poisoning her.

---

[73] The Simon court addressed a claim under the whistleblower provisions of the Water Pollution Control Act and the Solid Waste Disposal Act.

[74] See OB-16.

This multi-pronged Hyundai attack, executed after the conclusion of the OSHA safety investigation, was not protected conduct. <u>Williams v. U.S. Dept. of Labor</u>, 157 Fed. Appx. 564 (4th Cir. 2005), held an employee's continued efforts to address a situation the employee perceived to be dangerous, after OSHA had investigated and found no safety issue, were <u>unreasonable</u> and <u>unprotected</u>, and thus resulting in disciplinary action was appropriate. 157 Fed. Appx. at 569-70.[75]

The facts here are strikingly similar to those in <u>Williams</u>. OSHA had concluded its investigation, and issued <u>no citations</u> regarding Lear's atmosphere. Just as the <u>Williams</u> employee's conduct interfered with her employer's operations and was not protected, here, Ms. King's false statements and attacks on Hyundai after OSHA determined the atmosphere was safe were not protected.

The fact that the false statements and Hyundai attacks touched on a safety issue does not make them protected. "An employer may terminate an employee who behaves inappropriately **even if the behavior relates to a legitimate safety concern**." <u>Ridgley v. U. S. Department of Labor</u>, 298 Fed. Appx. 447, 454 (6th Cir. 2008)(emphasis added; cited in OB 15)). When relevant activity is not protected, earlier participation in protected activity not relevant is immaterial; "an employee's participation in activities protected by OSHA does not automatically

---

[75] Although the employee's initial OSHA complaint was protected, her letters claiming the water quality to be unsafe which "impeded the school's educational function" were not protected and justified her suspension and termination. <u>Id.</u>

render him immune from discharge or discipline for legitimate reasons, or from adverse action dictated by non-prohibited considerations[.]" Perez v. Renaissance Arts & Education Inc., 2013 WL 5487097 (M.D. Fla. 2013)( cited in OB 19). As Ms. King's and Ms. Irby's relevant acts were not protected, OSHA has no likelihood of success on the merits.

### 2.    OSHA Cannot Establish Causation

OSHA cannot demonstrate that protected complaints were the "but-for" cause of the discipline. The timing of the challenged suspension and termination decisions clearly foreclose causation. Intervening acts negate "but-for" causation.

Wolf v. Coca-Cola Co., 200 F.3d 1337, 1342-1343 (11th Cir. 2000)(cited in OB 16), like Univ. of S'western Med. Ctr. v. Nassar, 133 S.Ct. 2517 (2013), make clear OSHA must prove that "but for" the protected complaints Irby and King made, they would not have suffered adverse employment action. OSHA cannot meet this standard.

They cannot meet it by temporal inference. Ms. Irby and Ms. King made their safety complaints in May of 2014. In this Circuit, a 4-month chasm between protected conduct and adverse action is too lengthy to establish causation.[76] Here, the suspension occurred 8 months after the protected acts, and Ms. King's

---

[76] Curtis v. Broward County, 292 Fed. Appx. 882, 885 (11th Cir. Sept. 16, 2008) ("This temporal gap of almost nine months is insufficient to establish a causal connection between the filing and her termination because this Court has held that such a long time period severs any inference of causal connection."); Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (holding that three-month period between alleged protected activity and adverse action insufficient to establish causation); Scalone v. Home Depot U.S.A., Inc., 280 Fed. Appx. 905, 909 (11th Cir.

discharge occurred 10 months later.  Because a 4-month window will not support a retaliation inference, the undisputed timeline here creates too great a chasm for any reasonable inference to traverse.[77]

OSHA offers no other evidence of causation.  Though the timespan between protected activity and adverse action is long, the time period between Lear's non-retaliatory reasons and the corresponding adverse actions is not.[78]  The suspension came right after the tortious video, and the discharge came right after the tortious assault on Hyundai. If close temporal proximity supports an inference of retaliation between protected conduct and adverse action, surely the opposite is true when time is short between legitimate grounds for discipline and the discipline itself.

Intervening acts of misconduct after protected activity exclude a causation finding anyhow.[79]  Hankins v. AirTran Airways, Inc., 237 Fed. Appx. 513, 520, 521

---

2008) (five month disparity); Drake-Sims v. Burlington Coat Factory Warehouse of Alabama, Inc., 330 Fed. Appx. 795, 804 (11th Cir. 2009) (six month disparity); Schecter v. Ga. State Univ., 341 Fed. Appx. 560, 563 (11th Cir. Aug. 12, 2009) (five month disparity); Summers v. Winter, 303 Fed. Appx. 716, 720 (11th Cir. Dec. 16, 2008) (more than three months); Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004) (three month disparity); Mathis v. Leggett & Platt, 263 Fed. Appx. 9, 14 (11th Cir. 2008) (five month disparity); Wascura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001) (three and a half month disparity).

[77] See, Crayton v. Valued Services of Alabama, LLC, 737 F.Supp.2d 1320, 1335-36 (M.D. Ala. 2010)(affirming summary judgment against retaliation claim).  Plaintiff also includes Crayton in its string citation describing adverse employment actions.  See OB 17.

[78] See, e.g., Cooney v. Consololidated Edison, 220 F.Supp. 2d 241, 251 (S.D.N.Y. 2002)(holding relation claim failed because "each of the allegedly adverse actions occurred shortly after the plaintiff engaged in some error at the workplace").

[79] See Henderson v. Federal Express, 442 Fed. Appx. 502, 507 (11th Cir. 2011)(falsifying time card amidst two weeks between protected act and discharge foreclosed causal inference); Hankins, 237 Fed. Appx. at 520-21 (finding plaintiff's intervening act of misconduct severed the causal connection, if any, between her initial complaint of discrimination and her employer's decision to terminate her employment); Austin v. Compass Group, 2014 WL 377387 *8 (N.D. Ala. Jan. 6, 2014)(money theft held intervening); see also Jackson v. Carolinas Healthcare Sys., 2007 WL 4287749, *11 (W.D.N.C. Dec. 5, 2007) (granting summary judgment for no causal connection because patient complaints about plaintiff severed any possible causal connection from a seven months disparity between

(11th Cir. 2007), held that employee misconduct 5 days after protected conduct "severed the causal connection" necessary to establish a retaliation claim. <u>Id.</u> Here, Ms. King and Ms. Irby received no discipline for 8 months after making their protected safety complaint. Their suspensions occurred on January 21, 2015, just <u>3 days</u> after they posted a video attacking Hyundai and making false claims about safety in the plant. Ms. King's termination and the subsequent lawsuit arose only after she repeatedly attacked Hyundai through her disruptive Hyundai plant visit and false Internet statements. Clearly, the intervening acts of misconduct and not the protected activity caused the suspension, termination, and lawsuit.

### 3.    OSHA Cannot Show Retaliation Otherwise

A review of the undisputed facts, in light of well-settled precedent, demonstrates that OSHA cannot establish a viable retaliation claim -- certainly not a claim that warrants the entry of a preliminary injunction.

For example, the challenged September 2014 transfer of Ms. King and Ms. Irby to the warehouse was not adverse action because they did not lose pay or benefits. See <u>Adams v. City of Montgomery</u>, 2014 WL 2782013 (11th Cir. June 28, 2014). The transfer was performed to accommodate the employees' stated safety concerns and insulated them from any potential TDI exposure.

Likewise, Lear's lawsuit filed against Ms. King cannot constitute adverse

---

protected activity and termination); <u>Parada v. Great Plains Int'l of Sioux City, Inc.</u>, 483 F. Supp. 2d 777, 814 (N.D. Iowa 2007) (granting summary judgment on no causal connection where customer complaints about plaintiff eroded any causal connection).

action, and OSHA's attempt to enjoin it is unfounded.  "If [OSHA] is allowed to enjoin the prosecution of a well-grounded State lawsuit, it necessarily follows that state plaintiffs subject to such an injunction will be totally deprived of a remedy for actual injury...."  Bill Johnson's Restaurant v. NLRB, 461 U.S. 731, 743 (1983). Filing a well-founded lawsuit may not be enjoined as an unfair labor practice even if it would not have been evinced without the plaintiff's desire to retaliate against the defendant for his actions under the NLRA. Id. The same is true here.[80]

Lear's lawsuit was not filed during OSHA's investigation. It was only filed after it became clear that Ms. King refused to cease making public defamatory attacks against Lear and its only customer. Predictably, OB 18-19's discussion of the merits of Lear's lawsuit contains no evidence whatsoever. Lear's Verified Complaint, LB Ex. 1, standing alone, clearly demonstrates the solid factual evidence and legal authorities on which it is based.  OSHA's attempt to derail that legal action lacks merit.

### B.    OSHA Cannot Show Irreparable Harm

OSHA cannot establish irreparable harm.  Speculation is not enough. Relief sought is unnecessary. Timing matters. OSHA loses.

---

[80] OB 17-18's citations do not apply here:  Compare EEOC v. Outback Steakhouse of Florida, 75 F.Supp.2d 756 (N.D. Ohio 1999)(lawsuit filed in bad faith can be retaliatory); Torres v. Gristede's Operating Corp., 628 F.Supp.2d 447, 474 (S.D.N.Y. 2008)(when lawsuit contained neither statutory nor common law theory and lawsuit counterclaim contained neither common law nor statutory theory, and when counterclaim plaintiff failed to argue it vigorously, court found lawsuit groundless and adverse action) with EEOC v. Levi Strauss & Co., 515 F.Supp. 640 (N.D.Ill.1981) (defamation suit initiated in good faith to rehabilitate employer's reputation not violative).

A plaintiff cannot offer mere speculation to demonstrate irreparable harm. "In order to qualify as irreparable harm, 'the injury must be neither remote nor speculative, but actual and imminent.'"[81]  "[V]ague or conclusory affidavits are insufficient to satisfy the plaintiff's burden."[82] OSHA offers only speculation[83] and provides no evidence that its 7-month investigation has been hindered in any way by Lear's legitimate actions.

OSHA speculates that Lear has prevented other employees "from initiating discussion with OSHA" (OB-22), yet provides no information whatsoever to support this assertion.  This is because there are no individuals who actually fit this description.  Likewise, OSHA offers only speculation that Lear has not complied with the informal settlement agreement.

Relief sought is unnecessary. Injunctive relief is unnecessary to preserve OSHA's ability to render a meaningful decision on the §11(c) allegations.[84] Assuming *arguendo* that OSHA could demonstrate witnesses were reluctant to come forward, it has subpoena power that fully protects witness participation.[85] OSHA has issued no witness subpoenas in connection with its investigation.

---

[81] Mercedes-Benz U.S. Intern., Inc. v. Cobasys, LLC, 605 F. Supp. 2d 1189, 1206 (N.D. Ala. 2009) (*quoting* Northeastern Fla. Chapter, AGC v. Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)).

[82] Palmer v. Braun, 155 F. Supp. 2d 1327, 1331 (M.D. Fla. 2001).

[83] See Defendants' Motion to Strike Portions of Plaintiff's Affidavits, filed simultaneously herewith.

[84] "[T]he 'very purpose of a preliminary injunction is to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" U.S. Bank Nat'l Ass'n v. Turquoise Properties Gulf, Inc., 2010 WL 2594866, *4 (S.D. Ala. June 18, 2010) (*quoting* United States v. Alabama, 791 F.2d 1450, 1459 (11th Cir. 1986)).

[85] See 29 U.S.C. §657(b).

All relief sought in the §11(c) complaint is fully available after the resolution of the statutory investigation and enforcement process. "[T]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[86]  Economic issues alone do not justify [injunctive relief]."[87] "An injury is 'irreparable' only if it cannot be undone through monetary remedies."[88]  Here, any alleged damages suffered by Ms. King can be fully remedied fully through the statutory process that OSHA is required to follow.

Finally, OSHA's delay forecloses irreparable harm. "[U]nexplained delay may 'standing alone, . . . preclude the granting of preliminary injunctive relief.'"[89] OSHA's §11(c) investigation has been pending for 8 months. OSHA waited too long. Had OSHA been concerned about irreparable harm, this action would have been filed months earlier.  If Lear's actions were truly chilling employee conduct, why did not OSHA act much sooner?  Certainly Lear has been firmly on OSHA's radar, and the agency has been well aware of these challenged adverse employment

---

[86] U.S. Bank Nat'l Ass'n, 2010 WL 2594866, *5 (*quoting* United States v. Jefferson Cty., 720 F.2d 1511, 1520 (11th Cir. 1983)). Like here, U.S. Bank involved a mandatory preliminary injunction which "seeks to alter the status quo, rather than merely preserving it pending trial. . . Mandatory preliminary injunctions are traditionally disfavored, and courts should be especially cautious in issuing them." Id. at *3 (internal citations omitted).

[87] Id. (*quoting* Bell South Telecomms., Inc. v. MCI Metro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005)).

[88] Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1999)(*quoting* Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 1189 (1965)).

[89] U.S. Bank Nat'l Ass'n, 2010 WL 2594866, *4 (*quoting* Tough Traveler, Ltd. v. Outbound Products, 60 F.3d 964, 968 (2nd Cir. 1995))(finding that four month delay precluded irreparable harm finding "'because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggest that there is, in fact, no irreparable injury'").

actions for months. For OSHA to present this dispute as "urgent" is simply wrong.

## C. The Equities Tilt Sharply in Lear's Favor

Contrary to OSHA's assertions,[90] the equities tilt sharply in Lear's favor. Ms. Irby remains currently employed, and Ms. King can find a comparable job. However, if OSHA's actions result in plant closure, approximately 100 individuals will lose their jobs. This is, in fact, irreparable harm.

Lear is the party that continues to suffer. Loss of goodwill, loss of ability to control business reputation, and lost profits each constitute irreparable harm.[91] Lost goodwill or a closed plant is not the type of injury money can fix.[92] "[T]he loss of customers and goodwill is an 'irreparable injury.'"[93]

Due to King's and Irby's false statements and attacks on its customer, Lear has already lost goodwill and faces the risk of losing **its sole customer** should their misconduct continue. It has become difficult to attract new employees to work at the facility because of the false claims that the atmosphere is hazardous. It has lost relationships with vendors because of the claims. In Ferrero, even the potential loss of customers causing a 2.3% loss in sales, the loss of goodwill, "as well as the

---

[90] See OB 24-25.

[91] BellSouth Telecomms., Inc. v. MCI Metro Access Transmission Servs.,LLC, 425 F.3d 964, 970 (11th Cir. 2005) ("the loss of customers and goodwill is an irreparable injury") (quoting Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir.1991)); Ferrellgas Partners, L.P., v. Barrow, 143 F. Appx. 180, 190 (11th Cir.2005) ("[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill").

[92] McDonald's Corp., 147 F.3d at 1310 ("We can conceive of no realistic way to determine the damages under such circumstances.").

[93] Ferrero, 923 F.2d at 1449 (citing Spiegel v. City of Houston, 636 F.2d 997 (5th Cir., Unit A, 1981)).

likelihood of layoffs," was sufficient to constitute "irreparable harm," as the injury to the company is difficult to calculate and cannot be judged by comparing the actual losses to the size of the company.  923 F.3d at 1449.

Lear cannot wait to see if its customer pulls the business, because once that happens, the plant will close. Because there could be no greater harm to Lear's Selma facility and its employees than the loss of the Hyundai business, the potential damage is "irreparable," and not measurable by money. The only irreparable harm present here is faced by Lear. Compared to the speculative harm OSHA alleges, the threatened injury to Lear far outweighs any potential injury to OSHA if an injunction is not issued.

**D.     The Requested Relief Destroys the Public Interest.**

OSHA's requested injunctive relief violates the public interest. If continued defamation and interference causes Lear's business to go to its West Point, Georgia competitor, over 100 employees lose their jobs and Selma will lose an important source of jobs and tax revenue. Interfering with Lear's legal attempt to protect itself is the kind of unconstitutional interference against which Bill Johnson's and other cases protects.[94]

<u>**Conclusion**</u>

Lear thus asks that the Court deny the injunction sought.

---

[94] Bill Johnson's Restaurants, Inc., 461 U.S. at 741.

Respectfully submitted,


*/s/ Kathryn M. Willis*

Edward G. Bowron (BOWRE9029)
Kathryn M. Willis (MOR130)
**BURR & FORMAN LLP**
RSA Tower
11 North Water Street
Suite 22200
Mobile, Alabama  36602
Telephone: (251) 344-5151
Facsimile: (251) 344-9696


*/s/ John J. Coleman, III*

John J. Coleman, III (COLEJ6234)
**BURR & FORMAN LLP**
3400 Wells Fargo Tower
420 North Twentieth Street
Birmingham, Alabama 35203
Telephone: (205) 458-5167
Facsimile: (205) 244-5623


## Certificate of Service

I hereby certify that the foregoing has been served upon below named counsel of record herein via CM/ECF on this __22nd__ day of April, 2015:

Yasmin K. Yanthis-Bailey
Office of the Solicitor
U.S. Department of Labor
61 Forsyth Street, S.W.
Room 7T10
Atlanta, GA 30303
Yanthis-Bailey.Yasmin@dol.gov


*/s/    Kathryn M. Willis*
Of Counsel