IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 15-0205-CG-M |
| | ) | |
| LEAR CORPORATION EEDS AND INTERIORS and RENOSOL SEATING, LLC, | ) ) ) | |
| | ) | |
|     Defendants. | ) | |

## ORDER

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order and to Show Cause Why a Preliminary Injunction Should Not Issue. (Doc. 1). Defendants filed a response in opposition (Doc. 14), and Plaintiff replied. (Doc. 18). Defendants also filed a Motion to Strike Portions of Plaintiff's Affidavits (Doc. 13), and Plaintiff responded. (Doc. 17). This Court granted Plaintiff's request for a temporary restraining order, gave the parties time for limited discovery, and held an evidentiary hearing on April 29, 2015. (Doc. 9). At the hearing, both sides offered evidence and sworn testimony in support of their respective positions. For the reasons stated below, the Court finds that Plaintiff is entitled to preliminary injunctive relief.

# BACKGROUND

This case is about whether Defendant Lear Corporation retaliated against one of its employees, Kimberly King, for complaining about health concerns while working in its Renosol Seating plant located in Selma, Alabama (Lear Corporation and the Renosol Seating plant are collectively "Defendants").[1] King specifically raised concerns about exposure to a chemical called toluene diisocyanate ("TDI"). Although Defendants attached importance to certain issues at the hearing, this case is not about whether employees at the plant wish to unionize, nor is it about TDI levels at the plant exceeding permissible exposure limits.

The Renosol Seating plant employs over 100 people in Selma, Alabama. (Doc. 14, p. 3). The plant makes foam cushions that are used in car seats and head rests. For this process, the plant uses a chemical system that automatically offloads TDI from rail cars, along with other chemicals, and combines them into molds to make the foam cushions. (Doc. 14, p. 4). Hyundai Motor Manufacturing Alabama, LLC ("Hyundai") is the plant's primary customer, and its orders account for all of the plant's revenues. (Doc. 14, p. 4).

Kimberly King began working at the Renosol Seating plant in 2004. (Doc. 14, Exh. 1, p. 4). King worked on the production line, and helped make foam cushions. On May 8, 2014, King, along with nine other employees, provided Connie Messer,

---

[1] Lear Corporation Eeds and Interiors and Renosol Seating, LLC, owns the Renosol seating plant. (Doc. 11). Lear Corporation Eeds and Interiors and Renosol Seating, LLC, is wholly owned by Lear Corporation. (Doc. 11). Lear Corporation employs more than 132,000 people worldwide. (Doc. 1, Exh. 1, p. 2).

human resources manager, with a signed letter regarding TDI leaks at the plant

and health concerns. (Defs.' Exh. 65). The letter stated in part:

> **The way management handled the TDI leak last week is one example of why we believe workers need a voice at Renosol.** TDI affects every worker in this plant. It will affect some of us for the rest of our lives. There are three things that we want Renosol to do <u>immediately</u> so that we can protect our health:
>
>> 1. Provide free medical screenings to <u>all</u> workers in the plant to test our breathing and find out if we need additional medical care.
>>
>> 2. Tell us, in writing, exactly why the TDI alarms went off multiple times between April 29 and May 5; what steps Renosol took to protect our health; and what Renosol is doing to fix the problem.
>>
>> 3. Give us copies of Renosol's OSHA 300 logs by the close of business tomorrow, as required by law.

(Defs.' Exh. 65).

After receiving this letter, Defendants promptly hired an independent group

to test the air in the plant for TDI. (Doc. 14, p. 2). OSHA also conducted its own air

testing in the plant. (Doc. 14, p. 2). Over the next several months, OSHA and

independent groups tested the air in the plant several times. (Doc. 14, pp. 2 − 3).

Defendants and OSHA offered into evidence air monitoring results that show 2, 4-

TDI and 2, 6-TDI levels are within legal limits at the Renosol plant. Other records

and testimony offered into evidence, however, indicate that employees may become

"sensitized" to TDI, even though it is within legal limits, resulting in adverse health

effects. (Pl's. Exh. 2). Defendants and OSHA shared information with employees at

the plant regarding their TDI test results and TDI health effects. (Defs.' Exh. 49).

In November 2014, OSHA issued multiple citations to Defendants for safety

3

infractions at the plant. (Doc. 1, Exh. 2, pp. 16 – 26). The "serious" infractions include one citation for failing to require employees to wear protective equipment when handling TDI and a substance called methylene diphenyl dissocynate ("MDI") (Doc. 1, Exh. 2, p. 21); one citation for failing to require employees to use appropriate hand protection when handling TDI and MDI (Doc. 1, Exh. 2, p. 22), and one citation for failing to train employees about the physical and health hazards of TDI and MDI. (Doc. 1, Exh. 2, p. 23). OSHA also cited Defendants for one "other-than-serious" infraction because they allegedly failed to record injury or illness on their OSHA 300 Log and 301 Incident Report. (Doc. 1, Exh. 2, p. 24).

In December 2014, OSHA and Defendants entered into an informal settlement agreement "to correct the violations as cited in the above citations or as amended below." (Doc. 14, Exh. 3, p. 2). OSHA and Defendants agreed to withdraw one "serious" citation concerning protective equipment, and reduced the amount of the penalties for the other citations. (Doc. 14, Exh. 3, p. 3). Neither the citations nor the informal settlement agreement say that TDI exceeds permissible levels at the Renosol plant.

During the course of the OSHA investigation, Kimberly King spoke with media outlets regarding her health and her work at the plant. (Doc. 14, Exh. 1, pp. 5 – 8). King became the subject of an nbcnews.com news article on July 14, 2014, which described how TDI and other workplace chemicals correlate with certain respiratory concerns like asthma. (Doc. 14, Exh. 1, p. 6). In the article, a doctor who reviewed King's case stated "she is in the top 25 percent in terms of levels" of

isocyanate antibodies in her blood, and "the tests are consistent with isocyanate asthma." The article also quoted King saying, "I knew it was the chemicals making me sick, but now nobody can say I'm making it up."[2] The same news article quoted employee Denise Barnett and included a photograph of employee Latasha Irby. The article further states 12 plant workers spoke to NBC for its report, but the names of the other employees are not included.

After the report appeared on nbcnews.com, another news agency, al.com, repeated a similar version of the story on July 15, 2014.[3] King did an interview and provided quotes for the al.com story as well. (Doc. 14, Exh. 1, p. 6). At the same time, King never filed paperwork seeking workers compensation. (Doc. 14, Exh. 1, p. 7). Defendants, however, moved King from the production line to the warehouse in September 2014 to ensure she did not come into contact with TDI. (Doc. 14, p. 8; Exh. 1, p. 7). Defendants also moved two other employees, Denise Barnett and Latasha Irby, from the plant floor to the warehouse at the same time. King, Barnett, and Irby received the same hourly wage in their new positions at the warehouse. (Doc. 14, p. 8).

In late 2014 or early 2015, King and another employee participated in a video

---

[2] Seth Fred Wessler, What's Making These Selma, Alabama Auto Parts Workers So Sick? July 14, 2014, *available at*: http://www.nbcnews.com/feature/in-plain-sight/whats-making-these-selma-alabama-auto-parts-workers-so-sick-n150136.

[3] Erin Edgemon, Working for Selma Hyundai supplier blamed for asthma, other ailments, employee Kim King says, July 15, 2014, *available at*: http://www.al.com/news/montgomery/index.ssf/2014/07/kim_king_says_she_developed_as.html.

about the plant, TDI, and their health. The record does not explain who made the

video. On January 21, 2015, Defendants suspended King and the other employee for

three days without pay for participating in the video. (Doc. 1, Exh. 1, p. 11; Doc. 14,

Exh. 1, p. 7). Defendants offered to reduce the penalty to a one-day suspension if

King and the other employee who participated in the video agreed to respond to the

following questions:

> (a) In making statements to the public that the air was unsafe
> when I knew all testing of the air showed it to be safe, what did I do
> wrong?
>
> (b) What are the consequences to the company when disparaging,
> false statements are made to the public? and
>
> (c) How will I avoid violations in the future?

(Doc. 1, Exh. 1, p. 11). Both King and the other employee refused the offer to answer

these questions and have their suspensions reduced. (Doc. 1, Exh. 1, p. 11).

In March 2015, an organization called the Kairos Center posted pictures of

King on Facebook, with the caption: "Making seats for Hyundai made Kim King

sick, but she continues to march on in Selma." (Doc. 14, Exh. 1, p. 8). The record

does not reveal who made the pictures. On March 5, 2015, King went to the

Hyundai plant in Montgomery County, Alabama to deliver a letter signed by herself

and others in the community, demanding that Hyundai require Defendants to

"make the necessary investments to ensure good, safe, fair working conditions

throughout its supply chain." (Defs.' Exh. 59). King and others blocked the employee

entrance to the Hyundai facility, and police officers later escorted them from the

premises. (Doc. 14, p. 13). Defendants suspended King for seven days without pay

after she attempted to deliver the letter to Hyundai. (Doc. 1, Exh. 1, p. 11).

Defendants terminated King on March 16, 2015, and filed a lawsuit against her in the Circuit Court of Montgomery County on March 18, 2015. (Doc. 1, Exh. 1, p. 12; Doc. 14, Exh. 1). The verified complaint in the Montgomery County lawsuit alleged King continued to publicly claim TDI made her sick, and Defendants sought to prevent her from making "false statements and assertions to the media and third parties" about "being forced to work in an unsafe work atmosphere despite repeated assurances that Lear had received confirmations in testing and monitoring by OSHA and by independent laboratories that the air in the plant is safe and in conformity with all safety standards." (Doc. 14, Exh. 1, p. 10). Defendants further stated "King has made and is continuing [to] pursue a pattern of distributing false statements for purposes of having Lear's ability to do business interfered with, harming Lear's relationship with its customer, adversely affecting Lear customers elsewhere, and harming Lear's reputation." (Doc. 14, Exh. 1, p. 10). The verified complaint further alleged "King has a long history of an asthmatic condition with etiology outside the workplace and preceding her employment with Lear." (Doc. 14, Exh. 1, p. 5). Based on these allegations, Defendants sued King for one count of Intentional Interference with Business Relations, and one count of Defamation. (Doc. 14, Exh. 1, pp. 10 – 12).

The state court granted Defendants' request for a temporary restraining order on March 19, 2015. (Doc. 14, Exh. 2). The state court concluded Lear Corporation established a "reasonable chance of success of prevailing on the merits

of its claims for intentional interference with a business or contractual relations and defamation." (Doc. 14, Exh. 2, p. 3). The state court also found "King published non-privileged false statements that the Selma plant air is unsafe, knew such statements were false, and they were directed at Lear's business reputation." (Doc. 14, Exh. 2, p. 3). The temporary restraining order expired on March 30, 2015.  (Doc. 14, Exh. 2, p. 5).

On April 15, 2015, Plaintiff filed his motion for a temporary restraining order and to show cause why a preliminary injunction should not issue. (Doc. 1). Plaintiff alleges that Defendants are retaliating against employees for exercising their right to provide information to the Secretary of Labor and others regarding concerns relating to occupational safety and health, including but not limited to: air quality, chemical exposure, and potentially related health effects. (Doc. 1, pp. 1 – 2). Plaintiff further argues Defendants must immediately be prevented from continuing such unlawful conduct less their threats be carried out and employees lose their livelihood or suffer other harm. (Doc. 1, p. 2).

In response, Defendants state no employee suffered retaliation. (Doc. 14, p. 2). Defendants further state that they promptly conducted independent air testing, and shared the test results with their employees. (Doc. 14, p. 2). Defendants state they discharged King "for defamation and interfering with its relationship with its customer and brought suit to make her stop injuring this relationship" only after she "had made posts on the internet claiming working on Lear's only customer's car seats made her sick, went to Lear's only customer's premises, attempted to enter

8

and then to block its employees' entrance, was removed by police, read aloud at a press conference a statement addressed to the customer's president claiming Lear's plaint's air had made her sick and demanding the customer do something to Lear." (Doc. 14, p. 3).[4]

This Court held a preliminary injunction hearing on April 29, 2015, where both sides presented evidence to support their case. Plaintiff called Kimberly King to testify, along with Joseph Roesler, OSHA Area Director; Gloria Colon, OSHA Inspector; and Kathleen Fagan, M.D.. Defendants called Jacqueline Adkins, an employee at the Renosol plant; and Connie Messer, human resources manager.

## LEGAL STANDARD

The Court may grant injunctive relief if the movant establishes the following four prerequisites:

> (1) a substantial likelihood of success on the merits; (2) a threat of irreparable injury; (3) that its own injury would outweigh the injury to the nonmovant; and (4) that the injunction would not disserve the public interest. Tefel v. Reno, 180 F.3d 1286, 1295 (11th Cir. 1999); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998). The Court should be mindful that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant has clearly satisfied the burden of persuasion as to the four requisites. McDonald's, 147 F.3d at 1306; Northeastern Fl. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990).

Hammock ex rel. Hammock v. Keys et al., 93 F. Supp. 2d 1222, 1226-27 (S.D. Ala.

---

[4] At the hearing, the witnesses said that King and others went to a Burger King after leaving Hyundai. King testified that she read the letter aloud at the Burger King. This is presumably the press conference that Defendants mention.

2000). The party seeking the injunction has the burden of persuasion as to each of the four factors. Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002).

## ANALYSIS

### 1.  OSH Act Jurisdiction for Injunctive Relief

Defendants first argue that this Court lacks jurisdiction to hear this case. Defendants claim Plaintiff lacks statutory authority to file an action seeking a preliminary injunction or temporary relief. (Doc. 14, p. 14). Defendants further argue Plaintiff lacks statutory authority to file an action prior to reaching a determination on the merits. (Doc. 14, p. 14).

The Court first reviews the statute upon which Plaintiff brought his motion, the Occupational Health and Safety Act (29 U.S.C. § 660(c)) ("OSH Act"). The OSH Act seeks to ensure "safe and healthful working conditions" for employees "by encouraging employers and employees in their efforts to reduce the number of occupational safety and health hazards at their places of employment." 29 U.S.C. § 651(b). To that end, § 11(c)(1) of the OSH Act provides "No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or caused to be instituted any proceeding under or related to this [Act] ... or because of the exercise by such employee on behalf of himself or others of any right afforded by this [Act]." 29 U.S.C. § 660(c)(1).

The OSH Act further provides that any employee who believes she has been discharged or otherwise discriminated against by any person in violation of this provision may file a complaint with the Secretary alleging such discrimination. 29

U.S.C. § 660(c)(2). Upon receipt of such complaint, the Secretary must investigate the claim as he deems appropriate. Id. If "the Secretary determines that the provisions of this subsection have been violated, he shall bring an action in any appropriate United States district court against such person." Id. "In any such action the United States district courts shall have jurisdiction, for cause shown to restrain violations of [section 660(c)(1)], and order all appropriate relief including rehiring or reinstatement of the employee to [her] former position with back pay." Id. Thus the applicable OSH Act statute makes clear this Court has jurisdiction over this matter. See also Robert F. Koets, 134 A. L. R. Fed. 629, What Constitutes Appropriate Relief for Retaliatory Discharge Under § 11(c) of Occupational Safety and Health Act (collecting district court cases on OSH Act claims brought by Secretary of Labor in accordance with 29 U.S.C. § 660(c)).

Furthermore, the OSH Act states that the Secretary must investigate a complaint only as he deems appropriate. "Thus, as far as the Act is concerned, the Secretary need not conduct any investigation prior to instituting suit." Dunlop v. Hanover Shoe Farms, Inc., 441 F. Supp. 385, 387 (M.D. Pa. 1976). Accordingly, "section 11(c)(2) does not require an investigation as a prerequisite to a lawsuit." Solis v. Consol. Gun Ranges, 780 F. Supp. 2d 1165, 1169 (W.D. Wash. 2011); see also Phillips v. Gen. Elec. Co., 881 F. Supp. 1553, 1558 (M.D. Ala. 1995) ("Section 660(c) further provides that the Secretary of Labor determines if a retaliation claim warrants judicial action.").

In this case, Plaintiff determined that he needed to take judicial action on

11

behalf of employee Kimberly King after Defendants suspended her without pay, terminated her employment, and later sued her in state court. The statute states Plaintiff may bring an action in an appropriate federal district court. Defendants do business in, and are located in, the Southern District of Alabama, making this an appropriate district court. Defendants' argument that the Court lacks jurisdiction over this matter fails.

### 2. Likelihood of success on the merits

Plaintiff claims Defendants unlawfully suspended and then fired employee Kimberly King in retaliation for raising health concerns about TDI in violation of OSH Act section 11(c) (codified at 29 U.S.C. § 660(c)). To prevail on a retaliation claim, Plaintiff must show that an employee engaged in protected activity, the employer was aware of that activity, the employer took adverse action against the employee, and a causal connection exists between the protected activity and the adverse action. See Solis v. Blue Bird Corp., 404 F. App'x 412, 413 n. 2 (11th Cir. 2010) ("Although we were unable to find any published case in which this Circuit has analyzed a claim of retaliatory discharge under § 660(c)(1), we agree that it was proper for the district court to apply the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."); see also Donovan v. Freeway Const. Co., 551 F. Supp. 869, 878 – 79 (D. R. I. 1982) (discussing cases and regulations concerning retaliation claims based on violations of 29 U.S.C. § 660(c)(1)). Once a prima facie case is established, the burden of production shifts to Defendants to provide a legitimate business reason

for the adverse employment action. "If protected activity was a substantial reason for the action, or if the discharge or other adverse action would not have taken place 'but for' engagement in protected activity, section 11(c) has been violated." 29 C.F.R. § 1977.6(b); Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). Plaintiff can then rebut Defendants' proffered legitimate business reason with evidence of pretext. Solis v. Blue Bird Corp., 404 F. App'x at 413.

### a. Prima Facie Case of Retaliatory Discharge

The scope of rights protected implicitly and explicitly under the OSH Act is broad. See, e.g., 29 C.F.R. § 1977.12 (discussing conduct explicitly and implicitly protected under the OSH Act); 29 C.F.R. § 1904.36 (prohibiting retaliation for reporting workplace injury). Under the terms of the OSH Act, protected activity generally includes acting upon a perceived safety or health hazard at the workplace. See, e.g., Whirlpool Corp. v. Marshall, 445 U.S. 1, 3-4 (1980) (among the rights that the Act so protects is the right of an employee to choose not to perform his assigned task because of a reasonable apprehension of death or serious injury coupled with a reasonable belief that no less drastic alternative is available); Donovan v. Commercial Sewing, Inc., 562 F. Supp. 548, 553 (D. Conn. 1982) (employee experienced headaches and nausea when exposed to a type of glue used by the employer for a project, and after asking about the glue's contents, left work early and was then wrongfully discharged); Donovan v. R.D. Andersen Const. Co., 552 F. Supp. 249, 252 (D. Kan. 1982) (employee's communication with a newspaper reporter concerning the safety and health hazards on the jobsite is a protected

activity under section 11(c)). An employee must reasonably believe that an aspect of the workplace is unsafe. See Whirlpool Corp., 445 U.S. at 21 (employee runs the risk of reprimand or discharge in the event a court subsequently finds that he acted unreasonably or in bad faith); N.L.R.B. v. Tamara Foods, Inc., 692 F.2d 1171, 1181 – 82 (8th Cir. 1982) (discussing grounds for OSH Act inspection and complaint, and whether employee reasonably believes there is risk of death or injury).

In this case, King engaged in protected activity when she spoke about the conditions at the Renosol plant, TDI, and its perceived effects on her health. At this stage in the proceedings, her belief that TDI adversely affected her health appears reasonable. The testimony of Dr. Kathleen Fagan and her corresponding medical report of inspection # 978386 (Pl.'s Exh. 2) further support King's reasonable belief that TDI exposure may contribute to or cause her asthma. Indeed, Dr. Fagan states in her medical report that there are "probable cases of occupational asthma due to exposure to isocyanates at Renosol." (Pl.s' Exh. 2, p. 9).  And it appears that, due to sensitization of some workers to exposure, such can occur even where, as in this case, TDI air sampling gives numbers within permissible OSHA limits. (Pl.'s Exh 2, pp. 5 – 8). Therefore, the Court finds King's participation in a video about the Renosol plant, TDI and her health, speaking to the press, and complaining to OSHA constitute protected activity.

The record, however, does not make clear whether King engaged in protected activity when she went to Hyundai to deliver a letter about TDI at the Renosol plant. (Defs.' Exh. 59). It is possible that when King tried to deliver the letter to

Hyundai, she acted outside the scope of OSH Act protected activity. See Whirlpool Corp., 445 U.S. at 21. Though not directly on point with King's actions in this case, Whirlpool Corp. illustrates that an employee may not act unilaterally to remedy what she perceives to be a safety risk unless faced with death or serious injury to herself or others and there is no reasonable alternative. When King tried to deliver the letter to Hyundai in March 2015, Defendants had already moved her to the warehouse to avoid potential exposure to TDI. It is also not clear if King's position in the warehouse would continue following the completion of the OSHA investigation. Thus the Court cannot make a determination whether King engaged in protected activity when she went to Hyundai at this stage in the proceedings, or whether Defendants unlawfully retaliated against her following this specific action.

Based on the record before the Court, King likely engaged in protected activity prior to March 2015. The Court therefore concludes Plaintiff has established a prima facie case of retaliation based on that protected activity (i.e., speaking with the media, complaining to OSHA, participating in a video about the Renosol plant). The evidence presented at the hearing showed that King's employer was aware of that activity, took adverse action against her because of that activity (suspending her without pay and suing her in state court), and a causal connection exists between the protected activity and the adverse action. The Court will now consider whether Defendants' reasons for suspending, terminating, or suing King are a pretext for retaliation.

### b. Burden Shifting under <u>McDonnell-Douglas</u>

A prima facie retaliation case raises a presumption that the employer is liable to the employee.  Then, the burden shifts to the employer to produce admissible evidence that, if believed, would establish that its action was motivated by a legitimate, nondiscriminatory reason. Once a defendant satisfies its intermediate burden of production, and the initial presumption of discrimination accompanying the prima facie case has been eliminated, the plaintiff has the opportunity to discredit the defendant's proffered explanations for its decision. <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1528 (11th Cir. 1997).

At the hearing, Defendants stated that their reason for suspending and later terminating and suing King stemmed directly from King's activities concerning TDI and her health. Connie Messer, human resources manager, testified about the various actions Defendants took over the course of several months with regards to King. First, Defendants shared their TDI test results with King. Defendants also offered into evidence a copy of those test results, which King refused to sign. (Defs.' Exh. 49). Next, Defendants moved King and two other employees from the plant floor to the warehouse to alleviate their concerns about any potential exposure to TDI. At this point, Defendants' actions do not appear adverse to King, but the case does not end there.

After being moved to the warehouse, King continued to speak about TDI through the media and other outlets, and participated in a video about the Renosol plant and TDI concerns. Messer testified that she did not know who made the video,

16

but employees Kimberly King and Latasha Irby participated in it. Messer further testified that Defendants suspended King and Irby from work without pay for participating in the video when they knew the Renosol plant was not exposing employees to TDI. Messer stated that King would not stop the lies and slander about TDI and the Renosol plant. Messer also confirmed that Defendants asked King and Irby to recant the statements they had made in the media and accept responsibility for what the company considered defamatory statements, but King and Irby refused to do so. In January 2015, Defendants suspended King and Irby for three days without pay as a result of their actions.

In March 2015, King went to Hyundai to deliver a letter that she and other community members signed, asking Hyundai to fix the conditions at the Renosol plant. Defendants suspended King for seven days without pay for her actions. Upon her return to work, Defendants terminated King's employment, and then filed a lawsuit against her in state court.

Based upon the limited record before the Court, there is sufficient evidence that Defendants took adverse action against King for her protected activity, and that, but for this protected activity, King would not have been disciplined. Defendants did not offer a legitimate reason for suspending King that was not related to her TDI concerns, or show that they would have made the same decision in the absence of her protected activity. As a result, the burden shifting inquiry ends here, and the Court does not need to examine whether Defendants' reasons for firing King are pretextual. The Court finds Plaintiff has established a likelihood of

success on the merits of the retaliation claim.

### 3.  Threat of irreparable injury

The Court finds that the harm risked by failure to preliminarily enjoin Defendants' conduct is severe. Defendants likely retaliated against an employee for engaging in protected activity under the OSH Act. If so, Defendants are dissuading and preventing employees from working with the Secretary of Labor and others to ensure a safe and healthy work environment. This chilling effect also limits Plaintiff's ability to investigate any future or related claims.

### 4.  Plaintiff's injury outweighs the injury to Defendants

By enjoining Defendants' conduct herein, the Court prevents Defendants from engaging in the conduct described below until a final determination can be reached in this case. Defendants fear that Hyundai could take its business elsewhere in light of King's allegations, but such concern does not make legal Defendants' decision to suspend or sue King for what appears to be a reasonable concern about her health and TDI. The Court finds that given the severe threat of the particularized harm alleged by Plaintiff, particularly in regards to King's suspension and later being sued, and the relatively minor cost to Defendants of refraining from the disputed activity, that a preliminary injunction is appropriate.

### 5.  The injunction serves the public interest

The Court finds no reason to believe that the contemplated injunctive relief would disserve the public interest. Because the Court finds Defendants may have violated the OSH Act by suspending certain employees, and later terminating and

suing King, injunctive relief is appropriate and will serve the public interest. The public retains an interest in safe and healthy workplace environments for all employees, and protecting employees who speak up about perceived dangers in the workplace.  This preliminary injunction may also help prevent future violations of section 11(c) and inform current employees of their rights under this section.

6.    **Motion to Strike**

The Court reiterates "the purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). Given the limited purpose of a preliminary injunction, and the haste that is often necessary to preserve each party's position, a preliminary injunction is typically granted following procedures that are less formal and evidence that is less complete than in a trial on the merits. "A party thus is not required to prove his case in full at a preliminary-injunction hearing, and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." Id. (citations omitted). With these considerations in mind, the Court turns to Defendants' motion to strike.

Defendants filed a motion to strike portions of the two affidavits that Plaintiff submitted in support of its initial motion. (Doc. 13). Plaintiff submitted affidavits from Joseph Roesler and Gloria Colon, both of whom testified at the evidentiary hearing. (Doc. 1, Exhs. 2, 3). In their motion to strike, Defendants raised the following evidentiary objections: relevance, hearsay, expert testimony for which no

19

expert has been offered, the statements are conclusory, speculative, and not the best

evidence. (Doc. 13, pp. 2 – 3).  Because Roesler and Colon both testified at the

evidentiary hearing and Defendants cross-examined them, this gave Defendants the

opportunity to cure their objections and probe certain statements Roesler and Colon

made in their respective affidavits. The Court reviewed the two affidavits before

granting the temporary restraining order, but largely relied on the testimony of

Roesler and Colon at the evidentiary hearing before deciding whether to grant the

preliminary injunction. At the hearing, the Court found the testimony of Roesler

and Colon relevant, and limited certain instances of hearsay. Accordingly,

Defendants' motion to strike (Doc. 13) is **DENIED**.

## PRELIMINARY INJUNCTION

The Court has balanced the four factors appropriate for consideration of a

preliminary injunction and finds Defendants should be enjoined at this stage in the

proceedings.  Therefore, **IT IS HEREBY ORDERED** as follows:

1. Defendants are enjoined from terminating, suspending, harassing, suing, threatening, intimidating, or taking any other discriminatory or retaliatory action against any current or former employee based on Defendants' belief that such employee exercised any rights he or she may have under the Occupational Safety and Health Act;

2. Defendants are enjoined from telling any current or former employee not to speak to or cooperate with representatives of the Secretary of Labor;

3. Defendants are enjoined from obstructing any investigation by the Secretary of Labor or its designee;

4. Defendants are enjoined from suing current or former employees because of those individuals' complaints about health and safety or because they engaged in protected activity under the Occupational Safety and Health Act.

Whether Plaintiff is entitled to further relief, including a permanent injunction or reinstatement and back pay for certain Renosol employees, is a matter to be determined through the course of this litigation.

**DONE and ORDERED** this 7th day of May, 2015.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE